IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Case No. 06-10166-PJW |
| | : | (Jointly Administered) |
| WORLD HEALTH | : | |
| ALTERNATIVES, INC., et al., | : | Chapter 7 |
| | : | |
| Debtors. | : | |
| GEORGE L. MILLER, | : | |
| Chapter 7 Trustee for WORLD HEALTH | : | |
| ALTERNATIVES, INC., et al., | : | |
| | : | Adversary No. 07-51350 (PJW) |
| Plaintiff, | : | |
| | : | |
| v. | : | Jury Trial Demanded |
| | : | |
| RICHARD E. MCDONALD, MARC ROUP, | : | |
| JOHN C. SERCU, BRUCE HAYDEN, | : | |
| FREDERICK R. JACKSON, SR., JOHN W. | : | |
| HIGBEE, BRIAN T. LICASTRO, and | : | |
| MARK B. RINDER | : | |
| Defendants | | |

DEFENDANT BRIAN T. LICASTRO'S
OPENING BRIEF IN SUPPORT OF HIS MOTION TO
WITHDRAW THE REFERENCE

<div style="margin-left:40%">

Michael D. DeBaecke (No. 3186)
**BLANK ROME LLP**
1201 Market Street
Suite 800
Wilmington, DE   19801
(302) 425-6400

and

Norman E. Greenspan
One Logan Square
Philadelphia, PA   19103
(215) 569-5500

*Attorneys for Defendant*
*Brian T. Licastro*

</div>

125751.00601/40175017v.1

## TABLE OF CONTENTS

Page

NATURE AND STAGE OF PROCEEDING ..................................................................1

SUMMARY OF ARGUMENT ...................................................................................2

STATEMENT OF FACTS ........................................................................................3

ARGUMENT .........................................................................................................5

I.    SUFFICIENT CAUSE EXISTS TO WITHDRAW THE REFERENCE OF THE NON-
      CORE CLAIMS.. .........................................................................................5

      A.    Licastro has the right to a jury trial on all of the Trustee's remaining state law,
            non-core claims ..................................................................................5

      B.    The Bankruptcy Court lacks authority to conduct a jury trial on the Non-Core
            Claims and in any event, Licastro does not consent to a jury trial in the
            Bankruptcy Court ...............................................................................7

II.   TIMING OF WITHDRAWAL OF THE REFERENCE IS DETERMINED BY THIS
      COURT BASED UPON THE FACTS AND CIRCUMSTANCES PRESENTED. ..........7

CONCLUSION.......................................................................................................9

# TABLE OF AUTHORITIES

## Cases

Page

*Granfinanciera, S.A. v. Nordberg,*
492 U.S. 33, 43 (1989) ............................................................................6

*Hutchins v. APCC Servs., Inc.*
(In re *Star Creditors' Liquidating Trust*), 2004 WL 406353 (D. Del. Mr. 3,
2004) .........................................................................................................8

*Langenkamp v. Culp,*
498 U.S. 42 (1990)...................................................................................6

*Miller v. Parker,*
2007 WL 925915 (E.D. Pa. Mar. 22, 2007)............................................8

*NDEP Corp. v. Handl-It, Inc. (In re NDEP Corp.),*
203 B.R. 905, 913 (D. Del. 1996)............................................................7

*OHC Liquidation Trust v. Credit Suisse*
(In re *Oakwood Homes Corp.*), 378 B.R. 59 (Bankr. D. Del. 2007) ............................6

*Pereira v. Farace,*
413 F. 3d 330 (2d Cir. 2005)....................................................................6

*Troisio v. Poirier*
(In re *U.S.A. Floral Prods., Inc.*), 2005 WL 3657096 (D. Del. July 1, 2005) ...........6, 8

## Constitutions & Statutes

U.S Constitution Amend. VII ............................................................................6

11 U.S.C. §§ 548, 550.......................................................................................3

28 U.S.C. §§ 157(b), (c)(1)...............................................................................7

28 U.S.C. § 157(d) ....................................................................................1, 5, 7

28 U.S.C. § 157(e) ............................................................................................7

Pennsylvania Uniform Fraudulent Transfer Act §§ 5104, 5105.....................................3

## NATURE AND STAGE OF PROCEEDING

This is defendant Brian T. Licastro's ("Licastro") opening brief in support of his motion pursuant to 28 U.S.C. §157(d) for permissive withdrawal of the reference (the "Motion").

The Trustee's First Amended Complaint (hereafter, the "Complaint") was filed on January 8, 2008. [Adv. Dkt. No. 113, a copy of which is attached hereto as Exhibit "A"]  Nine individuals were named as defendants: Richard E. McDonald ("McDonald"), Marc Roup ("Roup"), John C. Sercu ("Sercu"), Bruce Hayden ("Hayden"), Frederick R. Jackson, Sr. ("Jackson"), John W. Higbee ("Higbee"), Brian T. Licastro, Mark B. Rinder ("Rinder"), and Deana J. Seruga ("Seruga") (collectively, the "Defendants").  The Trustee has settled with defendants Roup, Sercu, and Higbee so this adversary proceeding is now dismissed as to them. [Adv. Dkt. No. 144]  The Trustee also has voluntarily dismissed the action as to defendant Hayden. [Adv. Dkt. No. 148]

Licastro moved to dismiss the Amended Complaint, which motion was granted in part and denied in part by opinion and order dated April 9, 2008. [Adv. Dkt. Nos. 139, 140]  Counts IX, X, XI, and XII were dismissed as to Licastro, with leave granted to the Trustee to replead within 30 days.  The Trustee did not seek to further amend the Complaint to correct the deficiencies noted in the Opinion so Counts IX through XII are dismissed as to Licastro.

Licastro filed an answer to the Amended Complaint on May 9, 2008. [Adv. Dkt. No. 142]  Within his Answer, Licastro demanded a jury trial.[1]  Licastro has not filed a proof of claim in the bankruptcy case.

_____

[1] Within the Complaint, the Trustee also demanded a jury trial.  In his response to Licastro's motion to amend scheduling order, the Trustee for the first time indicated that he would withdraw his demand for a jury trial. [Adv. Dkt. No. 147 at 4, n. 7].  Upon information and belief, the Trustee has not yet withdrawn his demand for a jury trial.

On May 13, 2008, Licastro filed a motion to amend the scheduling order. [Adv. Dkt. No. 145] The motion to amend was resolved by agreement of the parties, as announced on the record at the scheduling conference held on June 5, 2008. An amended scheduling order has been entered by the Bankruptcy Court. [Adv. Dkt. No. 162, a copy of which is attached hereto as Exhibit "B"]

By the Motion, Licastro seeks withdrawal of the reference so that he can have a jury trial in this Court on all claims remaining against him. Concurrently with the Motion, Licastro has filed a motion to determine core and non-core proceedings (the "Core/Non-Core Motion") with respect to the claims remaining against him. By the Core/Non-Core Motion, Licastro argues that all remaining claims against him are non-core.

## SUMMARY OF ARGUMENT

Because all of the Trustee's remaining claims against Licastro (the "Non-Core Claims") are legal claims and/or they seek legal relief (ie. monetary damages), the Seventh Amendment entitles Licastro to a jury trial on each of the Non-Core Claims. The Bankruptcy Court lacks authority to conduct a jury trial on the Non-Core Claims. Licastro has not filed a proof of claim in the bankruptcy case and otherwise has not consented to have the Non-Core Claims tried by the Bankruptcy Court with or without a jury. Moreover, it would be inefficient and a waste of judicial resources for this Court to review *de novo* any proposed findings of fact and conclusions of law the Bankruptcy Court may issue on the Non-Core Claims. This Court therefore should withdraw the reference of the Non-Core Claims asserted against Licastro.

125751.00601/40175017v.1

## STATEMENT OF FACTS

The Complaint alleges 13 counts: (1) breach of fiduciary duty against all Defendants (Count I); (2) aiding and abetting breach of fiduciary duty against all Defendants (Count II); (3) corporate waste against all Defendants (Count III); (4) aiding and abetting waste of corporate assets against all Defendants (Count IV); (5) negligent misrepresentation against all Defendants (Count V); (6) fraud against McDonald (Count VI); (7) aiding and abetting fraud against all Defendants other than McDonald (Count VII); (8) turnover of property of estate against McDonald (Count VIII); (9) fraudulent transfer under 11 U.S.C. §§ 548 and 550 against defendants McDonald, Sercu, Hayden, Jackson, Higbee, Licastro, and Rinder (Count IX); (10) fraudulent transfer under Pennsylvania Uniform Fraudulent Transfer Act, § 5104 against defendants McDonald, Sercu, Hayden, Jackson, Higbee, Licastro, and Rinder (Count X); (11) fraudulent transfer under Pennsylvania Uniform Fraudulent Transfer Act, § 5105 against defendants McDonald, Sercu, Hayden, Jackson, Higbee, Licastro, and Rinder (Count XI); (12) equitable subordination against certain defendants (Count XII); and (13) professional negligence against Licastro (Count XIII).  (Opinion at 21-22, citing to Complaint, ¶¶173-257).[2]

By the Complaint, the Trustee has demanded compensatory and punitive damages, and as part of his request for damages, has requested "attorney fees, accounting fees, investigation expenses and other costs and expenses incurred in connection with the Company's restatement, the SEC investigation and the securities class action lawsuits."  (Complaint, Prayer for Relief)

The Non-Core Claims are premised solely on state law and alleged prepetition conduct: (1) breach of fiduciary duty (Count I); (2) aiding and abetting breach of fiduciary duty (Count

---

[2] As stated above, Counts IX, X, XI, and XII were dismissed as against Licastro by the Court's April 9 Opinion on Licastro's motion to dismiss.

II); (3) corporate waste (Count III); (4) aiding and abetting corporate waste (Count IV); (5)

negligent misrepresentation (Count V); (6) aiding and abetting fraud (Count VII); and (7)

professional malpractice (Count XIII).  By the Non-Core Claims, the Trustee seeks to hold

Licastro and the other remaining Defendants liable for alleged prepetition damage sustained by

the Debtor World Health Alternatives, Inc. (the "Debtor") in connection with the alleged

prepetition actions and omissions of the Defendants acting in their alleged capacities as officers

and/or directors of the Debtor.

For example and not by way of limitation, the Trustee alleges that starting in the early

part of 2003 and continuing until shortly before the Debtor's bankruptcy filing on February 20,

2006: (i) Defendants engaged in and/or allowed the routine waste of the Debtor's limited

resources on expensive and unnecessary luxuries for their personal benefits such as use of private

flights and extravagant automobiles.  (Opinion at 8 and 31, citing to Complaint, ¶82; *see e.g.*

Complaint, ¶¶83, 87-91);  (ii) Defendants made or allowed to be made certain misrepresentations

in prepetition press releases and SEC filings by the Debtor (Opinion at 36, citing to Complaint,

¶198; *see e.g.* Complaint, ¶¶109-120, 127-136); and  (iii) defendant McDonald caused the

transfer of corporate funds to himself and manipulated and falsified the books and records of the

Debtor, with the other Defendants essentially turning a blind eye to this conduct in violation of

their fiduciary duties owed to the Debtor, to the detriment of the Debtor and others.  (*See e.g.*

Complaint, ¶¶101-105, 106-108, 117-120, 150-51, 166-172)

Defendant McDonald and his alleged tortious conduct is the primary focus of the

allegations contained within the Complaint.  Based upon initial disclosures provided by the

Trustee, McDonald is the subject of multiple investigations being carried out by various federal

agencies.  Throughout his Answer filed on January 18, 2008, McDonald asserted his Fifth Amendment rights against self-incrimination.  [Adv. Dkt. No. 121]

The Trustee demanded a jury trial in the Complaint and has not yet withdrawn such demand.  Moreover, in his Answer Licastro has demanded a jury trial on the Non-Core Claims. [Adv. Dkt. No. 142]  Licastro has not filed a proof of claim in the bankruptcy case.  Licastro seeks a jury trial on the Non-Core Claims in the Delaware District Court, as he has not consented to a jury trial in the Bankruptcy Court.

## ARGUMENT

"The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown."  28 U.S.C. § 157(d).  Because Licastro is entitled to a jury trial on the Non-Core Claims and because it would be in the interests of judicial economy for the District Court to hear and determine the Non-Core Claims in the first instance rather than addressing *de novo* the Bankruptcy Court's proposed findings of fact and conclusions of law, sufficient cause exists to withdraw the reference of the Non-Core Claims.  In the Court's discretion, the reference of the Non-Core Claims can be withdrawn immediately or after pretrial matters are complete in the Bankruptcy Court.

**I.     SUFFICIENT CAUSE EXISTS TO WITHDRAW THE REFERENCE OF THE NON-CORE CLAIMS.**

    **A.     Licastro has the right to a jury trial on all of the Trustee's remaining state law, non-core claims.**

> In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved
> . . . .

125751.00601/40175017v.1

U.S. CONST. amend. VII. Each of the Non-Core Claims are prepetition claims based purely on

applicable state law for which the Trustee seeks legal relief (ie. monetary damages). The

Seventh Amendment therefore entitles Licastro to a jury trial on all of the Non-Core Claims. *See*

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 43 (1989) (setting forth two-pronged test for

determining whether a right to a jury trial exists); see *also Pereira v. Farace,* 413 F.3d 330, 340-

41 (2d Cir. 2005) (applying *Granfinanciera*, held that district court erred in not granting

defendants a jury trial on chapter 7 trustee's breach of fiduciary duty claims brought under

Delaware law); *OHC Liquidation Trust v. Credit Suisse (In re Oakwood Homes Corp.),* 378

B.R. 59, 66 (Bankr. D. Del. 2007) (applying *Granfinanciera*, court found that defendants were

entitled to jury trial on breach of contract, negligence, and breach of fiduciary duty claims

seeking compensatory damages); *Troisio v. Poirier (In re U.S.A. Floral Products, Inc.),* 2005

U.S. Dist. LEXIS 38912 (D. Del. 2005) (in action for breaches of fiduciary duties, negligent

misrepresentation, and corporate waste of assets, defendant officers and directors were entitled to

jury trial; action subject to immediate withdrawal of the reference).

Certain of the Non-Core Claims are legal claims (Counts V, VII, and XIII) and certain of

the Non-Core Claims arguably are equitable claims (Counts I, II, III, and IV). Regardless of

whether particular Non-Core Claims are determined to be legal or equitable claims, the Trustee

seeks a legal remedy, ie. compensatory damages, as to all of the Non-Core Claims. Based upon

*Granfinanciera* and its progeny, Licastro clearly is entitled to a jury trial. The Trustee is

estopped from arguing otherwise, as the Trustee himself demanded a jury trial on the same

claims. Moreover, Licastro has not waived his right to a jury trial by submitting a proof of claim

against the bankruptcy estate. *See Langenkarnp v. Culp,* 498 U.S. 42, 45 (1990) (per curiam).

Sufficient cause exists to withdraw the reference.

6

Separate and apart from withdrawal of the reference based upon Licastro's clear right to a jury trial, the reference also should be withdrawn as to the Non-Core Claims because all of the Non-Core claims are just that, non-core, as more fully explained in Licastro's opening brief in support of his Core/Non-Core Motion.  It would be a waste of the courts' and parties' resources for the Bankruptcy Court to issue proposed findings of fact and conclusions of law on the Non-Core Claims, only to have this Court be required to address the Non-Core Claims on a *de novo* basis.  28 U.S.C. §§157(b), (c)(1).  The reference should be withdrawn as to the Non-Core Claims asserted against Licastro.

> **B.**    **The Bankruptcy Court lacks authority to conduct a jury trial on the Non-Core Claims and in any event, Licastro does not consent to a jury trial in the Bankruptcy Court.**

The Bankruptcy Court may only conduct a jury trial on the Non-Core Claims if it has been "specially designated to exercise such jurisdiction by the district court and with the express consent of all the parties."  28 U.S.C. § 157(e).  Neither requirement is met here, as the Bankruptcy Court has not been specially designated to conduct a jury trial and Licastro obviously has not consented to a jury trial before the Bankruptcy Court.  The reference should be withdrawn as to the Non-Core Claims asserted against Licastro.

## II.    TIMING OF WITHDRAWAL OF THE REFERENCE IS DETERMINED BY THIS COURT BASED UPON THE FACTS AND CIRCUMSTANCES PRESENTED.

Pursuant to 28 U.S.C. §157(d), a district court determines based upon the facts and circumstances of a particular case whether the reference should be withdrawn immediately or after pretrial matters are completed in the Bankruptcy Court.  *Compare NDEP Corp. v. Handl-It, Inc. (In re NDEP Corp.)*, 203 B.R. 905, 908, 913-14 (D. Del. 1996) (reference withdrawn immediately in interests of judicial economy because it would be waste of judicial resources to

7

allow bankruptcy court to maintain jurisdiction where defendant had right to jury trial on non-core claims), *Hutchins v. APCC Servs., Inc. (In re Star Creditors' Liquidating Trust)*, 2004 WL 406353 (D. Del. Mar. 3, 2004) (withdrawing suit during pretrial stages in interests of judicial economy where defendants had right to jury trial), and *Troisio v. Poirier, supra* (reference withdrawn immediately over plaintiff's objection in light of defendants' right to jury trial and because it would be more efficient for district court to manage pretrial process given early stage of litigation) with *Miller v. Parker*, 2007 WL 925915 (E.D. Pa. March 22, 2007) (where three of eleven defendants were entitled to jury trial and only two defendants moved to withdraw the reference, court held that movants could renew motion after all pretrial matters were complete in bankruptcy court).

Licastro defers to the sound discretion of this Court as to whether the reference of the Non-Core Claims is withdrawn now or after pretrial matters in the Bankruptcy Court are complete.

8

## CONCLUSION

Based upon all of the above, the reference of the Non-Core Claims should be withdrawn.

A proposed form of order is attached to the Motion.

Dated:  June 17, 2008

BLANK ROME LLP

_Michael DeBaecke_

Michael D. DeBaecke (No. 3186)
1201 Market Street
Suite 800
Wilmington, DE   19801
(302) 425-6400

and

Norman E. Greenspan
One Logan Square
Philadelphia, PA   19103
(215) 569-5500

_Attorneys for Defendant_
_Brian T. Licastro_

9

# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| WORLD HEALTH ALTERNATIVES, INC., *et al.*[1] | CHAPTER 7 |
| | Case No. 06-10166 (PJW) |
| | Jointly Administered |
| Debtors. | |
| GEORGE L. MILLER, Chapter 7 Trustee for WORLD HEALTH ALTERNATIVES, INC., *et al.* | Adversary No. 07-51350 |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| RICHARD E. MCDONALD, MARC ROUP, JOHN C. SERCU, BRUCE HAYDEN, FREDERICK R. JACKSON, SR., JOHN W. HIGBEE, BRIAN T. LICASTRO, MARK B. RINDER and DEANA J. SERUGA | |
| Defendants. | |

## FIRST AMENDED COMPLAINT

Plaintiff, George L. Miller, the chapter 7 trustee (the "Trustee," or the "Plaintiff") for the jointly-administered estates of World Health Alternatives, Inc. *et al.* (collectively, the "Debtors"), by and through his counsel, Fox Rothschild LLP, brings this adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to *inter alia*: (i) avoid and recover any fraudulent or preferential transfers of an interest of the Debtors to the Defendants (as defined below); (ii) recover damages caused by fraud,

---

[1] In addition to World Health Alternatives, Inc., a Florida corporation, the following entities are debtors in possession in these jointly administered bankruptcy cases: World Health Staffing, Inc., a California corporation, World Health Staffing, Inc., a Delaware corporation f/k/a MedTech Medical Staffing of Orlando, Inc., Better Solutions, Inc., JC Nationwide, Inc. f/k/a Medtech Staffing of Boca Raton, Inc. d/b/a JC Nationwide, MedTech

mismanagement and/or breach of fiduciary duty; (iii) recover damages caused by corporate waste, self-dealing transactions, and misappropriation of corporate assets; and (iv) equitably subordinate the Defendants' claims. In support of this Amended Complaint, the Trustee avers as follows:

## JURISDICTION AND VENUE

1.      This Court (the "Bankruptcy Court") has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(a), since this civil proceeding arises under—or arises in, or is related to, a case under—title 11 of the United States Code (the "Bankruptcy Code").

2.      This is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(A), (F) and (O).

3.      Venue of this adversary proceeding is properly in the District of Delaware pursuant to 28 U.S.C. § 1409(a).

## THE PARTIES

4.      On November 1, 2006, the Bankruptcy Court appointed the Plaintiff as the Trustee for the Debtors' bankruptcy estates.

5.      On December 6, 2006, the Bankruptcy Court authorized the employment and retention of Fox Rothschild LLP to act as the Trustee's counsel. Since that date, Fox Rothschild LLP has been authorized to act as counsel for the Trustee.

6.      World Health Alternatives, Inc. (hereafter sometimes referred to as the "Company" or "World Health"), was a provider of healthcare staffing services to hospitals and other healthcare facilities. The Company is a Florida corporation that maintained its principal place of business at 777 Penn Center Boulevard, Suite 111, Pittsburgh, Pennsylvania 15235. The Company also has many affiliates.

---

Medical Staffing of New England, Inc. and MedTech Franchising, Inc.

PH1 931629v15 11/15/07

7.    The Company provided primarily nurse staffing, which included registered nurses, licensed practical nurses, and certified nurses' aides, allied health staffing and physician staffing.  It also provided support-services staffing and information technology staffing for clients in the healthcare industry and other industries.  World Health's clients included acute care hospitals, including community hospitals, teaching institutions and trauma centers, private physicians' practices, surgical and ambulatory care centers, nursing homes, pharmacies, medical clinics, and insurance companies located in or near metropolitan areas.

8.    Defendant Richard E. McDonald ("McDonald") is a resident of the Commonwealth of Pennsylvania.

9.    McDonald served as President, Chairman of the Board of Directors, Principal Financial Officer and Principal Accounting Officer of World Health from its inception as a public company on February 20, 2003, until June 23, 2004, at which time he became Chief Executive Officer.

10.    When World Health hired a Chief Financial Officer in mid-2005, McDonald remained Chief Executive Officer and Chairman until his abrupt resignation on August 15, 2005.

11.    McDonald was World Health's second largest shareholder, claiming ownership of 6,194,000 shares, or 22.5% of all common stock, as of April 27, 2004.

12.    Defendant Marc D. Roup ("Roup") is a resident of the Commonwealth of Pennsylvania.

13.    Roup was World Health's Chief Executive Officer until his resignation on June 23, 2004.

14.    Defendant John C. Sercu ("Sercu") is a resident of the Commonwealth of Pennsylvania.

3

15.     Sercu served as World Health's Chief Operating Officer from May 2004 until on or about August 16, 2005, when he became acting Chief Executive Officer after McDonald's resignation.  On September 23, 2005, he resumed his duties as Chief Operating Officer.

16.     World Health issued to Sercu 500,000 shares of World Health restricted common stock as part of his employment agreement, with an additional 500,000 shares contingently issuable upon the achievement of certain performance goals.

17.     Defendant Bruce Hayden ("Hayden") is a resident of the Commonwealth of Virginia.  Hayden served as World Health's Chief Financial Officer from July 18, 2005 through August 24, 2005.

18.     Defendant Frederick R. Jackson, Sr. ("Jackson") is a resident of the Commonwealth of Pennsylvania.  Jackson served as a member of World Health's Board of Directors throughout the relevant period.

19.     Defendant John W. Higbee ("Higbee") is a resident of the Commonwealth of Pennsylvania.  Higbee served as a member of World Health's Board of Directors throughout the relevant period.  Higbee served as chair of the Audit Committee.

20.     Defendant Brian T. Licastro ("Licastro"), upon information and belief, is a resident of the Commonwealth of Pennsylvania.  He served as World Health's Vice President of Operations.

21.     Upon information and belief, Licastro also served as the Company's in-house general counsel, on a *de facto* and/or formal basis.

22.     Defendant Licastro, upon information and belief, is a licensed attorney.  He was the only attorney among the senior management of World Health.

23.     Defendant Licastro caused the Company to obtain legal malpractice insurance.  In more than one instance, he sent e-mails and/or letters as counsel for World Health.

24.     Defendant Mark B. Rinder ("Rinder"), upon information and belief, is a resident of the State of Georgia.  Rinder served as a financial consulting advisor to World Health.

25.     Defendant Deana J. Seruga ("Seruga") is a resident of the Commonwealth of Pennsylvania.  Upon information and belief, Defendant Seruga served as the Company's corporate controller during all relevant times, on a *de facto* and/or formal basis.

26.     Defendant Seruga was intimately involved with the financial affairs of the Company.  She worked very closely with Defendant McDonald in preparing and distributing financial information for and about the Company.

27.     Defendant Seruga was aware of Defendant McDonald's access to, and ability to manipulate, the Company's financial records.

28.     Defendants McDonald, Roup, Sercu, Jackson, Higbee, Licastro, Rinder and Seruga are hereafter referred to as the "Defendants".

## BACKGROUND

29.     World Health was initially incorporated for the purpose of selling nutritional and similar products on the Internet.  The current structure of the Company was formed through a "reverse merger" on February 20, 2003, pursuant to which World Health acquired 100% of the common stock of Better Solutions, Inc. ("Better Solutions"), a healthcare staffing company, from its founders and co-owners, McDonald and Roup.

30.     In exchange, World Health provided McDonald and Roup with 33,000,000 shares of newly-issued World Health common stock.  As a result, Better Solutions became a wholly-owned subsidiary of World Health, and McDonald and Roup became the controlling shareholders of World Health, owning approximately 82% of its outstanding shares.

31.     The Company's common stock was traded on the OTC Bulletin Board under the symbol "WHAI.PK."

5

32.    As of March 31, 2003, World Health had assets totaling $245,727 and negative shareholders equity of $91,762. Sales for the three months ended March 31, 2003 and totaled $942,887, and World Health reported a net loss of $395,016, or $0.01 per share.

## A.    Funding the Company's Explosive Growth:

33.    On December 8, 2003, the Company redeemed 8,000,000 shares of the Company's common stock held by McDonald and 8,000,000 shares of the Company's common stock held by Roup (collectively, the "Redemption").

34.    According to the Company's Form 8-K filed with the United States Securities and Exchange Commission (the "SEC") on December 8, 2003 (the "Redemption 8-K"), immediately after the Redemptions, Messrs. McDonald and Roup held 7,569,000 and 8,750,000 shares of the Company's common stock, respectively.

35.    According to the Redemption 8-K, the Company allegedly effected the Redemptions to reduce the long-term dilutive effect on the Company's future earnings per share that would have been caused if the shares remained outstanding.

36.    Through the Redemption, the Company obtained sufficient authorized shares to execute on a strategy of funding future growth of the Company—and a series of acquisitions—through a series of private placement ("PIPE") transactions.

37.    Beginning in December 2003 and continuing through December 2004, the Company orchestrated numerous PIPE transactions, through which it issued common and preferred stock, warrants for the purchase of common stock, and convertible debentures.

38.    Upon information received, these financing transactions raised approximately $38 million for the Company.

6

39.    Upon information received, the Company also received approximately $6.9 million from the exercise of warrants issued in connection with these private placement transactions.

40.    Throughout 2004, the Company experienced explosive growth, which was primarily attributable to the following acquisitions:

(i)    **Superior Staffing Solutions, Inc. ("Superior"):**

41.    On December 22, 2003, the Company acquired substantially all of the assets of Superior for $4 million, 305,343 shares of common stock, and an assumption of $392,000 debt.

42.    At the time of the acquisition, Superior was a privately-held nurse staffing company located in Pittsburgh, Pennsylvania.

(ii)    **Pulse Healthcare Staffing, Inc. ("Pulse"):**

43.    On April 30, 2004, the Company acquired all of the stock of Pulse for $13.3 million, and 100,000 shares of common stock.

44.    At the time of the acquisition, Pulse was a California corporation and a medical staffing company located in Citrus Heights, California, that placed nurses in healthcare facilities for contractually-defined assignment periods and on a permanent basis.

45.    Upon information received, during the negotiation of this stock purchase, Sercu was an officer or employee of Pulse.

46.    Upon information received, after the closing of the Pulse acquisition, Sercu was offered an employment agreement with World Health that provided, *inter alia*, a $500,000 bonus that was payable in two equal installments—one upon Sercu's joining the Company, and a second installment upon the successful transition of Pulse's assets.

47.    Upon information received, Sercu also received 1 million shares of the Company's stock.

7

(iii)    **Care For Them Inc. ("Care For Them"):**

48.    On May 7, 2004, the Company acquired certain assets—primarily accounts receivable and fixed assets—of Care For Them for $242,000 and additional contingent payments.

49.    At the time of the acquisition, Care For Them was a Massachusetts corporation and a medical staffing company that placed nurses in healthcare facilities for contractually-defined assignment periods and on a permanent basis.

(iv)    **Curley and Associates, LLC ("Curley and Associates"):**

50.    On June 1, 2004, the Company acquired certain assets (primarily fixed assets) of Curley and Associates for $1.5 million, 662,025 shares of common stock, and additional contingent payments.

51.    At the time of the acquisition, Curley and Associates was a Florida corporation and a medical staffing company located in Stanford, Florida, which specialized in travel placements of allied healthcare professionals.

(v)    **Travel Nurse Solutions, Inc. ("TNS")**

52.    On October 14, 2004, the Company acquired substantially all of the assets of TNS for $6.3 million and 747,950 shares of common stock, with additional contingent payments made in stock.

53.    At the time of the acquisition, Travel Nurse Solutions was a privately-held medical staffing Company that specialized in travel nurse staffing and operated from offices in Birmingham, Alabama; Mobile, Alabama; and Cincinnati, Ohio.

PH1 931629v15 11/15/07

(vi)    **J&C Nationwide Inc. ("J&C")**

54.    On November 15, 2004, the Company acquired substantially all of the assets of J&C for 875,000 shares of restricted stock and the assumption of $22 million in notes payable.

55.    At the time of the acquisition, J&C was a physician staffing company that provided services throughout the United States under the trade name "J&C Nationwide".

(vii)    **Parker Services, Inc. ("Parker Services")**

56.    On December 31, 2004, the Company acquired substantially all of the assets of Parker Services for $4 million, 182,481 shares of restricted common stock, the assumption of $260,000 debt and $4 million in the form of a promissory note payable over two years.

57.    At the time of the acquisition, Parker Services was based in Seattle, Washington.

58.    Upon information received, at the time of the Parker Services asset purchase, Sercu was simultaneously serving as World Health's Chief Operating Officer and Parker's Chief Executive Officer.

59.    Upon information received, at the time of the Parker Services transaction, Sercu owned—or was entitled to purchase—20% of Parker Services.

60.    Upon information received, at the time of the Parker Services transaction, Sercu was entitled to receive 20% of the consideration paid for Parker Services through any asset sale.

(viii)    **Universal Staffing Group, Inc. ("Universal Staffing")**

61.    On July 27, 2005, the Company acquired substantially all of the assets of Universal Staffing.

62.    At the time of the acquisition, Universal Staffing was a privately-held staffing company based in Orlando, Florida.

9

**B.      World Health's Corporate Governance:**

63.      World Health did not have a full-time Chief Financial Officer until the middle of 2005.  McDonald served as both Chief Executive Officer and Principal Financial Officer until Hayden was hired, effective as of July 18, 2005.

64.      World Health also had a small Board of Directors with only three members: McDonald, Higbee, and Jackson.  The board of directors did not hold an annual meeting in 2003 or 2004, and thus, public shareholders did not elect any directors.  McDonald became a Director prior to World Health becoming public, and he appointed Higbee and Jackson in early 2004.

65.      Upon information received, McDonald either had, or alleged to have, general authority to execute Jackson's signature on board-related documents.

66.      As such, McDonald alleged that he could act on behalf of a majority of the Company's board of directors.

67.      Also upon information and belief, McDonald exercised this alleged authority to execute documents related to the board of directors—and actions authorized by the board of directors.

**C.      World Health's Capital Structure and Secured Debt:[2]**

68.      By the end of 2004, the Company had utilized all of the funding it raised through the PIPE transactions.

69.      To continue to fund its ongoing operations and its numerous acquisitions, the Company procured secured debt.

70.      On February 14, 2005, the Company entered into a revolving credit, term loan and security agreement (the "CSF Agreement") with CapitalSource Finance, LLC ("CSF") to refinance outstanding indebtedness and provide additional liquidity.

---

2 Nothing set forth herein shall be deemed an admission by the Trustee, the Company (or its subsidiaries) or the Debtors' estates with regard to the validity, priority, extent or nature of the claims and security interests set forth

10

71.     The Company and each of its subsidiaries were co-borrowers under the CSF Agreement.

72.     The CSF Agreement included a term loan in the amount of $7,500,000 (the "CSF Term Loan") and a revolving credit facility that provided a maximum loan amount of $37,000,000 (the "CSF Revolving Facility").

73.     The obligations under the CSF Agreement, were secured by substantially all of the assets of the Company and its subsidiaries.

74.     Fifty percent (50%) of the Company's Excess Cash Flow (as defined in the CSF Agreement) was required to repay the outstanding principal balance of the CSF Term Loan.

75.     In addition to the CSF Agreement, the Company incurred other secured obligations.

76.     Pursuant to the TNS acquisition, the Company and Better Solutions, Inc. pledged substantially all of their assets to secure payment of approximately $2.5 million in secured obligations due and owing to the sellers (the "Seller Parties").

77.     Pursuant to an Intercreditor Agreement, dated as of November 15, 2005, by and among CSF and the Seller Parties, all rights to payment and liens held by the Seller Parties were subordinate to the rights and liens of CSF.

78.     Additionally, on February 15, 2006, the Company received notice from the Internal Revenue Service (the "IRS") that on or about February 7, 2006, the IRS filed liens in favor of the United States on all property and rights to property belonging to World Health Staffing, Inc. (California).

79.     The IRS alleged that as of February 3, 2006, World Health Staffing, Inc. (California) was indebted to the United States in the approximate amount of $1,256,241.27.

herein.

PH1 931629v15 11/15/07

80.     On February 16, 2006, the Company received notice from the IRS that on or after February 7, 2006, the IRS allegedly filed liens in favor of the United States on all property and rights to property belonging to Better Solutions, Inc.

81.     The IRS alleged that as of February 2, 2006, Better Solutions, Inc. was indebted to the United States in the approximate amount of $2,274,316.23.

**D.      Mismanagement and Corporate Waste:**

82.     Starting as early as 2003, the Defendants actively engaged in and/or allowed the routine waste of the Company's limited resources on expensive and unnecessary luxuries for their personal benefit.

83.     For example, in May 2003, the Company entered an agreement to lease from Marquis Jet 25 hours of flight time on a private jet for the fixed payment of $112,939.70 (the "Marquis Jet Lease").

84.     According to the Company's SEC form 10-KSB (as amended) for 2003 (the "2003 Annual Report), at the time of executing the Marquis Jet Lease, the Company had gross revenues of $3,093,337.00 and negative net income in the amount of $33,094.00 (before adjustment for taxes).

85.     Also according to the 2003 Annual Report, at the close of fiscal year 2003, the Company had $177,699.00 in cash on hand and $1,516,265 in total current assets.

86.     Essentially, the Defendants caused and/or allowed the Company to squander nearly 7.5% of the total current assets on leasing 25 hours of flight time on a private jet.

87.     Furthermore, during 2003, the Company absorbed monthly lease payments for luxury cars provided to Roup (in the monthly amount of $2,207.38) and McDonald (in the monthly amount of $2,045.72)

88.    The trend of wasting corporate assets continued in 2004.  The Trustee has received evidence of the following costs associated with chartered flights:

| Date | Trip Description | Cost |
|------|-----------------|------|
| March 30, 2004 through March 31, 2004 | Pittsburgh, Pennsylvania; West Hampton, New York; Lawrence, Massachusetts; Orlando, Florida; San Antonio, Texas; Sacramento, California | $57,500.00 |
| July 31, 2004 through August 7, 2004 | Latrobe, Pennsylvania; Myrtle Beach, South Carolina | $18,588.00 |
| August 7, 2004 through August 8, 2004 | Latrobe, Pennsylvania; New York, New York | $10,810.80 |
| November 11, 2004 | Pittsburgh, Pennsylvania; Teterboro, New Jersey | $4,468.31 |
| November 16, 2004 | Pittsburgh, Pennsylvania; Teterboro, New Jersey; Atlanta, Georgia | $11,614.00 |
| December 3, 2004 | Pittsburgh, Pennsylvania; Teterboro, New Jersey | $11,200.00 |
| | **Total** | **$114,181.11** |

89.    At the time that the Company was incurring these charges, the Company was in the process of raising in excess of $40 million of equity funding due to its inability to fund operations and growth.  According to the Company's SEC Form 10-KSB (as amended) for 2004, (the "2004 Annual Report"), the Company had net losses of $13,427,523.00 for fiscal year 2004.

90.    The Company's finances were controlled at the Defendants' whim, and used to support frivolous expenses that the Company could not bear.

91.    The Company's board of directors, officers and other senior management knew or should have known about the above referenced mismanagement and waste and they exhibited a substantial and systematic failure to control and monitor the accrual of unnecessary expenses.

**E.    Failure to Implement Financial Controls and Proper Checks and Balances:**

92.    Upon information and belief, at all relevant times to this adversary proceeding, the Company utilized Quickbooks™ to manage its financial affairs.

13

93. Also upon information and belief, the Company implemented no other financial software to control its books and records.

94. Upon information received, the Company utilized manually-maintained spreadsheets to consolidate the financial performance of numerous subsidiaries of the Company and their collective nationwide operations.

95. Also upon information and belief, defendant McDonald had *carte blanche* to edit the Company's books, records, and financial reports.

96. To maintain this control, McDonald ensured that he was the sole source of financial and operational information for all third parties, including CSF, the Company's retained professionals, and the Company's auditors.

97. The Company did not maintain any "checks and balances" to ensure that the information provided by McDonald to third parties was complete, fair and accurate.

### LACK OF OVERSIGHT

98. To the contrary, upon information and belief, the Company's management did not believe that any system was in place pursuant to which they could have reported any abnormalities in the Company's financial reports and/or books and records.

99. Even when the Company's employees became aware of accounting and reporting abnormalities, there was no system or procedure in place to report these abnormalities.

100. Essentially, the Company was run with an absolute lack of oversight into the reports generated and altered and manipulated by McDonald.

101. Upon information received, McDonald's manipulations of the Company's financial information began as early as 2002, when McDonald commenced a scheme of manipulating United States Internal Revenue Service ("IRS") statements to create the false appearance of compliance with tax payments.

14

102.    Upon information received, McDonald began to "cut and paste" documents in an attempt to demonstrate that payments were made to the IRS to satisfy outstanding taxes.

103.    These cut-and-pasted documents were faxed to the IRS as false evidence of alleged payment of taxes.

104.    In actuality, these payments were never made, and the taxes owed by Better Solutions, Inc. remained due and outstanding.

105.    McDonald's systematic manipulation of the Company's financial statements and SEC reports continued through the merger of Better Solutions, Inc. into World Health Alternatives, Inc.  As set forth in more detail herein, McDonald routinely altered financial information, and even his own educational background information, to create the appearance of a more viable and credible Company.  These reports were relied upon not only by shareholders but also creditors who chose to conduct business with the Company based upon the created illusion of credibility.

**F.    The McDonald "Related Party" Loan:**

106.    To facilitate numerous accounting improprieties, McDonald "created" a related party loan account.

107.    McDonald would reward himself with excessive bonuses that the Company could not satisfy.  *In lieu* of taking immediate cash, McDonald increased the value of the related party loan.

108.    Upon information and belief, the account was used to offset the discrepancies that would occur when funds were not appropriately paid.  For instance, when payroll tax checks were issued by the Company but never remitted to the IRS, McDonald would cause the entry of an offsetting line-item into the related party loan account to hide the discrepancy.

PH1 931629v15 11/15/07

109.    On August 16, 2004, World Health issued a press release announcing its results for the second quarter of 2004. In addition to reporting the financial results, the release stated, without explanation, that World Health's current liabilities included a $1.518 million "related party loan."

110.    The press release failed to state that the "related party loan" was purportedly made by McDonald.

111.    On August 23, 2004, World Health filed Form 10-QSB with the SEC reiterating the results stated in the August 16, 2004 press release and containing certifications pursuant to sections 302 and 906 of the Sarbanes Oxley Act of 2002 signed by McDonald. The Form 10-QSB lists a "related party loan" as a $1,518,571 liability, but does not list that loan as having been provided by McDonald.

112.    The Form 10-QSB for the third quarter of 2004 increased the amount of the purported "related party loan" to $3,644,307, again without explanation.

113.    On March 29, 2005, World Health issued a press release announcing the financial results for year-end 2004. The release included a listing for the related party loan in a lower amount of $3.01 million in World Health's current liabilities. The press release failed to identify McDonald as the purported lender of the "related party loan."

114.    On April 15, 2005, the Company filed its 2004 Annual Report, which included the same decreased "related party loan" in the amount of $3,010,420 as the press release.

115.    In World Health's 2004 Annual Report, the amount of the "related party loan" was reduced from $3,644,307 to $3,010,420.

116.    The apparent reduction from the third quarter was a result of World Health beginning to "repay" the purported loan.

16

117.    McDonald caused World Health to transfer corporate funds to himself.  Note 11 of the financial statements reads:

> At December 31, 2004, there is a $3,010,420 loan from the Company's President and Chief Executive Officer, Richard McDonald.  The loan is of a demand nature without any interest rate.

118.    In the first quarter of 2005, the financial statement listed a "related party loan" liability of only $1,089,949.

119.    McDonald again caused World Health to transfer corporate funds to himself when, as alleged *infra*, the Defendants misstated and/or allowed to be misstated the amount of the debenture and warrant agreement associated with the Company's preferred stock, the Defendants failed to disclose tax liabilities in excess of $4 million, and the Defendants made intentional misstatements to the Company's lenders which caused them to over-fund the Company's lending arrangements by approximately $6.5 million.

120.    The transfers to McDonald were also made at a time when World Health was accruing unpaid tax liabilities: at the time of World Health's bankruptcy in February of 2006, it declared a tax liability including penalties of $6,946,888.

**G.    Misstatements in Financial Statements:**

121.    In several documents filed with the SEC, including the 2003 Annual Report, McDonald described his education background as follows:

> Mr. McDonald received the following degrees in Business Administration: (a) In April 1996, a Bachelor of Science Degree from the University of Pittsburgh; (b) in May 2000, a Master's Degree from Bridgewater University located in London, England; and (c) in May 2001, a Doctoral Degree from Bridgewater University.

122.    However, these representations were false.  On July 15, 2004, McDonald signed and filed a Form 8-K with the SEC stating:

17

it was confirmed that Mr. McDonald did attend the University of Pittsburgh but the records available at the time could not confirm that he graduated with a B.S. degree.

123.    The Form 8-K stated that all educational credentials should be deemed removed from McDonald's biography.  McDonald had not graduated from the University of Pittsburgh, and Bridgewater University is an unaccredited school that offers degrees over the internet for very little work.

124.    From the third quarter of 2003 to June of 2004, McDonald signed and filed two certifications as Chief Executive Officer with each Form 10-QSB and 10-KSB filed with the SEC pursuant to Sections 302 and 906 of the Sarbanes Oxley Act of 2002.  Roup also signed and filed two certifications as Chief Financial Officer with each Form 10-QSB and 10-KSB filed with the SEC from the third quarter of 2003 until his resignation in June of 2004.   The certifications stated in pertinent part:

1.    I have reviewed this quarterly report on Form 10-QSB of World Health Alternatives, Inc;

2.    Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.    Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report.

4.    I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d -14) for World Health Alternatives, Inc. and have:

(i)    Designed such disclosure controls and procedures to ensure that material information relating to World Health Alternatives, Inc. is made known to me by others within the Company, particularly during the period in which the periodic reports are being prepared;

(ii)    Evaluated the effectiveness of World Health Alternatives, Inc.'s disclosure controls and procedures as of a date within 90 days prior to the filing date of this report ("Evaluation Date"); and

(iii)    Presented in the report their conclusions about the effectiveness of the disclosure controls and procedures based on their evaluation as of the Evaluation Date;

5.    I have disclosed, based upon their most recent evaluation, to World Health Alternatives, Inc.'s auditors and the audit committee of the Company's Board of Directors:

(i)    All significant deficiencies in the design or operation of internal controls which could adversely affect World Health Alternatives, Inc.'s ability to record, process, summarize and report financial data and have identified for World Health Alternatives, Inc.'s auditors any material weaknesses in internal controls, and

(ii)    Any fraud, whether or not material, that involves management or other employees who have a significant role in World Health Alternatives, Inc.'s internal controls, and

6.    I have indicated in this quarterly report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of their most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

and:

In connection with the Quarterly Report of World Health Alternatives, Inc. (the "Company") on Form 10-QSB for the period ending March 31, 2004 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I certify, pursuant to 18 U.S.C. § 1350, as

adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

(1)    The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

125.    After Roup's resignation, McDonald signed all certifications as Chief Executive Officer and Principal Financial Officer. The consolidation of authority in one individual rendered meaningless the statutory requirement that both the Chief Executive Officer and the Principal Financial Officer provide certifications. 15 U.S.C. § 78j-1; 18 U.S.C. § 1350(a).

126.    Because World Health lacked adequate internal controls and was, therefore, unable to ascertain its true financial condition, these certifications were false and misleading.

127.    In addition, the Defendants released false information regarding the financial viability of World Health to the public in general and, therefore, to World Health creditors.

128.    On March 29, 2005, the Defendants issued a press release announcing World Heath's results for the fourth quarter and year-end 2004. For the fourth quarter, World Health reported sales of $22,553,603, an increase of 2244% over sales reported for fourth quarter of 2003. World Health attributed the growth to acquisitions and organic growth. Defendants reported that World Health experienced gross profit for the fourth quarter of $3,928,592, an increase of 802% compared to the fourth quarter of 2003. For the year, World Health reported sales of $40,339,739, compared to sales of $3,693,337 for 2003. Gross profit for the year was $10,242,997, compared to $1,599,794 in 2003. Total assets as of December 31, 2004 were reported as $100,697,761, compared to $5,301,358 in 2003. Shareholders' equity increased to $36,018,763 compared to $2,184,551 in 2003. McDonald stated:

The Company achieved critical mass in the fourth quarter, substantially through strategic acquisitions and strong organic growth. We now offer all of the product lines that are integral to staffing the healthcare industry, making us a 'one-stop' staffing solution for an entire healthcare system. We have established a national reach and expect the benefits to include additional client contracts, a deeper talent pool of consultants and stronger financial performance. We have also reduced our overall debt and improved our financial and operating position.

. . .

The first quarter of 2005 has also yielded excellent results so far and put us on schedule to meet our goals for the year. We expect our first quarter earnings to be $.08 to $.10 per share on revenues of $39 million to $42 million. Overall, we believe we are well-positioned to meet the increasing demand for healthcare staffing services that the Company has been experiencing and we reiterate our guidance for 2005 of $200 million in revenues and $.50 to $.55 in net earnings.

. . .

The Company expects to report a corresponding non-cash, beneficial increase in earnings in the first quarter of 2005 as a result of having incurred in the fourth quarter of 2004 certain non-cash expenses associated with preferred stock transactions recognized in the fourth quarter.

. . .

By incurring certain non-cash expenses in 2004, we have, in our estimation, positioned the Company for a profitable 2005. The financing we completed with CapitalSource Finance LLC in February 2005 to refinance existing indebtedness should provide us with the working capital and flexibility needed for us to grow our revenues to over half a billion dollars within the next two years through organic growth and acquisitions.

Defendant Sercu added:

We are on track and continue to execute our plan to become the premier healthcare staffing Company in the market. We have exceeded our organic growth expectations and continue to experience the benefits of our integration efforts. Our key performance metrics are increasing and all divisions are seeing the results of efforts to improve profitability.

129.    McDonald and Sercu's statements were false and misleading when made because World Health lacked adequate internal controls and was, therefore, unable to ascertain its true financial condition.  World Health could not properly ascertain its debt or its tax liabilities.

21

130.    On April 15, 2005, World Health filed Form 10-KSB, the 2004 Annual Report, with the SEC that reiterated the results of the March 29, 2005 press release.

131.    The 2004 Annual Report contained certifications pursuant to sections 302 and 906 of the Sarbanes Oxley Act of 2002 signed by McDonald.  These Certifications were identical to the ones presented above and were false and misleading because World Health lacked adequate internal controls and was, therefore, unable to ascertain its true financial condition.

132.    On May 12, 2005, World Health issued a press release announcing its financial results for the first quarter of 2005. World Health reported revenues of $40,477,810, compared to revenues of $1,680,745 reported for the first quarter of 2004.   It reported gross profit of $11,498,570 versus gross profit of $665,452 for the first quarter of 2004.  Earnings per share were reported to be $0.08 per fully diluted share, versus a loss of $0.01 per fully diluted share for the first quarter of 2004.   World Health reported total assets as of March 31, 2005 of $112,836,140 compared to assets of $100,592,422 as of December 31, 2004 and $4,984,794 as of March 31, 2004.  Shareholders' equity was reported as $50,381,614 compared to $37,402,921 as of December 31, 2004 and $3,595,343 as of March 31, 2004.

133.    On the very next day, May 13, 2005, World Health issued a press release announcing it was changing the financial results released for the fourth quarter and 2004 fiscal year after determining that "large, non-cash expenses in connection with a preferred stock transaction that occurred in December 2004" were improperly recorded.   The press release quotes McDonald as stating:

> We recorded the non-cash expenses in the fourth quarter of 2004 because we wanted to utilize a conservative reporting approach until we could consult with the Office of the Chief Accountant [of the SEC] and confirm that our position that the preferred stock conversion and redemption features did not create a need for any derivative accounting was correct. Additionally, the Company determined that the warrants associated with the transaction were a liability and therefore the $3,003,591 fair value of the warrants was

22

> recorded as a liability. The Company believed it was important to
> pursue this matter to increase the transparency of its financial
> reporting and better enable the market to evaluate the Company's
> financial results in 2004 and in the future. This positive
> restatement completes the Company's review of this matter as
> referenced in our 10-KSB for 2004.

The press release stated further that World Health was filing a Form 10-KSB/A later that day

setting forth revised financial statements that would exclude the large, non-cash expenses

relating to the preferred stock transaction. According to World Health's press release, "[a]s a

result, the Company's earnings for the quarter and fiscal year ended December 31, 2004

increased to 14 cents." A comparison of the Form 10-KSB/A filed on or about May 18, 2005,

with the March 29, 2005 press release announcing World Health's results for the fourth quarter

and year ended December 31, 2004 shows the opposite. The restatement merely reduced World

Health's reported loss by 14 cents per share, from $0.81 per share, as reported on March 29,

2005, to $0.67 per share, as reported on or about May 18, 2005.

     134.   On May 16, 2005, World Health filed Form 10-QSB with the SEC for the period

ended March 31, 2005. The report noted that:

> Effective December 15, 2004, the Company closed on a financing
> transaction with a group of private investors ("Investors") of up to
> $11,825,000. The financing consisted of two components: (a)
> 12,823 shares of Series A Convertible Preferred Stock with a
> principal amount of $12,823,000 at a dividend rate of 8% per
> annum and (b) Warrants registered in the name of each Investor to
> purchase up to a number of shares of common stock of the
> Company equal to 25% of such Investor's Subscription Amount
> divided by the subscription amount of $3.00 per share. The
> Investors have the right to purchase an aggregate of 1,068,583
> shires of the Company's restricted common stock. The Warrants
> have an exercise price equal to the closing price of the Company's
> common stock on the day prior to the closing ($3.86). The
> Warrant, which expires five years from the date of issuance, results
> in proceeds of $4,124,730 to the Company upon its exercise. The
> dividends are cumulative until December 31, 2006, and will be
> paid from an escrow established at closing if the Investors elect to
> be paid in cash. Under certain circumstances the Company may
> elect to pay the dividend in shares of the Company's common
> stock.

<div align="center">23</div>

> The Preferred Stock is convertible into shares of Common Stock of the Company at a conversion price of $3.00 per share, which would result in the issuance of 4,274,333 shares of the Company's common stock if all shares were converted.

135.    The preceding statements were false and misleading because Defendants were unable to correctly account for World Health's convertible debt and warrants associated with its preferred stock, and, was in breach of its existing financing documents.

136.    The Form 10-QSB for the period ended March 31, 2005 contained certifications pursuant to sections 302 and 906 of the Sarbanes Oxley Act of 2002 signed by defendant McDonald, which were identical to the ones presented above.  The certifications were false and misleading because Defendants had failed to implement adequate internal controls at World Health and were, therefore, unable to ascertain its true financial condition.

**H.    McDonald's Resignation and The August 19 Disclosure:**

137.    On July 18, 2005, World Health announced the appointment of Hayden as the Chief Financial Officer.  Hayden was awarded 500,000 shares of stock and up to $100,000 in relocation expenses.  Hayden's compensation was $215,000 per year.

138.    On August 16, 2005, World Health revealed the first indications that it had discovered fraudulent, previously reported financial results.  On that date, World Health unexpectedly and abruptly announced that McDonald had resigned as President and Chief Executive Officer "for health and family reasons."  World Health appointed Sercu as acting Chief Executive Officer.  World Health also announced it had notified the SEC that the Company would not file its 10-Q for the second quarter of 2005 on time.

139.    The statements referenced above were materially false and misleading because they failed to disclose the following material adverse facts that Defendants knew or should have known:

a.  Defendants engaged in improper accounting practices.  As detailed herein, Defendants admitted that World Health's prior financial reports were materially false and misleading when it announced that it was going to restate the financial results for 2004 and 2005;

b.  there were discrepancies in the financial statement recognition of a convertible debenture and warrant agreement associated with World Health's preferred stock;

c.  there was underpayment of certain tax liabilities in excess of $4 million;

d.  irregular reports to World Health's lenders resulted in excess funding under World Health lending arrangements of approximately $6.5 million;

e.  World Health was in breach of existing financing documents;

140.  World Health lacked adequate internal controls and was therefore unable to ascertain its true financial condition; and

141.  The Company issued the following press release on August 19, 2005:

World Health Alternatives, Inc. Commences Investigation

World Health Alternatives, Inc. (OTC BB: World Health OB) announced today that, following the recent departure of former Chief Executive Officer, Richard E. McDonald, the Company is investigating issues that include, but may not be limited to, apparent discrepancies in the amount of the debenture and warrant agreement associated with the Company's preferred stock, the underpayment of certain tax liabilities in excess of $4 million, and irregular reports to the Company's lenders that resulted in excess funding under the Company's lending arrangements of approximately $6.5 million, in addition to other issues which may constitute breaches of existing financing documents.

The Company has retained outside counsel, and the Board of Directors has retained special counsel to conduct an investigation into the discrepancies. The amounts at issue could change as the investigation continues. Since the Company's stock is traded on the OTC Bulletin Board, the Company does not have the authority to suspend trading of its stock.

The Company has also terminated its engagement with Daszkal Bolton LLP, its outside auditing firm, and will begin a search for a new auditing firm. It is expected that the Company's prior financial reports will be restated. The Company is actively working with its investment banking and funding sources to raise capital to meet its short-term cash obligations. John Sercu, the interim Chief Executive Officer of the Company, stated, "It is very unfortunate

25

to have discovered that we have to deal with these issues, but management and the Board are working diligently to resolve them. The Company continues to make staffing placements of its medical and other professionals on a daily basis with its clients, and we look forward to continuing our business into the future."

142.    The financial statements that were issued and/or should have been reviewed by Defendants on behalf of World Health throughout the relevant period were materially false and misleading because, among others, Defendants misstated or allowed to be misstated the amount of the debenture and warrant agreement associated with the Company's preferred stock, Defendants failed to disclose and/or knew of the failure to disclose tax liabilities in excess of $4 million, and Defendants made or allowed to be made intentional misstatements to the Company's lenders which caused them to over-fund the Company's lending arrangements by approximately $6.5 million.

143.    Upon information received, the Defendants were increasing and/or knew of the increase in the revenues reported in publicly-filed financial statements by including funds received for the exercise of warrants.

144.    Including these non-revenue amounts significantly increased the reported revenue and artificially inflated the Company's reported financial performance.

## FACTORING THE SAME RECEIVABLES TWICE

145.    Also upon information and belief, the Company executed a scheme pursuant to which it could "borrow" twice on certain accounts receivable.

146.    The Company maintained numerous Master Factoring Agreements with Advance Payroll Funding (the "Factoring Agreements"), pursuant to which the Company could immediately "sell" certain accounts receivable. The Factoring Agreements allowed the Company to receive instant cash in an amount equal to a percentage of the "sold" accounts receivable, subject to adjustment.

26

147. Upon information and belief, the payments received by the Company were not used to satisfy the Company's obligations under the CSF3 Agreements.

148. Also upon information and belief, the "factored" accounts receivable were included in the borrowing base calculation utilized for the CSF Agreements—*ergo*, the Company was able to borrow a percentage of these accounts receivable, even though the receivables were already "sold" and the Company no longer retained the right to collect on the receivables.

149. Also upon information and belief, management for the Company prepared the borrowing base calculation for the CSF Agreements and provided the reports to McDonald. McDonald would forward the information to CSF.

150. Upon information and belief, McDonald would alter the value of accounts receivable to include in the borrowing base calculation before forwarding the documents to CSF.

151. Members of the Company's management including Roup, Sercu, Higbee, Jackson, Licastro and Seruga became aware or should have been aware of the malfeasance and misdealing and discrepancies in the Company's revenues; however, no actions were taken consistent with their fiduciary duties to remedy or ameliorate the discrepancies until after McDonald's resignation.

152. World Health's statement that the Company's reports to its lenders were "irregular" is an admission that management intentionally falsified these reports.

153. The circumstances of the "discovery" of the falsification of financial statements and reports to its lenders following the abrupt "resignation" of McDonald strongly demonstrates McDonald's complicity in falsifying financial statements. McDonald's falsification of his academic credentials in the Company's SEC filings, moreover, further demonstrates his intent to deceive the public and creditors of the estate.

---

3 See page 11, supra of complaint for discussion of CSF Agreements.

27

**I.     The Indemnification Agreements:**

154.    On August 29, 2005, World Health filed a Form 8-K with the SEC announcing that the Company had entered into an indemnification agreement (the "Indemnification Agreement") with each of the executive officers and directors of World Health, including Bruce Hayden and Sercu, named Defendants in several securities class actions.

155.    Upon information and belief, the Indemnification Agreement also purported to have World Health indemnify Licastro, Higbee, Jackson, and Rinder (collectively, all Defendants covered by the Indemnification Agreement shall be referred to as the "Indemnified Defendants"), against the costs associated with shareholder fraud lawsuits, including attorney's fees and damages that they may otherwise have to pay.

156.    The announcement regarding the Indemnification Agreement came approximately 60 days before the revelation that World Health was undertaking an investigation of its accounting systems because of inadequate controls, examining past financial statements for possible restatement, and the need to withhold its financial statements for the third quarter of 2005 because of problems with the accounting systems.

157.    The Indemnified Defendants may attempt to rely on the Indemnification Agreement to state claims against the bankruptcy estate for costs and damages paid to settle the class action proceedings.

158.    Moreover, upon information and belief, no consideration was provided by the Indemnified Defendants in exchange for the Indemnification Agreement.

159.    The provision of the Indemnification Agreement to the Indemnified Defendants constitutes a fraudulent conveyance to the Indemnified Defendants.

160.    Although the announcement was made on August 29, 2005, upon information and belief, the Indemnification Agreement was dated August 21, 2005, one day prior to the filing of

28

the first securities class action. The 8-K also announced that Hayden had resigned as Chief

Financial Officer.

**J.      Announcement of the May 17 PIPE Transaction:**

161.    On August 24, 2005, the Company filed a Form 8-K with the SEC announcing

management discovered approximately $22 million in debt of which it was not previously aware.

The 8-K stated:

> Current management of World Health Alternatives, Inc. (the
> "Company") recently became aware that the Company entered into
> a Securities Purchase Agreement dated as of May 17, 2005 (the
> "Purchase Agreement") with certain investors pursuant to which
> the Company issued (i) $22,037,828.93 principal amount of the
> Company's debentures, convertible into shares of common stock at
> a $3.00 conversion price (subject to adjustment) per share, due on
> August 17, 2008 (the "May Debentures") and (ii) warrants (the
> "May Warrants") to purchase 4,205,693 shares of the Company's
> common stock with an exercise price of approximately $2.90 per
> share (subject to adjustment). Pursuant to the Purchase Agreement,
> the May Debentures were issued at a discount, and the aggregate
> principal amount issued represents 131.58% of the valuation of the
> consideration received. The consideration received by the
> Company for the issuance of the May Debentures and Warrants
> was $16,748,616, consisting of $1,969,866 paid in cash and
> $14,778,750 paid by the delivery and cancellation of Series A
> Convertible Preferred Stock held by the investors, which was
> valued at 125% of stated value pursuant to the Purchase
> Agreement. In connection with this transaction, the Company also
> entered into a Registration Rights Agreement dated May 17, 2005
> with the investors under the Purchase Agreement. The Registration
> Rights Agreement, in part, provides certain registration rights to
> the investors, establishes payments to them based on a percentage
> of the subscription amount for the May Debentures and Warrants if
> certain registration obligations are unmet and contains customary
> cross-indemnification covenants between the Company and the
> investors. The Registration Rights Agreement provided that the
> Company was required to file a registration statement registering
> the resale of common stock issuable in respect of the May
> Debentures and Warrants within 45 days of May 17, 2005 and to
> use its best efforts to cause such registration statement to be
> declared effective within 90 days of May 17, 2005, subject to
> certain exceptions.

On August 18, 2005, the Company entered into a Bridge Loan Agreement pursuant to which Palisades Master Fund LP (the "Lender") has provided the Company with $4,000,000 in bridge financing, the proceeds of which have been used for working capital and to fund business operations (the "Bridge Loan"). In consideration for the Bridge Loan, the Company reduced the conversion price on the May Debentures issued to the Lender pursuant to the Purchase Agreement from $3.00 to $1.25 per share, subject to adjustment.

. . .

The Company is seeking to have the holders of the May Debentures and the Bridge Loan commit to exchange such securities in connection with a proposed new convertible preferred stock and warrant financing. No assurance can be given that such exchange or new financing will be completed.

In addition, the Company is party to a number of agreements under which the Company is obligated to register the resale of privately placed securities. Certain of these agreements provide for liquidated damages in the event that a registration statement is not declared effective by a specified date or does not remain effective, or if the associated prospectus is not kept current. The Company has not registered all of the securities covered by such agreements, and in view of the matters identified in Item 4.02 below, has issued notice to the selling stockholders under its Form SB-2 Registration Statement, File No. 333-119643 to suspend sales. As a result, the Company may be subject to liquidated damage claims. See Item 1.01 above. At this time the Company cannot estimate when sales under such Form SB-2 may resume or additional registration statements may be filed or what liquidated damage claims may be asserted.

As a result of the issues noted above and related uncertainties, the Board of Directors together with current executive officers of the Company determined on August 19, 2005 that the Company's previously issued financial statements for 2004 and 2005 should not be relied upon at this time. The Company intends to restate these financial statements based on the finding of its investigation and following review by a new independent accountant to be engaged by the Company. The Company is in the early stages of its internal investigation, and in the process of the investigation the Company may discover information that will raise other issues or cause the Company to conclude that financial statements for other prior periods may also need to be restated.

162. On September 9, 2005, World Health announced that it had retained Alvarez & Marsal LLC, a global professional services firm specializing in turnaround management, to work

with World Health's Board of Directors and management to evaluate the business plan and strategic capital structure of the Company.

163.    On September 13, 2005, World Health filed a Form 8-K announcing it was aware of the SEC formal investigation involving the Company.

164.    On September 23, 2005, World Health filed a Form 8-K announcing that Bristol Investment Fund, Ltd. notified World Health that it was in default of the terms of the Convertible Debentures and related warrants to purchase common stock issued in May of 2005 due to breaches by World Health of the terms of the Debenture and Purchase Agreement.    Bristol notified World Health of a demand for payment of $6,288,373 plus interest and costs.

165.    As a result of a portion of these acts, and to remedy the harm suffered by the Company's shareholders, a class action complaint was filed in the United States District Court for the Western District of Pennsylvania styled as:    *In Re:   World Health Alternatives, Inc. Securities Litigation*, Case No.:   02-05CV1194.   Upon information and belief, a settlement of that class action with a settlement amount in excess of $2.7 million, has been approved.

**K.    Duties of the Defendants:**

166.    By reason of their positions as officers and/or directors of World Health, the Defendants owed the Company and its shareholders the fiduciary obligations of good faith, loyalty, and due care.

167.    Each director and officer owed to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company.   In addition, Defendants owed a duty to the Company and its shareholders to implement adequate internal controls and procedures and to assure that the financial condition and business prospects of the Company were reported truthfully and accurately.   Further, Defendants owed a duty to

ensure that the Company complied with all applicable state and federal laws, and that the Company's financial statements were prepared and presented in accordance with GAAP.

168.    Since the Company was insolvent at all relevant times, the Defendants owed these fiduciary duties to the Company's creditors as well.

169.    Defendants had a duty, by proper diligence, to keep informed of facts which the corporate books and records would have disclosed.

170.    Defendants were "ignorant of liability-creating activities and/or omissions of the Company."

171.    Defendants engaged in a "sustained and systemic failure to exercise oversight - - such as an utter failure to attempt to assure that a reasonable information and reporting system existed" at the Company.

172.    The Defendants violated these duties and abdicated their oversight responsibilities that they owed to World Health.  As a result, the Company has been a defendant in multiple securities class action lawsuits and is bankrupt.  As a further result, the Company is the subject of a SEC investigation and other law enforcement investigations.

## COUNT I

### Breach of Fiduciary Duty
### Against All Defendants

173.    The Trustee incorporates by reference the allegations in the preceding paragraphs of the Amended Complaint as though the same were set forth in full herein.

174.    The Defendants owed World Health, its shareholders and creditors fiduciary duties of loyalty and due care, including the exercise of oversight, and the duty to act in good faith and in the best interests of the Company.

175.    The Defendants breached their fiduciary obligations in the following manners:

32

a.  They caused and/or allowed the Company to misrepresent the financial condition and business prospects of the Company, and they failed to correct the Company's publicly-reported financial results and guidance;

b.  They failed to implement or cause to be implemented internal controls that would have prevented the wrongdoing alleged with particularity herein;

c.  They abused or allowed abuse of positions in the Company for their own personal gain and to the detriment of the Company;

d.  They failed to fulfill their fiduciary obligation to manage the Company with the best interests of the Company in mind;

e.  They permitted McDonald to cause the repayment of substantial portions of the related party loan without regard to the best interests of the Company, and without repayment of numerous secured obligations.

f.  They committed corporate waste by paying or allowing to be paid excessive compensation to themselves and using the Company's assets to support their own unnecessary expenses, while at the same time exposing the Company to millions of dollars in liabilities and costs;

176.  The Defendants allowed their fellow officers and directors to exercise unsupervised and unrestrained authority over the Company.

177.  Defendants failed to exercise any oversight over the Company's financial affairs.

178.  Defendants, in breaching both their duty of loyalty and duty of care, showed a conscious disregard for the best interests of the corporation.

179.  As a direct and proximate result of the foregoing failure of Defendants to perform their fiduciary obligations, the Debtors and their estates and creditors have sustained substantial damages for which the Defendants are liable.

<u>COUNT II</u>

**Aiding and Abetting Breach of Fiduciary Duty
Against All Defendants**

180.  The Trustee incorporates by reference the allegations in the preceding paragraphs of the Amended Complaint as though the same were set forth in full herein.

PH1 931629v15 11/15/07

181.    As set forth more fully in Count I above, the Defendants breached their fiduciary duty owed to the Company, it shareholders and its creditors.

182.    At all relevant times, each of the Defendants were knowing participants in, and gave substantial assistance or encouragement to, the breach of fiduciary duties and mismanagement that permeated the day-to-day management of the Company.

183.    Upon information and belief, each of the Defendants assisted, actively participated in, or failed to perform his/her obligation to monitor against: (i) the mismanagement of the Company; (ii) the diversion of funds out of the Company; (iii) the failure to pay the Company's proper creditors; and (iv) the failure to disclose the full amount of the Company's obligations.

184.    As a direct and proximate result of the foregoing conduct, the Debtors and their estates and creditors have sustained substantial damages for which the Defendants are liable.

## COUNT III

### Corporate Waste
### Against All Defendants

185.    The Trustee incorporates by reference the allegations in the preceding paragraphs of the Amended Complaint as though the same were set forth in full herein.

186.    As set forth with specificity above, the Trustee has received information that demonstrates that the Defendants subjected the Company to or allowed the Company to sustain expenses related to unnecessary luxuries for their personal benefits.

187.    The Company's incurrence of expenses for luxury cars and chartered jets for the Defendants including McDonald, Sercu and Roup occurred at a time when the Company desperately required working capital to execute on its growth strategy and to fund continuing operational losses.

34

188.    The Defendants also caused and/or allowed the Company to incur excessive salaries and bonus payments during this time period.

189.    The Defendants forced and/or allowed the Company to incur these expenses at a time when the Company was insolvent and losing money as a result of its continuing operations.

190.    The Company and its creditors suffered harm as a direct and proximate result of the Defendants' waste of corporate assets.

## COUNT IV

### Aiding and Abetting Waste of Corporate Assets
### Against All Defendants

191.    The Trustee incorporates by reference the allegations in the preceding paragraphs of the Amended Complaint as though the same were set forth in full herein.

192.    Each of the Defendants was either involved in the day-to-day management of the Company, or a member of the Company's board of directors.

193.    As such, at all times, each of the Defendants was aware, or should have been aware, of the abusive waste of assets that was occurring at the Company.

194.    Each of the Defendants either participated in, or substantially aided, the incurrence of unnecessary expenses at the Company to support personal luxuries for the Defendant.

195.    The Defendants failed to institute even the most basic measures and controls to ensure that the Company (through the Defendants) was not mismanaging its funds.

196.    As a direct and proximate result of this waste of corporate assets (and the absolute failure to monitor corporate spending) the Company and its creditors suffered substantial harm.

PH1 931629v15 11/15/07

## COUNT V

### Negligent Misrepresentation
### Against All Defendants

197.    The Trustee incorporates by reference the allegations in the preceding paragraphs of the Amended Complaint as though the same were set forth in full herein.

198.    As well documented above, throughout the Company's brief history, the Defendants made or allowed to be made numerous and systematic misrepresentations to creditors and other interested parties through public statements, press releases and SEC filings.

199.    Most notably, the Defendants misrepresented or allowed to be misrepresented the status of payment of the Company's taxes, the revenues generated by the Company and the value of the Company's assets.

200.    The Company's creditors justifiably relied upon the Defendants' misrepresentation and non-disclosures in continuing to conduct business with a seemingly financially-secure corporation.

201.    The reliance on these misrepresentations was to the detriment of all creditors who continued to conduct business with the Company.

202.    The Company's creditors and estates were harmed by the negligent misrepresentations that are referenced above.

## COUNT VI

### Fraud
### Against Defendant Richard McDonald

203.    The Trustee incorporates by reference the allegations in the preceding paragraphs of the Amended Complaint as though the same were set forth in full herein.

204.    Since the outset of the "reverse merger" that created the Company, Defendant McDonald defrauded the Company, its shareholders, creditors and vendors by utilizing a

36

seemingly unending series of misrepresentations and lies to make the Company appear financially sound. In reality, the Company was hemorrhaging cash and did not have sufficient resources to support its own operations.

205. To conceal the dire financial condition of the Company, McDonald caused the Company to misrepresent its revenues, its cash flow and its tax obligations.

206. Moreover, McDonald defrauded creditors—including, without limitation, CSF—by causing the Company to continually borrow against receivables to which it was no longer entitled to payment.

207. McDonald even caused the Company to misrepresent his educational background to create an appearance of creditability for himself (a member of the Company's senior management, board of directors and one of the Company's largest shareholders).

208. The ultimate result of the fraud and misrepresentations perpetrated by McDonald was the Company's payment of millions of dollars to McDonald at a time when the Company could not support operations.

209. Through the creation of a "related party loan" McDonald was able to mask millions of dollars of misappropriated funds, and concomitantly, facilitate payment of millions of dollars to himself.

210. McDonald intended that the Company's creditors and investors rely upon his representations in continuing to conduct business with the Company.

211. The Company's creditors relied upon the accuracy of the representations made by McDonald in continuing to conduct business with, and extend credit to, the Company.

212. The Company's creditors suffered damages as a result of McDonald's scheme to defraud creditors.

PH1 931629v15 11/15/07

## COUNT VII

### Aiding and Abetting Fraud
### Against All Defendants (Other Than Defendant McDonald)

213.    The Trustee incorporates by reference the allegations in the preceding paragraphs of the Amended Complaint as though the same were set forth in full herein.

214.    As set forth above, Defendant McDonald defrauded the Company's creditors, venders and investors. The remaining Defendants—all members of the Company's management or board of directors—substantially assisted in this pattern of fraud.

215.    The Defendants failed to establish any system to adequately monitor the Company's financial representations and performance. As a result of these failures, McDonald was able to make false representations regarding the Company's performance and financial stability.

216.    The Defendants joined McDonald in this pattern of fraud by making and/or allowing misrepresentations, or confirming McDonald's misrepresentations, to creditors and investors.

217.    The Defendants also provided substantial assistance to McDonald by failing to properly report misrepresentations that were knowingly false.

218.    Upon information and belief, the Defendants were aware and/or should have been aware of the fraudulent conduct that McDonald was perpetrating (including knowledge of the improper "booking" of revenue for financing received from the exercise of warrants).

219.    Despite this knowledge, the Defendants allowed McDonalds' conduct to continue, with reporting the conduct to the board of directors, or independent auditors.

220.    Also upon information and belief, the Defendants failed to maintain a system pursuant to which the Company's employees were able to report accounting abnormalities to the Company's management.

PH1 931629v15 11/15/07

221.   The Company's creditors were harmed as a direct and proximate result of this conduct.

## COUNT VIII

### Turnover of Property of Estate
### Against Defendant McDonald

222.   The Trustee incorporates by reference the allegations in the preceding paragraphs of the Amended Complaint as though the same were set forth in full herein.

223.   Section 541 of the Bankruptcy Code defines property of the estate as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Section 542 of the Bankruptcy Code gives a trustee the power to seek turnover of all property of the debtor's estate. 11 U.S.C. § 542. Section 542 states, in pertinent part, that:

> an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of the title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C. § 542(a).

224.   This section requires that any property of a debtor's estate held by any entity must be turned over to the trustee. *In re Allegheny Label, Inc.*, 128 B.R. 947, 954 (Bankr. W.D. Pa. 1991); *In re Express America, Inc.*, 130 B.R. 196, 198 (W.D. Pa. 1991), *Staats v. Meade (In re Meade)*, 84 B.R. 106, 108 (Bankr. S.D. Ohio 1988) (characterizing funds held in bank account for benefit of another as property of the estate recoverable under section 542).

225.   To obtain turnover under section 542, the Trustee must establish the following elements: "(1) that the property which the [T]rustee seeks to recover is property of the estate; and (2) that the [T]rustee is entitled under Section 363 to use, sell, or lease the property." *In re*

*Allegheny Label, Inc.*, 128 B.R. at 954 (citing *In re Weiss-Wolf, Inc.*, 60 B.R. 969, 975 (Bankr.S.D.N.Y. 1986)); *In re Express America, Inc.*, 130 B.R. at 198.

226.    The Trustee has standing to assert a claim under section 542 of the Bankruptcy Code.

227.    The Trustee submits that at least $250,000.00 currently in McDonald's possession constitutes property of the estate within the meaning of Bankruptcy Code section 541.

## COUNT IX

### Fraudulent Transfer Under 11 U.S.C. §§ 548 and 550
### Against Defendants McDonald, Sercu, Hayden, Jackson, Higbee, Licastro and Ridner

228.    The Trustee incorporates by reference the allegations in the preceding paragraphs of the Amended Complaint as though the same were set forth in full herein.

229.    Within one year of the Petition Date, World Health transferred to or for the benefit of McDonald a total of at least $250,000.00 for unknown reasons.

230.    Further, within one year of the Petition Date, the Indemnified Defendants transferred to themselves items of value from World Health such as the Indemnification Agreement, which named the Indemnified Defendants as indemnitees.

231.    In addition, according to the Statement of Financial Affairs prepared by M. Benjamin Jones, President and Restructuring Officer of the Company, dated March 22, 2005, the following transfers (not including payroll) were made to the following Defendants within one year of the Petition Date:

40

| NAME AND ADDRESS OF CREDITOR AND RELATIONSHIP TO DEBTOR | DATE OF PAYMENTS | AMOUNT PAID |
|---|---|---|
| Bruce Hayden<br>15301 Limestone School Road<br>Leesburg VA 20176<br>(not including payroll) | 6/21/05<br>7/29/05<br>8/19/05<br>8/26/05<br>9/26/05 | 1,057.61<br>817.44<br>2,064.73<br>225.35<br>218.70 |
| Brian T. Licastro<br>737 Harden Drive<br>Pittsburgh, PA 15229<br>(not including payroll and stock issuance) | 3/11/2005<br>7/29/2005<br>8/12/2005<br>9/9/2005<br>9/26/2005<br>10/7/2005<br>10/14/2005<br>10/21/2005<br>10/21/2005<br>11/18/2005 | 1200<br>82.77<br>85.56<br>85.56<br>22.00<br>85.56<br>5,292.65<br>172.56<br>96.00<br>200.00 |
| John W. Higbee<br>824 Arbordale Lane<br>Wexford, PA 15090 | 12/1/2005<br>12/29/2005<br>1/31/2006 | 5,000<br>5,000<br>5,000 |
| Frederick R. Jackson, Sr.<br>827 Keywest Drive<br>Pittsburgh, PA 15239 | 11/29/2005<br>12/28/2005<br>1/31/2006 | 5,000<br>5,000<br>5,000 |
| Richard McDonald<br>(not including other transactions listed on related loan account which are questionable or not carried forward to this schedule) | 4/18/05 | 250,000.00 |
| John C. Sercu<br>5428 Champer Pl<br>Issaquah, WA 98027<br>(not including payroll and stock issuance) | 3/3/2005<br>3/9/2005<br>4/22/2005<br>10/14/2005<br>10/14/2005<br>11/14/2005 | 8,568.26<br>14,791.99<br>623.80<br>8,725.01<br>633.73 |

232.    The transfers set forth above and the Indemnification Agreements were executed and/or entered into with the actual intent to hinder, delay or defraud creditors of the Company.

233.    World Health received less than reasonably equivalent value in exchange for World Health's transfers to McDonald as described above and for the Indemnification Agreement.

234.    World Health was insolvent on the date the transfers were made to McDonald and the other Defendants or became insolvent as a result of the transfers.

PH1 931629v15 11/15/07

235.    The Trustee is entitled to avoid the transfers made to the Defendants pursuant to 11 U.S.C. § 548 and to recover the amount of the transfers to the Defendants pursuant to 11 U.S.C. § 550.

## COUNT X

### Fraudulent Transfer Under Pennsylvania Uniform Fraudulent Transfer Act, Section 5104 Against Defendants McDonald, Sercu, Hayden, Jackson, Higbee, Licastro and Ridner

236.    The Trustee incorporates by reference the allegations in the preceding paragraphs of the Amended Complaint as though the same were set forth in full herein.

237.    The transfers described above from World Health to the Defendants were made with the actual intent to hinder, delay or defraud creditors of the debtor; or without World Health receiving a reasonably equivalent value in exchange for the transfer or obligation.

238.    World Health was engaged or was about to engage in a business or a transaction for which the remaining assets of the World Health were unreasonably small in relation to the business or transaction; or World Health intended to incur, or believed or reasonably should have believed that the World Health would incur, debts beyond the World Health's ability to pay as they became due.

239.    The Defendants were insiders of World Health.

240.    World Health was insolvent or became insolvent shortly after the transfer was made.

241.    Section 544(b) of the Code provides that "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or is not allowable only under section 502(e) of this title."

42

242.    Pursuant to the Pennsylvania Uniform Fraudulent Transfer Act, the payments to McDonald and the provision of the Indemnification Agreement as set forth above are void.

## COUNT XI

### Fraudulent Transfer Under Pennsylvania
### Uniform Fraudulent Transfer Act, Section 5105
### Against Defendants McDonald, Sercu, Hayden, Jackson, Higbee, Licastro and Ridner

243.    The Trustee incorporates by reference the allegations in the preceding paragraphs of the Amended Complaint as though the same were set forth in full herein.

244.    The transfers described above from World Health to the Defendants were fraudulent as to creditors because World Health made the transfer without receiving a reasonable equivalent value in exchange for the transfer and World Health was insolvent at the time of the transfers or World Health became insolvent as a result of the transfer.

245.    Pursuant to the Pennsylvania Uniform Fraudulent Transfer Act, Section 5105, the payments to McDonald and the provision of the Indemnification Agreement as set forth above are void.

## COUNT XII

### Equitable Subordination
### Against All Defendants

246.    The Trustee incorporates by reference the allegations in the preceding paragraphs of the Amended Complaint as though the same were set forth in full herein.

247.    Upon information and belief, certain of the Defendants—including Hayden and Jackson—have filed proofs of claim in these cases.

248.    Other Defendants are listed as having either priority unsecured, or general unsecured claims on the Debtors' Schedules of Assets and Liabilities and Statement of Financial Affairs (collectively, the "Schedules").

43

249.    Any claims asserted by (or to be asserted by), or Scheduled by the Debtors in favor of, the Defendants should be subordinated to all creditors of, and/or interest holders against, these estates pursuant to section 510(c) of the Bankruptcy Code.

250.    As set forth above, the Defendants were engaged in an ongoing pattern of wrongful conduct, including mismanaging the Company's assets and misrepresenting the Company's financial condition and performance.

251.    The Defendants' inequitable conduct caused harm to all valid creditors of the Company, who continued to conduct business with the Company under the illusion of financial stability that was created by the Defendants' misrepresentations (or failure to ameliorate these misrepresentations).

252.    The subordination of the Defendants' claims is consistent with the provisions of the Bankruptcy Code.

253.    The Plaintiff requests that this Court subordinate any allowed claim asserted by, or Scheduled in favor of, the Defendants to the rights, claims and interests of all other claimants and interest holders in these cases, and bar the Defendants' from receiving a distribution from the proceeds of this adversary proceeding.

## COUNT XIII

### Professional Negligence
### Against Defendant Licastro

254.    The Trustee incorporates by reference the allegations in the preceding paragraphs of the Amended Complaint as though the same were set forth in full herein.

255.    Defendant Licastro was employed by and served the Company as in-house General Counsel on a *de facto* and/or formal basis, and had a duty to provide legal services to the Company consistent with the applicable standard of care.

PH1 931629v15 11/15/07

256.    Defendant Licastro breached the applicable standard of care, for example, by not providing oversight and failing to provide advice that would have prevented the Company from submitting SEC filings that included material misrepresentations.

257.    As a proximate result of the material breach of Defendant Licastro's duties, the Company has suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a.    Against the Defendants and in favor of the estate of World Health for the amount of damages sustained because of the Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, including attorney fees, accounting fees, investigation expenses and other costs and expenses incurred in connection with the Company's restatement, the SEC investigation and the securities class action lawsuits;

b.    Awarding damages for deepening insolvency resulting from Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, including attorney fees, accounting fees, investigation expenses and other costs and expenses incurred in connection with the Company's restatement, the SEC investigation and the securities class action lawsuits;

c.    Awarding extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of the Defendants' trading activities or their other assets so as to ensure that Plaintiff has an effective remedy;

d.    Awarding to World Health restitution from the Defendants, and ordering disgorgement of all profits, benefits and other compensation obtained by these Defendants;

e.    Awarding to World Health costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

f.    Awarding punitive damages and all other just and appropriate relief related to the misconduct—including fraud and misrepresentation—set forth in this Amended Complaint;

g.    Equitably subordinating the Defendants' claims in these cases to all other classes of claims and interest holders in these cases;

PH1 931629v15 11/15/07

h.    Avoiding any fraudulent transfers made by the Company to the Defendants and recovering any such transferred property for the benefit of these estates and their proper creditors;

i.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Respectfully submitted,

**FOX ROTHSCHILD LLP**

By:_____/s/ Francis G. X. Pileggi, (#2624)
Francis G.X. Pileggi, Esquire (#2624)
Daniel K. Astin, Esquire (#4068)
Sheldon K. Rennie, Esquire (#3772)
Anthony M. Saccullo, Esquire (#4141)
919 N. Market Street, Suite 1300
Wilmington, DE  19801
(302) 654-7444

and

Edward J. DiDonato, Esquire
**FOX ROTHSCHILD LLP**
2000 Market Street, Tenth Floor
Philadelphia, PA  19103
*Attorneys for Trustee*

Dated:  November 15, 2007

46

# EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| WORLD HEALTH ALTERNATIVES, INC., *et al.*[1] | : | CHAPTER 7 |
|  | : | Case No. 06-10166 (PJW) |
| Debtors. | : | Jointly Administered |
|  | : |  |
| GEORGE L. MILLER, Chapter 7 Trustee for WORLD HEALTH ALTERNATIVES, INC., *et al.* | : | Adversary No. 07-51350 (PJW) |
| Plaintiff, | : |  |
| v. | : |  |
| RICHARD E. MCDONALD, MARC ROUP, JOHN C. SERCU, BRUCE HAYDEN, FREDERICK R. JACKSON, SR., JOHN W. HIGBEE, BRIAN T. LICASTRO, MARK B. RINDER and DEANA J. SERUGA | : | RE: Docket No. *159* |
| Defendants. | : |  |

## AMENDED SCHEDULING ORDER

IT IS HEREBY ORDERED that:

1.    This Order only applies to the litigation between George L. Miller, the chapter 7 trustee (the "Chapter 7 Trustee") for the estates of the above-captioned debtors (the "Debtors"), and Defendant Brian T. Licastro. This Order does not extend any of the deadlines contained in the original scheduling order for any of the other above-captioned defendants.

---

[1] In addition to World Health Alternatives, Inc., a Florida corporation, the following entities are debtors in possession in these jointly administered bankruptcy cases: World Health Staffing, Inc., a California corporation, World Health Staffing, Inc., a Delaware corporation f/k/a MedTech Medical Staffing of Orlando, Inc., Better Solutions, Inc., JC Nationwide, Inc. f/k/a Medtech Staffing of Boca Raton, Inc. d/b/a JC Nationwide, MedTech Medical Staffing of New England, Inc. and MedTech Franchising, Inc.

WM1A 822462v3 06/10/08

*Adv. Dkt. No. 162*
*6/12/08*

2.    Initial Disclosures.  Initial disclosures required by Federal Rule of Civil Procedure 26(a)(1)(A), as incorporated into this proceeding by Federal Rule of Bankruptcy Procedure 7026, have already been provided by the parties.

3.    Fact Discovery.  All fact discovery shall be completed no later than September 19, 2008.[2] The parties may agree to additional or later fact discovery without leave of Court so long as the dates set forth in paragraph 5 of this Order are not affected.

4.    Expert Discovery.  All expert discovery shall be completed as set forth below:

(a)    Affirmative expert reports shall be served no later than October 3, 2008;

(b)    Rebuttal expert reports shall be served no later than October 17, 2008; and

(c)    Expert discovery shall be completed no later than October 31, 2008.

The parties may agree to additional or later expert discovery without leave of Court so long as the dates set forth in paragraph 5 of this Order are not affected.

5.    Dispositive Motions.  All dispositive motions shall be filed and served no later than November 14, 2008.  All opposition papers shall be filed and served no later than November 28, 2008.  All reply papers shall be filed and served no later than December 5, 2008.

6.    Joint Pre-Trial Memorandum.  The parties shall file a joint pre-trial memorandum ten (10) days prior to the pre-trial conference date established by this Court.

7.    Pre-Trial Conference Date.  The adversary proceeding shall be set for a pre-trial conference on _Jan. 8, 2009 at 9:30_

8.    Deadline Extension.  The deadlines contained in this Order may be extended only by the Court and only upon written motion or stipulation of the parties, except insofar as

---

2 Per agreement of the parties, Defendant Licastro will respond to up to an additional twenty-five (25) Interrogatories timely served by the Chapter 7 Trustee, and the Trustee will respond to up to an additional twenty-five (25) Interrogatories timely served by Defendant Licastro.

WM1A 822462v3 06/10/08

paragraphs 3 and 4 above permit the parties to alter the discovery schedule by consent without further order of the Court.

9.    Service of the Order.  The Chapter 7 Trustee shall serve this Order on Defendant Brian T. Licastro within five (5) business days after the entry thereof.

Dated: June _11_, 2008

_____

The Honorable Peter J. Walsh
United States Bankruptcy Judge

3