**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| | : Chapter 7 |
| WORLD HEALTH ALTERNATIVES, | : |
| INC., *et al.*[1] | : |
| | : Case No. 06-10166 (PJW) |
| | : Jointly Administered |
| Debtors. | : |
| | : |
| GEORGE MILLER, | : |
| Chapter 7 Trustee for WORLD HEALTH | : |
| ALTERNATIVES, INC., et al. | : Adversary No. 07-51350 (PJW) |
| | : |
| Plaintiff, | : |
| v. | : |
| | : |
| RICHARD E. MCDONALD, MARC ROUP, | : |
| JOHN C. SERCU, BRUCE HAYDEN, | : |
| FREDERICK R. JACKSON, SR., | : |
| JOHN W. HIGBEE, BRIAN T. LICASTRO, | : |
| MARK B. RINDER and DEANA J. SERUGA, | : |
| | : |
| Defendants. | : |

**CHAPTER 7 TRUSTEE'S BRIEF IN OPPOSITION TO DEFENDANT
BRIAN T. LICASTRO'S (I) MOTION FOR DETERMINATION OF CORE AND
NON-CORE PROCEEDINGS, AND (II) MOTION TO WITHDRAW THE REFERENCE**

Francis G.X. Pileggi (Bar No. 2624)
Sheldon K. Rennie (Bar No. 3772)
Carl D. Neff (Bar No. 4895)
FOX ROTHSCHILD LLP
919 N. Market Street, Suite 1300
Wilmington, DE 19801
Tel: (302) 622-4210/Fax: (302) 656-8920

-and-

---

[1] In addition to World Health Alternatives, Inc, the following entities are debtors in possession in these jointly administered bankruptcy cases: World Health Staffing, Inc. a California corporation, World Health Staffing, Inc., a Delaware corporation f/k/a MedTech Medical Staffing of Orlando, Inc., Better Solutions, Inc., JC Nationwide, Inc. f/k/a Medtech Staffing of Boca Raton, Inc. d/b/a JC Nationwide, MedTech Medical Staffing of New England, Inc. and MedTech Franchising, Inc.

Edward J. DiDonato, Esquire
2000 Market Street, Tenth Floor
Philadelphia, PA 19103
Tel: (215) 299-2000/Fax: (215) 299-2150
*Attorneys for Trustee, George L. Miller*

Dated: July 1, 2008

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

NATURE AND STATE OF PROCEEDING ............................................................................1

SUMMARY OF ARGUMENT ..............................................................................................1

STATEMENT OF FACTS ....................................................................................................2

ARGUMENT ......................................................................................................................4

CONCLUSION ...................................................................................................................7

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                                           <u>Page</u>

*Central Ill. Savings & Loan Assoc. v. Rittenberg Co., Ltd. (In re IP*
 *Telecommunications, Inc.)*, 70 B.R. 742 (N.D. Ill. 1987).....................................................5

*Connolly v. Bidermann Industries U.S.A., Inc.*, No. 95 Civ. 1791, 1996 WL 325575
 (S.D.N.Y. June 13, 1996).........................................................................................5

*In re Baldwin-United Corp.*, 57 B.R. 751 (S.D. Ohio 1985)......................................................5

*In re Giorgio*, 50 B.R. 327 (D.R.I. 1985) .................................................................................5

*In re Stavriotis*, 111 B.R. 154 (N.D. Ill. 1990) ..........................................................................5

*Internal Revenue Service v. CM Holdings, Inc. (In re CM Holdings, Inc.)*
 212 B.R. 715, 720 (D. Del. 1998)..........................................................................................4

*Laine v. Gross*, 128 B.R. 588 (D. Maine 1991) ........................................................................5

*Lowin v. Dayton Securities Associates (In re the Securities Group 1980)*
 89 B.R. 196 (M.D. Fla. 1988) ...............................................................................................4

*NDEP Corp. V. Handl-It, Inc. (In re NDEP Corp.),* 203 B.R. 905 (D. Del. 1996)..............4, 6

*U.S. v. Kaplan*, 146 B.R. 500, 503 (D. Mass. 1992)............................................................5, 6

## FEDERAL STATUTES AND REGULATIONS

28 U.S.C. § 157(d) ....................................................................................................................4

## NATURE AND STAGE OF PROCEEDINGS

On May 21, 2007, Plaintiff, George L. Miller, the chapter 7 trustee (the "Trustee" or "Plaintiff") for the jointly-administered estates of World Health Alternatives, Inc. *et al*. (the "Debtors", or "World Health") filed a complaint (the "Original Complaint") asserting various causes of action including breach of fiduciary duty claims. [Docket No. 1]. On July 25, 2007, Defendant Brian T. Licastro ("Licastro") filed a motion to dismiss the Original Complaint (the "First Motion to Dismiss"). [Docket No. 52].

On November 15, 2007, the Trustee filed an amended complaint (the "Amended Complaint") against Licastro and other named defendants. [Docket No. 89]. On December 11, 2007, Licastro filed a motion to dismiss (the "Second Motion to Dismiss") the Amended Complaint. [Docket No. 98]. The Second Motion to Dismiss was denied in part by Order dated April 9, 2008. Specifically, Licastro's Second Motion to Dismiss with the exception of Counts IX, X, XI, and XII of the Amended Complaint.

Defendant Licastro has now filed a Motion for Determination (the "Motion for Determination") of Core and Non-Core Proceedings within this adversary proceeding, along with a Motion to Withdraw the Reference ("Motion to Withdraw"). This is the Trustee's brief in opposition to Licastro's Motion for Determination and Motion to Withdraw.

## SUMMARY OF ARGUMENT

Licastro's Motion for Determination and Motion to Withdraw should be denied, because it is untimely. Litigation between the Trustee and Licastro (collectively the "Parties") in this adversary proceeding has been ongoing for more than a full year, as the Original Complaint was filed May 21, 2007. Additionally, discovery in this matter has been initiated since November 30, 2007, and the deadline to complete all fact discovery is merely less than three months away.

Licastro had many opportunities to file these motions at the onset of this litigation when he was on notice of the claims asserted in both the Original Complaint and the Amended Complaint. Instead, he stood idly by and allowed valuable time to pass without proceeding with such a motion. Even if he wanted to wait until a decision was rendered on his Second Motion to Dismiss, there is certainly no justification for waiting months after this Court denied in part that motion before filing his Motion to Withdraw or Motion for Determination with the Court.

Further, judicial economy would be best served by keeping this matter before the Bankruptcy Court. The facts underlying the corporate wrongdoing of the Defendants have been before the Bankruptcy Court since the filing of the Original Complaint, and that Court has had the opportunity to digest such facts in ruling on Licastro's Second Motion to Dismiss. It would not be efficient for the District Court to now have to unravel the facts of this proceeding, especially at this stage of the litigation. Accordingly, Licastro's Motion for Determination and Motion to Withdraw should be denied, because of their unexcused untimeliness and because of established case precedent that requires their denial.

## **STATEMENT OF FACTS**

On May 21, 2007, the Trustee filed the Original Complaint against Licastro and other defendants, asserting the following claims against Licastro: (i) breach of fiduciary duty, (ii) unjust enrichment, (iii) Sarbanes-Oxley Act violations, (iv) self-dealing/breach of fiduciary duties, (v) breach of fiduciary duty against creditors, (vi) fraudulent transfer under 11 U.S.C. §§ 548 and 550, and (vii) fraudulent transfer under §§ 5104 and 5105 of the Pennsylvania Uniform Fraudulent Transfer Act.

On November 15, 2007, the Trustee filed an Amended Complaint against Licastro and the other defendants, asserting many of the claims set forth in the Original Complaint, along with

2

several additional claims.  The following claims are asserted in the Amended Complaint against Licastro: (i) breach of fiduciary duty, (ii) aiding and abetting breach of fiduciary duty, (iii) corporate waste, (iv) aiding and abetting corporate waste, (v) negligent misrepresentation, (vi) aiding and abetting fraud, (vii) fraudulent transfer under 11 U.S.C. §§ 548 and 550, (viii) fraudulent transfer under §§ 5104 and 5105 of the Pennsylvania Uniform Fraudulent Transfer Act (ix) equitable subordination, and (x) professional negligence.

A scheduling order was entered on July 13, 2007 (the "Original Scheduling Order"), which required that all discovery be completed by May 15, 2008.  Pursuant to this Original Scheduling Order, a Pretrial Conference Date had been scheduled for August 14, 2008, approximately 45 days from today.  On May 13, 2008, more than a month after Licastro's Second Motion to Dismiss was denied in part, Licastro moved to amend the scheduling order ("Motion to Amend").  Licastro had not conducted any discovery prior to the discovery cut-off scheduled in the Original Scheduling Order.  The Parties agreed to an Amended Scheduling Order which, among other things, extended fact discovery for a period of 105 days.

The litigation between the Trustee and Licastro (the "Parties") is quickly progressing. An extensive amount of discovery has been conducted to date, and less than three months remain for the Parties to conduct fact discovery.  Licastro has served discovery requests on the Trustee and the other named defendants, noticed a Rule 30(b)(6) deposition for the corporate designee of the Debtors, and has filed and served initial disclosures.

As indicated in the Trustee's Response to Licastro's Motion to Amend, on June 26, 2008, the Trustee filed a Notice of Withdrawal of Request for Trial by Jury.  [Docket No. 176].

Now, more than thirteen months after the Original Complaint was filed, and over seven months after the Amended Complaint was filed, Licastro moves to withdraw this proceeding to

the District Court. Given the untimely filing of Licastro's Motion for Determination and Motion

to Withdraw, and coupled with the fact that Licastro had full knowledge that potentially non-core

claims were asserted against him in the Original Complaint, these Motions should be denied.

## ARGUMENT

Given the untimeliness of the filing of Licastro's Motion for Determination and Motion

to Withdraw, both of these Motions should be denied.

In determining whether to grant or deny a motion to withdraw the reference, "this Court

will consider ... whether withdrawal would serve judicial economy, such as the goals of

promoting uniformity in bankruptcy administration, reducing forum shopping and confusion,

fostering the economical use of the debtors' and creditors' resources, and expediting the

bankruptcy process." *NDEP Corp. V. Handl-It, Inc. (In re NDEP Corp.),* 203 B.R. 905, 913 (D.

Del. 1996).

28 U.S.C. § 157(d) permits withdrawal of the reference "on timely motion of a party." 28

U.S.C. § 157(d). "[T]imeliness of the motion for withdrawal of the reference is not defined in

the statute and can be judged only in a relative sense." *Lowin v. Dayton Securities Associates (In

re the Securities Group 1980),* 89 B.R. 196, 197 (M.D. Fla. 1988). Accordingly, courts have

interpreted the language as requiring a motion to withdraw the reference to be filed at the first

reasonable opportunity. *See, e.g., Internal Revenue Service v. CM Holdings, Inc. (In re CM

Holdings, Inc.),* 212 B.R. 715, 720 (D. Del. 1998) (a six-week delay not untimely). *See also

Lowin v. Dayton Securities Associates (In re the Securities Group 1980)*, 89 B.R. 196, 197 (M.D.

Fla. 1988) (failure to make the motion "at the first opportunity" constitutes an implied waiver of

objection to the bankruptcy court's jurisdiction over the adversary proceeding).

4

In *Laine v. Gross*, 128 B.R. 588 (D. Maine 1991), the defendants waited until after the bankruptcy court's denial of their motions to dismiss RICO claims to seek withdrawal of the reference.  The district court held that the filing of a motion to withdraw the reference over six months after the defendants were served with the complaint was untimely where it was clear from the face of the complaint that grounds for withdrawal existed.  *See id.* at 589; *see also In re Stavriotis*, 111 B.R. 154 (N.D. Ill. 1990); *Connolly v. Bidermann Industries U.S.A., Inc.*, No. 95 Civ. 1791, 1996 WL 325575, at *2-3 (S.D.N.Y. June 13, 1996); *U.S. v. Kaplan*, 146 B.R. 500, 503 (D. Mass. 1992) (where the right to withdrawal of the reference was evident from the face of the complaint, a motion filed five months after the adversary proceeding instituted was untimely); *In re Giorgio*, 50 B.R. 327, 328-329 (D.R.I. 1985); *In re Baldwin-United Corp.*, 57 B.R. 751, 754 (S.D. Ohio 1985); *Central Ill. Savings & Loan Assoc. v. Rittenberg Co., Ltd. (In re IP Telecommunications, Inc.)*, 70 B.R. 742, 746-47 (N.D. Ill. 1987) (motion of defendants who waited over one year to seek withdrawal of reference was denied as untimely but motion of newly-added defendant brought before filing of motion to dismiss was granted as timely).

It is clear that the Original Complaint served on Defendant Licastro on May 21, 2007 placed him on notice that there existed issues potentially giving rise to a right to withdrawal of the reference.  Instead of filing a Motion to Withdraw at the time that he filed the First Motion to Dismiss, however, Licastro waited until almost a year later to raise the issue.  At the very least, Licastro should have accompanied his Second Motion to Dismiss with a request to withdraw the reference, the filing of which occurred almost seven months ago.  It is apparent that Licastro's questionable timing in filing his untimely Motion to Withdraw and Motion for Determination is in direct response to the Bankruptcy Court's ruling denying in part his Second Motion to

Dismiss. *See* copy of the Memorandum Opinion denying Licastro's Second Motion to Dismiss, dated April 9, 2008, attached hereto as Exhibit "A".

In the course of Licastro's delay in filing his Motion to Withdraw, the litigation between the Parties has advanced significantly. The Trustee conducted an entire first round of discovery, pursuant to the deadlines set forth in the Original Scheduling Order. Discovery pursuant to the Amended Scheduling Order is now underway, and less than three months remain for the Parties to conduct fact discovery. Licastro himself has actively pursued discovery to date, including serving discovery requests upon the other named defendants and the Trustee, noticing a Rule 30(b)(6) deposition of a corporate designee of the Debtors, and filing his initial disclosures. Furthermore, the Parties have even conducted mediation in this matter.

Clearly, withdrawal of this proceeding would not serve judicial economy, nor would it expedite the bankruptcy process. *See NDEP Corp.*, 203 B.R. at 913. It was clear from the face of the Original Complaint, filed over a year ago, and the Amended Complaint, filed over seven months ago, that issues presented in these pleadings could give rise to a filing of a withdrawal of the reference. Such a delay should be disallowed by the Court. *See Kaplan*, 146 B.R. at 503 (where the right to withdrawal of the reference was evident from the face of the complaint, a motion filed five months after the adversary proceeding instituted was untimely).

In addition, Licastro waited for over two months after the Court's opinion denying in part his Second Motion to Dismiss to file the Motion for Determination and Motion to Withdraw. There is no excuse for such a delay. Granting Licastro's Motion to Withdraw at this very late stage in the litigation is simply not consistent with applicable case law. Accordingly, this Motion to Withdraw should be denied as untimely.

6

## <u>CONCLUSION</u>

In light of the foregoing reasoning and authorities, the Trustee respectfully submits that

Defendant Licastro's Motion to Withdraw and Motion for Determination be denied.


FOX ROTHSCHILD LLP

By:    /s/ Carl D. Neff
       Francis G.X. Pileggi (Bar No. 2624)
       Sheldon K. Rennie (Bar No. 3772)
       Carl D. Neff (Bar No. 4895)
       919 N. Market Street, Suite 1300
       Wilmington, DE  19801
       Tel: (302) 655-3667/Fax: (302) 656-8920

         -and-

       Edward J. DiDonato, Esquire
       000 Market Street, Tenth Floor
       Philadelphia, PA  19103
       Tel: (215) 299-2000/Fax: (215) 299-2150

       *Attorneys for Trustee, George L. Miller*


Dated: July 1, 2008

WM1A 903617v1 07/01/08

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WORLD HEALTH ALTERNATIVES, INC., et al., | ) ) | Chapter 7 |
| | ) | Case No. 06-10166 (PJW) |
| Debtors. | ) | (Jointly Administered) |
| _____ | ) | |
| | ) | |
| GEORGE L. MILLER, Chapter 7 Trustee for WORLD HEALTH ALTERNATIVES, INC., et al., | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 07-51350 |
| | ) | |
| RICHARD E. MCDONALD, MARC ROUP, JOHN C. SERCU, BRUCE HAYDEN, FREDERICK R. JACKSON, SR., JOHN W. HIGBEE, BRIAN T. LICASTRO, MARK B. RINDER and DEANA J. SERUGA, | ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

| | |
|---|---|
| Francis G.X. Pileggi | Michael D. DeBaecke |
| Sheldon K. Rennie | Blank Rome LLP |
| Carl D. Neff | 1201 Market Street |
| Fox Rothschild LLP | Suite 800 |
| 919 N. Market Street | Wilmington, DE 19801 |
| Suite 1300 | |
| Wilmington, DE 19801-3046 | Norman E. Greenspan |
| | Evan H. Lechtman |
| Edward J. DiDonato | Blank Rome LLP |
| Fox Rothschild LLP | One Logan Square |
| 2000 Market Street | Philadelphia, PA 19103 |
| Tenth Floor | |
| Philadelphia, PA 19103 | Counsel to Defendant |
| | Brian T. Licastro |
| Counsel to the Trustee, | |
| George L. Miller | |

Dated: April 9, 2008

2

**WALSH, J.**

This opinion is with respect to defendant Brian T. Licastro's ("Licastro") motion (Doc. # 98) to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and Federal Rule of Bankruptcy Procedure 7012. For the reasons stated below the Court will deny the motion with respect to Counts I, II, III, IV, V, VII, and XIII, and grant the motion with respect to Counts IX, X, XI, and XII.[1]

## BACKGROUND

The facts contained in this section are as set forth in the First Amended Complaint ("Complaint"). (Doc. # 113.) The Complaint is a rather comprehensive document, consisting of 257 paragraphs covering 46 pages.

**The Parties**

The Debtors in this chapter case are World Health Alternatives, Inc. and affiliated entities (collectively, "World Health" or "Company"). World Health was a Florida corporation that maintained its principal place of business in Pittsburgh, Pennsylvania. World Health provided healthcare staffing services to hospitals and other healthcare facilities nationwide. (Doc. # 113, ¶ 6.)

---

[1] Counts VI and VIII are claims against defendant Richard E. McDonald only, therefore not relevant to this motion.

3

World Health filed its chapter 11 petition on February 20, 2006. The case was converted to a chapter 7 case on October 31, 2006 and George L. Miller ("Trustee") was appointed the chapter 7 trustee.

The Defendants are Richard E. McDonald ("McDonald") who served as president, chairman of the board, principal financial officer and principal accounting officer of World Health from its inception as a public company on February 20, 2003 until June 23, 2004 at which time he became chief executive officer; Marc D. Roup ("Roup") who was World Health's chief executive officer until his resignation on June 23, 2004; John C. Sercu ("Sercu") who served as World Health's chief operating officer from May 2004 until on or about August 16, 2005 when he became chief executive officer after McDonald's resignation; Bruce Hayden ("Hayden") who served as World Health' chief financial officer from July 18, 2005 through August 24, 2005; Frederick R. Jackson, Sr. ("Jackson") who served as a member of World Health's board of directors throughout the relevant period; John W. Higbee ("Higbee") who served as a member of World Health's board throughout the relevant period; Brian T. Licastro ("Licastro") who served as World Health's vice president of operations and in-house general counsel, on a de facto and/or formal basis;[2] Mark B. Rinder ("Rinder") who served as a financial

---

[2]     Licastro does not admit or deny that he was the in-house general counsel and in his reply brief he requests that I ignore the exhibits attached to the Trustee's answering brief

4

consulting advisor to World Health; and Deana J. Seruga ("Seruga")
who served as World Health's corporate comptroller during all
relevant times.

World Health's Board of Directors consisted of three
members: McDonald, Jackson, and Higbee. Jackson and Higbee were
appointed by McDonald in 2004. The board did not hold annual
meetings in 2003 or 2004, and thus, public shareholders did not
elect any directors. (Doc. # 113, ¶ 64.) Allegedly, McDonald had
general authority to execute Jackson's signature on board-related
documents. Therefore, he had the power to execute documents on
behalf of the majority of the board. (Doc. # 113, ¶¶ 65-66.)

**Company's Growth and Financing - 2003-2004**

On February 20, 2003, World Health became a public
company. (Doc. # 113, ¶ 9.) It underwent a "reverse merger" to
acquire 100% of the common stock of Better Solutions, Inc. ("Better
Solutions"), a healthcare staffing company, from its founders and
co-owners, McDonald and Roup. (Doc. # 113, ¶ 29.) World Health
provided McDonald and Roup with 33,000,000 shares of newly-issued
World Health common stock, making them the controlling shareholders

---

that label Licastro as general counsel. He is correct in that
regard. However, this is a motion to dismiss and in a number of
places the Complaint specifically asserts that in addition to
being a vice-president Licastro was the general counsel. (Doc. #
113, ¶¶ 20-23.) The Complaint states it and in a motion to
dismiss the court must accept the allegations as true unless the
defendant presents evidence showing the allegation to be false.
(Rocks v. City of Phila., 868 F.2d 644, 645; Morse, 132 F.3d at
906). Licastro has not done that in his motion papers.

5

of World Health, owing approximately 82% of its outstanding shares. (Doc. # 113, ¶ 30.)

As of March 31, 2003, World Health had assets totaling $245,727 and negative shareholders equity of $91,762.  Sales for the three months ended March 31, 2003 totaled $942,887, and World Health reported a net loss of $395,016, or $0.01 per share.  (Doc. # 113, ¶ 32.)

In December 2003, World Health redeemed 8,000,000 shares of common stock each from McDonald and Roup. (Doc. # 113, ¶ 33.) In its Form 8-K filing with the Securities and Exchange Commission (the "SEC") on December 8, 2003, World Health stated that the purpose of the redemption was to reduce the long term delutive effect on World Health's future earnings per share. (Doc. # 113, ¶ 35.)

Through the redemption, World Health obtained sufficient authorized shares to execute a strategy of future growth.  The center piece of the strategy was a series of private placement transactions ("PPT").  From December 2003 through December 2004 World Health executed numerous PPTs, through which it issued common and preferred stock, warrants for the purchase of common stock, and convertible debentures.  (Doc. # 113, ¶¶ 35-36.)  It purportedly raised approximately $38 million through these financial transactions.  (Doc. # 113, ¶ 38.)  Additionally, World Health allegedly received approximately $6.9 million from the exercise of

6

warrants issued in connection with these PIPE transactions. (Doc. # 113, ¶ 39.)

Throughout 2003 and 2004, and one instance in 2005, World Health used the funds raised to make the following acquisitions:

(1) Superior Staffing Solutions, Inc., December 22, 2003.

(2) Pulse Healthcare Staffing, Inc., April 30, 2004.

(3) Care For Them Inc., May 7, 2004.

(4) Curley and Associates, LLC., June 1, 2004.

(5) Travel Nurse Solutions, Inc. ("TNS"), October 14, 2004.

(6) J&C Nationwide Inc., November 15, 2004.

(7) Parker Services, Inc., December 31, 2004.

(8) Universal Staffing Group, Inc., July 27, 2005.

**Debt Obligations**

By the end of 2004, World Health used up all of the funding it raised through the PPTs.  To continue its ongoing operation and acquisitions, World Health procured secured debts from CapitalSource Finance, LLC. ("CSF") to refinance outstanding indebtedness and provide additional liquidity. (Doc. # 113, ¶¶ 68-70.)  On February 14, 2005, World Health and CSF entered into a series of agreements  ("CSF Agreement"). (Doc. # 113, ¶ 70.)  The CSF Agreement included a term loan ("CSF Term Loan") in the amount of $7,500,000 and a revolving credit facility that provided a maximum loan amount of $37,000,000.  (Doc. # 113, ¶ 72.)  World

7

Health and each of its subsidiaries were co-borrowers under the CSF Agreement. The obligations under the CSF Agreement were secured by substantially all of World Health and its subsidiaries' assets. (Doc. # 113, ¶ 73.)

In addition to the CSF Agreement, World Health had incurred other obligations. First, pursuant to the TNS acquisition, World Health pledged substantially all of its assets to secure approximately $2.5 million in secured obligations due and owing to the sellers ("Seller Parties"). The Seller Parties agreed to subordinate all of their rights to payments and liens to those of CSF. (Doc. # 113, ¶¶ 76-77.)

World Health received notice from the Internal Revenue Service (the "IRS") that on or about February 7, 2006 the IRS filed liens in favor of the United States on all properties and rights to property belonging to a California subsidiary. (Doc. # 113, ¶ 78.) The IRS alleged that as of February 3, 2006 that subsidiary was indebted to the United States for approximate $1,256,241.27. (Doc. # 113, ¶ 79.) Furthermore, the IRS notified World Health that on or about February 7, 2006 it filed liens in favor of the United States on all properties and rights to property belonging to another subsidiary. The IRS alleged that as of February 2, 2006 that subsidiary was indebted to the United States in the approximate amount of $2,274,316.23. (Doc. # 113, ¶¶ 80-81.) The IRS tax liability amounted to in excess of $4,000,000.

**Corporate Waste**

The Trustee alleges that since 2003 Defendants engaged in and/or allowed the routine waste of World Health's limited resources on expensive and unnecessary luxuries for their personal benefits. (Doc. # 113, ¶ 82.) One instance was World Health leasing 25 hour of flight time on a private jet from Marquis Jet for a payment of $112,939.70. (Doc. # 113, ¶ 83.) In 2004, World Health spent another $114,181.11 on six different chartered flights. (See Doc. # 113, ¶ 88.)

According to World Health's SEC Form 10-KSB (as amended) for 2003 ("2003 Annual Report"), at the time of the chartering, World Health had a gross revenue of $3,093,337 and a negative net income of $33,094 (before adjustment for taxes). At the close of fiscal year 2003, World Health had $177,699 in cash and $1,516,265 in total current assets. Thus, the Trustee alleges that Defendants caused and/or allowed World Health to squander nearly 7.5% of the total current assets on leasing 25 hours of flight time on a private jet. (Doc. # 113, ¶¶ 83-86.) Another example of the alleged waste was World Health paying monthly leases for Roup's and McDonald's luxury cars. (Doc. # 113, ¶ 87.) The monthly payments were $2,207.38 and $2,045.72, respectively. (Doc. # 113, ¶ 87.)

During this time World Health was executing its PPT to raise approximately $40 million to fund its operations and growth. According to its SEC Form 10-KSB (as amended) for 2004 ("2004

9

Annual Report") World Health had a net loss of $13,427,523 for the fiscal year. (Doc. # 113, ¶ 89.)

**Fraudulent Activities**

The Trustee pleads that World Health's management never implemented a system that allowed them to report any accounting and reporting abnormalities in World Health's financial reports, books, or records. (Doc. # 113, ¶¶ 98-100.) The following fraudulent activities allegedly occurred as a result.

**(a) 2002 IRS Reporting**

As early as 2002 McDonald commenced a scheme of manipulating the IRS. McDonald would "cut and past" documents to demonstrate that payments were made to the IRS to satisfy outstanding taxes. Then, he would fax these cut-and-pasted documents to the IRS as evidence of alleged payment of taxes. In actuality, these payments were never made and taxes owed by one of the subsidiaries remained due and outstanding. (Doc. # 113, ¶¶ 98-100.)

**(b) Related Party Loan Account**

McDonald created a related party loan account to offset discrepancies that would occur when funds were not appropriately paid. (Doc. # 113, ¶¶ 106-07.) For example, he would reward himself with excessive bonuses that World Health could not satisfy, instead of taking the cash, McDonald would increase the value of the related party loan. (Doc. # 113, ¶ 107.) In addition, when

payroll tax checks were issued by World Health, McDonald would not remit the checks to the IRS and enter an offsetting line-item into the related party loan account to hide the discrepancy.  (Doc. # 113, ¶ 108.)

On August 16, 2004, World Health issued a press release announcing its second quarter of 2004 results. In it World Health listed a $1,518,571 related party loan liability.  (Doc. # 113, ¶ 109.)  In its August 23, 2004 Form 10-QSB filing with the SEC, again it listed the related party loan as a $1,518,571 liability. (Doc. # 113, ¶ 111.)  By the third quarter of 2004 the related party loan listed in Form 10-QSB had increased to $3,644,307. (Doc. # 113, ¶ 112.)

On March 29, 2005, World Health announced the financial results for year-end 2004.  The press release listed a lower amount for the related party loan, $3,010,420, in World Health's current liabilities.  (Doc. # 113, ¶ 113.)  The 2004 Annual Report confirmed the lower amount of $3,010,420.  (Doc. # 113, ¶ 114.) The apparent reduction was the result of World Health beginning to "repay" the purported loan.  (Doc. # 113, ¶ 116.)  By the first quarter 2005 the related party loan liability had decreased to $1,089,949.  (Doc. # 113, ¶ 118.)

**(c) Misrepresentations in Financial Statements**

McDonald misrepresented his educational background in several SEC filings.  For example, in the 2003 Annual Report he

described his educational background as follows:

> Mr. McDonald received the following degrees in Business Administration:(a) In April 1996, a Bachelor of Science Degree from the University of Pittsburgh; (b) in May 2000, a Master's Degree from Bridgewater University located in London, England; and (c) in May 2001, a Doctoral Degree from Bridgewater University.

(Doc. # 113, ¶ 121.) However, this representation was false.  On July 15, 2004, McDonald signed and filed a Form 8-K with the SEC stating:

> [I]t was confirmed that Mr. McDonald did attend the University of Pittsburgh but the records available at the time could not confirm that he graduated with a B.S. degree.

(Doc. # 113, ¶ 123.)  The Form 8-K stated that all educational credentials should be deemed removed from McDonald's biography. McDonald had not graduated from the University of Pittsburgh, and Bridgewater University is an unaccredited school that offers degrees over the internet for very little work.  (Doc. # 113, ¶ 123.)

From the third quarter of 2003 to June of 2004, McDonald signed and filed certifications as chief executive officer with each Form 10-QSB and 10-KSB filed with the SEC pursuant to § 302 and § 906 of the Sarbanes-Oxley Act of 2002. (Doc. # 113, ¶ 124.) Roup also signed and filed certifications as chief financial officer with each Form 10-QSB and 10-KSB filed with the SEC from the third quarter of 2003 until his resignation in June of 2004. (Doc. # 113, ¶ 124.)  The certifications stated that they each had

12

reviewed the reports, and based on their knowledge the reports do not contain any untrue, omission, or misleading statement of material fact, and based on their knowledge the reports fairly presented in all material respects the financial condition of World Health.  (Doc. # 113, ¶ 124.)   The Trustee alleges that these certifications were false and misleading. (Doc. # 113, ¶ 126.)

Defendants released false information regarding the financial viability of World Health to the public, therefore, to World Health's creditors. On March 29, 2005, Defendants issued a press release announcing World Health's results for the fourth quarter and year-end 2004. For the fourth quarter, World Health reported sales of $22,553,603, an increase of 2244% over sales reported for fourth quarter of 2003. World Health attributed the growth to acquisitions and organic growth.  Defendants reported that World Health experienced gross profit for the fourth quarter of $3,928,592, and increase of 802% compared to the fourth quarter of 2003.  For the year, World Health reported sales of $40,339,739 compared to sales of $3,693,337 for 2003.  Gross profit for the year was $10,242,997, compared to $1,599,794 in 2003.  Total assets as of December 31, 2004 were reported as $100,697,761 compared to $5,301,358 in 2003. Shareholder's equity increased to $36,018,763 compared to $2,184,551 in 2003. In the press release, McDonald stated:

The Company achieved critical mass in the fourth quarter, substantially through strategic acquisitions and strong organic growth. We now offer all of the product lines that are integral to staffing the healthcare industry, making us a 'one-stop' staffing solution for an entire healthcare system. We have established a national reach and expect the benefits to include additional client contracts, a deeper talent pool of consultants and stronger financial performance. We have also reduced our overall debt and improved our financial and operating position.

. . .

The first quarter of 2005 has also yielded excellent results so far and put us on schedule to meet our goals for the year. We expect our first quarter earnings to be $.08 to $.10 per share on revenues of $39 million to $42 million. Overall, we believe we are well positioned to meet the increasing demand for healthcare staffing services that the Company has been experiencing and we reiterate our guidance for 2005 of $200 million in revenues and $.50 to $.55 in net earnings.

. . .

The Company expects to report a corresponding non-cash, beneficial increase in earnings in the first quarter of 2005 as a result of having incurred in the fourth quarter of 2004 certain non-cash expenses associated with preferred stock transactions recognized in the fourth quarter.

. . .

By incurring certain non-cash expenses in 2004, we have, in our estimation, positioned the Company for a profitable 2005. The financing we completed with CapitalSource Finance LLC in February 2005 to refinance existing indebtedness should provide us with the working capital and flexibility needed for us to grow our revenues to over half a billion dollars within the next two years through organic growth and acquisitions.

Defendant Sercu added:

We are on track and continue to execute our plan to become the premier healthcare staffing Company [sic] in the market. We have exceeded our organic growth expectations and continue to experience the benefits of our integration efforts. Our key performance metrics are increasing and all divisions are seeing the results of efforts to improve profitability. (Doc. # 113, ¶ 128.)

The Trustee alleges that McDonald and Sercu's statements

were false and misleading because World Health lacked adequate internal controls and was, therefore, unable to ascertain its true financial condition and could not properly ascertain its debt or its tax liabilities. (Doc. # 113, ¶ 129.)

On April 15, 2005, World Health filed its 2004 Annual Report with the SEC. It reiterated the results stated in the March 29, 2005 press release. The 2004 Annual Report also contained McDonald's certifications pursuant to §§ 302 and 906 of the Sarbanes-Oxley Act of 2002. The Trustee claims that these reports were false and misleading because World Health lacked adequate internal controls and was, therefore, unable to ascertain its true financial condition. (Doc. # 113, ¶¶ 130-31.)

On May 13, 2005, World Health issued a press release announcing it was changing the financial results released for the fourth quarter and fiscal year 2004 after determining that "large, non-cash expenses in connection with a preferred stock transaction that occurred in December 2004" were improperly recorded. The press release quoted McDonald as stating:

> We recorded the non-cash expenses in the fourth quarter of 2004 because we wanted to utilize a conservative reporting approach until we could consult with the Office of the Chief Accountant [of the SEC] and confirm that our position that the preferred stock conversion and redemption features did not create a need for any derivative accounting was correct. Additionally, the Company determined that the warrants associated with the transaction were a liability and therefore the $3,003,591 fair value of the warrants was recorded as a liability. The Company believed it was important to pursue this matter to increase the transparency of its financial reporting and better enable the market to evaluate the Company's financial results in 2004 and in

the future. This positive restatement completes the Company's review of this matter as referenced in our 10-KSB for 2004.

The press release further stated that World Health was filing a Form 10-KSB/A later that day setting forth revised financial statements that would exclude the large, non-cash expenses relating to the preferred stock transaction. According the press release, "[a]s a result, the Company's earnings for the quarter and fiscal year ended December 31, 2004 increased to 14 cents." A comparison of the Form 10-KSB/A filed on or about May 18, 2005 with the March 29, 2005 press release announcing showed the opposite. The restatement merely reduced World Health's reported loss by 14 cents per share, from $0.81 per share to $0.67 per share. (Doc. # 113, ¶ 133.)

On May 16, 2005, World Health filed Form 10-QSB with the SEC for the period ended March 31, 2005. The report noted that:

Effective December 15, 2004, the Company closed on a financing transaction with a group of private investors ("Investors") of up to $11,825,000. The financing consisted of two components: (a) 12,823 shares of Series A Convertible Preferred Stock with a principal amount of $12,823,000 at a dividend rate of 8% per annum and (b) Warrants registered in the name of each Investor to purchase up to a number of shares of common stock of the Company equal to 25% of such Investor's Subscription Amount divided by the subscription amount of $3.00 per share. The Investors have the right to purchase an aggregate of 1,068,583 shires [sic] of the Company's restricted common stock. The Warrants have an exercise price equal to the closing price of the Company's common stock on the day prior to the closing ($3.86). The Warrant, which expires five years from the date of issuance, results in proceeds of $4,124,730 to the Company upon its exercise. The dividends are cumulative

> until December 31, 2006, and will be paid from an escrow
> established at closing if the Investors elect to be paid
> in cash. Under certain circumstances the Company may
> elect to pay the dividend in shares of the Company's
> common stock.
>
> The Preferred Stock is convertible into shares of Common
> Stock of the Company at a conversion price of $3.00 per
> share, which would result in the issuance of 4,274,333
> shares of the Company's common stock if all shares were
> converted.

(Doc. # 113, ¶ 134.)   The Trustee believes that these statements were false and misleading because Defendants were unable to correctly account for World Health's convertible debt and warrants associated with its preferred stock, and was in breach of its existing financing agreements.   (Doc. # 113, ¶¶ 135.)

The Form 10-QSB for the period ended March 31, 2005 contained McDonald's certifications pursuant to §§ 302 and 906 of the Sarbanes-Oxley Act of 2002.   The Trustee alleges that the certifications were false and misleading because Defendants failed to implement adequate internal controls at World Health, thus, unable to ascertain its true financial condition. (Doc. # 113, ¶¶ 135-36.)

World Health's false and misleading financial reporting became public in the second half of 2005.  On July 18, 2005, World Health announced Hayden as the Chief Financial Officer.   (Doc. # 113, ¶ 137.)  On August 16, 2005, World Health first indicated that it had discovered fraudulently reported financial results.  On that date, World Health unexpectedly and abruptly announced that

17

McDonald had resigned as president and chief executive officer "for health and family reasons." World Health appointed Sercu as acting chief executive officer. It also announced that it had notified the SEC that it would not file its 10-Q for the second quarter of 2005 on time. (Doc. # 113, ¶ 138.)

The Trustee alleges that the above described conduct reflects materially false and misleading information because they failed to disclose the following material adverse facts that Defendants knew or should have known:

(a) Defendants engaged in improper accounting practices. Defendants admitted that World Health's prior financial reports were materially false and misleading when it announced that it was going to restate the financial results for 2004 and 2005.

(b) There were discrepancies in the financial statement on the recognition of a convertible debenture and warrant agreement associated with World Health's preferred stock.

(c) There was underpayment of tax liabilities in excess of $4,000,000.

(d) Irregular reports to World Health's lenders resulted in excess funding under World Health lending arrangements of approximately $6.5 million.

(e) World Health was in breach of existing financing documents.

Defendants were increasing or knew of the increase in the revenue reported in publicly-filed financial statements by including funds received from the exercise of warrants. The inclusion of such non-revenue amounts significantly increased the reported revenue and artificially inflated World Health's reported financial performance. (Doc. # 113, ¶¶ 143-44.)

**(d) Double Borrowing on Receivable**

The Trustee alleges that World Health executed a scheme to "borrow" twice on certain account receivable. World Health maintained numerous Master Factoring Agreements with Advance Payroll Funding ("Factoring Agreements"). The Factoring Agreements allowed World Health to receive instant cash in an amount equal to a percentage of the "sold" accounts receivable, subject to adjustment. (Doc. # 113, ¶ 146.)

The problem with the Factoring Agreements was that the "factored" accounts receivable were included in the CSF Agreements' borrowing base calculation. Thus, World Health was able to borrow a percentage of these accounts receivable from CSF, even though the receivables were already "sold" and World Health no longer retained the right to collect on the receivables. (Doc. # 113, ¶ 148.) Also, World Health was not using payments received to satisfy its obligations under the CSF Agreements. (Doc. # 113, ¶ 147.)

Furthermore, when World Health prepared the borrowing base calculation for the CSF Agreements, it provided the reports to

19

McDonald, who would then forward the information to CSF. The Trustee claims that McDonald altered the value of accounts receivable used in the borrowing base calculation before forwarding the documents to CSF. (Doc. # 113, ¶¶ 149-50.) The Trustee also claims that members of World Health's management, including Roup, Sercu, Higbee, Jackson, Licastro, and Seruga became aware of or should have been aware of the malfeasance and misdealing and discrepancies in World Health's revenues. They, however, did not take any action consistent with their fiduciary duties to remedy or ameliorate the discrepancies until after McDonald's resignation. (Doc. # 113, ¶ 151.) The Trustee points to World Health's statement that its reports to its lenders were "irregular" as an admission that management intentionally falsified those reports. (Doc. # 113, ¶ 152.)

**Indemnification Agreement**

On August 29, 2005, World Health filed a Form 8-K with the SEC announcing that it had entered into an Indemnification Agreement with each of World Health's executive officers and directors who were named Defendants in several securities class actions.[3] (Doc. # 113, ¶ 154.) The Indemnification Agreement purportedly included Hayden, Sercu, Licastro, Higbee, Jackson, and Rinder (collectively "Indemnified Defendants"). (Doc. # 113, ¶¶

---

[3] It also announced that Hayden had resigned as Chief Financial Officer. (Doc. # 113, ¶ 160.)

20

154-55.)    It  covered  against  costs  associated  with  shareholder
fraud  lawsuits,  including  attorney's  fees  and  damages  that  the
Indemnified  Defendants  may  otherwise  have  to  pay.  (Doc. # 113, ¶
155.)

The  Trustee  alleges  that  the  provisions  of  the
Indemnification  Agreement  constituted  a  fraudulent  conveyance  to
the  Indemnified  Defendants.  (Doc. # 113, ¶ 159.)   He  contends  that
no  consideration  was  provided  by  the  Indemnified  Defendants  in
exchange  for  the  Indemnification  Agreement.   (Doc. # 113, ¶ 158.)
Although  the  announcement  was  made  on  August  29,  2005  the
Indemnification  Agreement  was  dated  August  21,  2005,  one  day  prior
to  the  filing  of  the  first  securities  class  action.   The
announcement  also  came  approximately  60  days  before  the  revelation
that  World  Health  was  undertaking  an  investigation  of  its
accounting  systems  because  of  inadequate  controls,  examining  past
financial  statements  for  possible  restatement,  and  withholding  its
financial  statements  for  the  third  quarter  of  2005  because  of
problems  with  the  accounting  systems.   (Doc. # 113, ¶ 156.)

**World Health's Collapse**

On  August  24,  2005,  World  Health  filed  a  Form  8-K  with
the  SEC  announcing  that  the  management  discovered  approximately  $22
million  in  debt  of  which  it  was  not  previously  aware.   On  September
9,  2005,  World  Health  announced  that  it  had  retained  Alvarez  &
Marsal  LLC,  a  global  professional  services  firm  specializing  in

turnaround management, to work with World Health's board of directors and management to evaluate the business plan and strategic capital structure of World Health. (Doc. # 113, ¶ 162.) On September 13, 2005, World Health filed a Form 8-K announcing it was aware of the SEC's formal investigation involving it. (Doc. # 113, ¶ 163.) On September 23, 2005, World Health filed a Form 8-K announcing that Bristol Investment Fund, Ltd. notified World Health that it was in default of the terms of the Convertible Debentures and related warrants to purchase common stock issued in May of 2005 due to breaches by World Health of the terms of the Debenture and Purchase Agreement. Bristol notified it of a demand for payment of $6,288,373 plus interest and costs. (Doc. # 113, ¶ 164.) A securities law class action complaint was filed in the United States District Court for the Western District of Pennsylvania. World Health filed its chapter 11 petition on February 20, 2006. The case was converted to a chapter 7 case on October 31, 2006 and the Trustee was appointed.

**The Complaint**

The Complaint alleges 13 counts: (I) breach of fiduciary duty against all Defendants; (II) aiding and abetting breach of fiduciary duty against all Defendants; (III) corporate waste against all Defendants; (IV) aiding and abetting waste of corporate assets against all Defendants; (V) negligent misrepresentation against all Defendants; (VI) fraud against McDonald; (VII) aiding

and abetting fraud against all Defendants other than McDonald;
(VIII) turnover of property of estate against McDonald; (IX)
fraudulent transfer under 11 U.S.C. §§ 548 and 550 against
McDonald, Sercu, Hayden, Jackson, Higbee, Licastro, and Rinder; (X)
fraudulent transfer under Pennsylvania Uniform Fraudulent Transfer
Act, § 5104 against McDonald, Sercu, Hayden, Jackson, Higbee,
Licastro, and Rinder; (XI) fraudulent transfer under Pennsylvania
Uniform Fraudulent Transfer Act, § 5105 against  McDonald, Sercu,
Hayden, Jackson, Higbee, Licastro, and Rinder; (XII) equitable
subordination; and (XIII) professional negligence against Licastro.
(Doc. # 113, ¶¶ 173-257.)

## STANDARD OF REVIEW

Licastro moves to dismiss the Complaint pursuant to Rule
12(b)(6) of the Federal Rule of Civil Procedure, which is made
applicable to this case by Rule 7012 of the Federal Rules of
Bankruptcy Procedure.  In considering a motion to dismiss under
Rule 12(b)(6), courts must accept as true all allegations in the
complaint and draw all reasonable inferences in the light most
favorable to the plaintiff. Morse v. Lower Merion Sch. Dist., 132
F.3d 902, 906 (3d Cir. 1997); Rocks v. Philadelphia, 868 F.2d 644,
645 (3d Cir. 1989).  A motion to dismiss should be granted if "it
appears to a certainty that no relief could be granted under any
set of facts which could be proved." D.P. Enters. Inc. v. Bucks
County Cmty. Coll., 725 F.2d 943, 944 (3d Cir. 1984).

**DISCUSSION**

**(a) Breach of Fiduciary Duty Claim (Count I)**

Both parties agree, Florida law should govern the breach of fiduciary duty claim (Count I).   (See Doc. # 99, p. 9; Doc. # 104, p. 11.)   Under Delaware and Florida laws, issues involving corporate internal affairs are governed by the law of the state of incorporation.   Select Portfolio Serv. Inc. v. Evaluation Solutions, LLC., No. 3:06-CV-582-J-33 MMH, 2006 WL 2691784, at *9 (M.D. Fla. Sept. 20, 2006); In re Circle Y Yoakum Texas, 354 B.R. 349, 359 (Bankr. D. Del. 2006) (citing Vantage Point Venture Partners 1996 v. Examen, Inc., 871 A.2d 1108, 1115 (Del. 2005)). A breach of fiduciary duty claim involves the internal affair of a corporation.   Coleman v. Taub, 638 F.2d 628, 629, n.1 (3d Cir. 1981).   Thus, because World Health was incorporated in Florida, Florida law governs this claim.

Licastro argues that the fiduciary claim should be dismissed because the Trustee did not plead the claim with particularity. (See Doc. # 99, pp. 9-11.)   He cites Florida law requiring a plaintiff of a breach of fiduciary duty claim to demonstrate with particularity the facts which purportedly created the breached duty.   See Parker v. Gorden, 442 So.2d 273, 275 (Fla. 4th DCA, 1983).   In addition, he asserts that federal courts have heightened the pleading requirement of Federal Rules of Civil Procedure Rule 9(b) for breach of fiduciary duty claims which rely

on allegations of fraudulent conduct.  See  Am. Mobile Commc'ns, Inc. v. Nationwide Cellular Serv., Inc., No. 91 Civ. 3587, 1992 WL 232058, *6 (S.D.N.Y. Sept. 3, 1992); Frota v. Prudential-Bache Sec. Litig., 639 F.Supp. 1186, 1193 (S.D.N.Y. 1986).  Licastro contends that the Complaint did not contain any specific allegation of him breaching his fiduciary duty to the shareholders or the Company. Rather, the Trustee grouped Licastro with the other Defendants who are officers of World Health and imputed his breach based on the lack of conduct or misconduct of the group.

While it is true that there is a heightened pleading requirement for a breach of fiduciary duty claim based on fraudulent conduct of a defendant, that is not the case here.  The basis for the Trustee's claim is that Licastro breached his duty of care by failing to implement an adequate monitoring system and/or the failure to utilize such system to safeguard against corporate wrongdoing. See In re Caremark Int'l Inc. Derivative Litig., 698 A.2d 959, 967-71 (Del. Ch. 1996); Stone v. Ritter, 911 A.2d 362, 370 (Del. 2006).  Even though Florida law governs this claim, Delaware law is still relevant because "[t]he Florida courts have relied upon Delaware corporate law to establish their own corporate doctrines." Connolly v. Agostino's Ristorante, Inc., 775 So.2d 387, 388 n.1 (Fla. Dist. Ct. App. 2000) (citing Int'l Ins. Co. v. Johns, 874 F.2d 1447, 1459 n.22 (11th Cir. 1989)).

The Trustee relies on <u>ATR-Kim Eng Fin. Corp. v. Araneta</u>, No. 489-N, 2006 WL 3783520 (Del. Ch., Dec. 21, 2006) for his position. In <u>Araneta</u>, the court found two defendants who were directors and officers of the company liable for not stopping the company's majority shareholders and fellow director from transferring the company's assets to members of his family, a violation of his fiduciary duties. <u>See</u> <u>id.</u> at *1, 19, 23-25. The court cited the Delaware Supreme Court's <u>Stone</u> decision for directors' liability:

> <u>Caremark</u> articulates the necessary conditions predicated for director oversight liability: (a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or control, consciously failed monitor or oversee its operation thus disabling themselves from being informed of risks or problems requiring their attention.

<u>Id.</u> at *24 (citing <u>Stone</u>, 911 A.2d at 370). The court reasoned that:

> One of the most important duties of a corporate director is to monitor the potential that others within the organization will violate their duties. Thus, a "director's obligation includes a duty to attempt in good faith to assure that a corporate information and reporting system, which the board considers to be adequate, exists." Obviously, such a reporting system will not remove the possibility of illegal or improper acts, but it is the directors' charge to "exercise a good faith judgement that the corporation's information and reporting system is in concept and design adequate to assure the board that appropriate information will come to its attention in a timely manner as a matter of ordinary questions, so that it may satisfy its responsibility."

<u>Id.</u> at * 23-24 (quoting <u>Caremark</u>, 698 A.2d at 970).

The Trustee alleges that as the vice president of operation and in-house general counsel to World Health, Licastro was responsible for failing to implement any internal monitoring system and/or failing to utilize such system as is required by Caremark and Araneta.  The material misrepresentations contained in World Health's SEC filings are examples of such failure.  Since the SEC adopted a final rule pursuant to § 307 of the Sarbanes-Oxley Act, effective August 5, 2003, a general counsel has an affirmative duty to inspect the truthfulness of the SEC filings.  17 C.F.R. Part 205 (Jan. 29, 2007).  Section 307 addresses the professional responsibilities of attorneys.  It directs the SEC to issue rules that "set[] forth minimum standards of professional conduct for attorneys appearing and practicing before the Commission in any away in the representation of issuers."  Sarbanes-Oxley Act § 307, 15 U.S.C. § 7245 (2005).  The standards must contain a rule requiring "an attorney to report evidence of a material violation of securities law or breach of fiduciary duty or similar violation by the issuer up-the-ladder within the company."  Id.  Therefore, the Trustee appropriately asserts that Licastro as the in-house general counsel and the only lawyer in top management of World Health during the relevant period, had a duty to know or should have known of these corporate wrong doings and reported such breaches of fiduciary duties by the management.

In his reply brief, Licastro takes a different tact and argues that Delaware law does not support the breach of fiduciary duty claims against officers because the Caremark line of cases all addressed the fiduciary duties of directors, not officers. Licastro asserts: "The Trustee has sought to drastically broaden the scope of Caremark by expanding liability for allegedly failure of oversight to not just corporate directors, but also to corporate officers and employees.  Delaware law does not recognize this principle."  (Doc. # 126, pp. 1-2.)  That statement is both correct and wrong.  It is correct that Delaware law does not impose fiduciary duty on "employees" generally, but it is incorrect that it does not impose failure of oversight (fiduciary duty) as to officers.  Of course, Licastro was not just an "employee"; he was an officer in two respects, vice president of operations and general counsel.  See Sarah Helene Duggin, AALS Annual Meeting Article: the Pivotal Role of the General Counsel In Promoting Corporate Integrity and Professional Responsibility, 51 ST. LOUIS U. L.J. 989, 1014-15 (2007)("Many perhaps most, general counsel are corporate officers. Titles such as 'vice president and general counsel' or 'vice president, legal affairs' are common. . . . As vice presidents . . . , in addition to their professional obligations, general counsels owe fiduciary allegiance to the corporation as officers."); Lyman P.Q. Johnson & Mark A. Sides, Corporate Governance and the Sarbanes-Oxley Act: The Sarbanes-Oxley

28

Act and Fiduciary Duties, 30 Wm. Mitchell L. Rev. 1149, 1205-06 (2004)
("Although often overlooked, corporate officers, including senior
officers such as the . . . General Counsel, Executive Vice
Presidents, . . . and others are 'agents' of the corporation.
Agency is a fiduciary relationship. Even though senior officers of
corporations typically have employment agreements, they still
occupy a fiduciary status in relation to the corporate
principal."). Thus, in this respect I believe Licastro is wrong.

While it is true that all of the cases relied upon by the
Trustee involved directors' conduct, not officers', I believe the
Caremark decision itself suggests that the same test would be
applicable to officers. In the Caremark opinion the court, when
addressing the meaning of the prior decision of Graham v. Allis-
Chalmer Mfg. Co., 188 A.2d 125, 130-31 (Del. 1963), stated: "The
case can be more narrowly interpreted as standing for the
proposition that, absent grounds to suspect deception, neither
corporate boards nor senior officers can be charged with wrongdoing
simply for assuming the integrity of employees and the honesty of
their dealing on the company's behalf." Caremark, 188 A.3d at 969
(emphasis added). Also, in Miller v. U.S. Foodservice, Inc., 361
F. Supp. 2d 470, 477 (D. Md. 2005), the court, in reliance upon
the Delaware decision of Aronson v. Lewis, 473 A.2d 805, 812 (Del.
1984), stated: "While generally courts do not second-guess
corporate decision-making and directors and officers enjoy the

presumption of the business judgment rule, the rule can be overcome by allegations of gross negligence." <u>Miller</u>, 361 F. Supp. 2d at 477. <u>In re Walt Disney Co. Derivative Litigation</u>, No. Civ. A. 15452, 2004 WL 2050138, at *3 (Del. Ch. Sept. 10, 2004), clearly suggests that Licastro is wrong on this point:

> To date, the fiduciary duties of officers have been assumed to be identical to those of directors. With respect to directors, those duties include the duty of care and the duty of loyalty. There has also been much discussion regarding a duty of good faith, which may or may not be subsumed under the duty of loyalty. Ovitz became an officer of Disney on October 1, 1995 when he became President of the corporation, and he became a director on January 22, 1996. Therefore, upon becoming an officer on October 1, 1995, Ovitz owed fiduciary duties to Disney and its shareholders.

Id. at 3 (internal citation omitted).

Other courts have also applied the Delaware law and recognized that officers owe fiduciary duties to the corporation. In <u>Stanziale v. Nachtomi</u> (<u>In re Tower Air, Inc.</u>), the Third Circuit Court of Appeals upheld the bankruptcy trustee's claims against Tower Air's directors and officers. Count two alleged that Tower Air's officers breached their fiduciary duty to act in good faith, <u>inter alia</u>, by failing to tell the directors about maintenance problems, and by failing to address the maintenance problems. 416 F.3d 229, 234 (3d Cir. 2005). The Third Circuit held that "[t]he officers' passivity in the face of negative maintenance reports seems so far beyond the bounds of reasonable business judgement that its only explanation is bad faith." <u>See</u> <u>id.</u> at 234, 239. <u>See</u>

Greater Southeast Cmty. Hosp. Corp. v. Tuft, 353 B.R. 324, 339
(D.D.C. 2006) (The defendant corporation was incorporated in
Delaware and the court applied Delaware law. "The directors of
Delaware corporations have a triad of primary fiduciary duties . .
. . With respect to the obligation of officers to their own
corporation and its stockholders, there is nothing in any Delaware
case which suggest that the fiduciary duty owned is different in
the slightest from that owed by directors.").

        "Florida law has [also] long recognized that corporate
officers and directors owe duties of loyalty and a duty of care to
the corporation." Welt v. Jacobson (In re Aqua Clear Tech. Inc.),
361 B.R. 567, 575 (Bankr. S.D. Fla. 2007).  In Cohen v. Hattaway,
the court expressly stated that "[c]orporate directors and officers
owe a fiduciary obligation to the corporation and its shareholders
and must act in good faith and in the best interest of the
corporation." 595 So. 2d 105, 107 (Fla. Dist. Ct. App. 1992)
(quoting Tillis v. United Parts, Inc., 395 So. 2d 618 (Fla. Dist.
Ct. App. 1981)).  Thus, it is clear that under both Delaware and
Florida law both officers and directors owe fiduciary duties to the
corporation.

**(b) Waste of Corporate Assets Claim (Count III)**

        The standard for adjudicating a waste of corporate assets
claim (Count III) is well settled in Delaware.  The Delaware
Supreme Court held: "[W]aste entails an exchange of corporate

assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade." <u>Brehm v. Eisner</u>, 746 A.2d 244, 263 (Del. 2000). At this phase, however, "[t]he doctrine of waste . . . allows a plaintiff to pass go at the complaint stage even when the motivations for a transaction are unclear by pointing to economic terms so one-sided as to create an inference that no person acting in a good faith pursuit of the corporation's interests could have approved the terms." <u>Sample v. Morgan</u>, 914 A.2d 647, 670 (Del. Ch. 2007); <u>Harbor Fin. Partners v. Huizenga</u>, 751 A.2d 879, 893 (Del. Ch. 1999) ("[T]he fundamental basis for a waste claim must rest on the pleading of facts that show that the economics of the transaction were so flawed that no disinterested person of right mind and ordinary business judgment could think the transaction beneficial to the corporation.").

The expenditures in question occurred in two time periods: (1) In 2003, World Health leased 25 hours of private flight time from Marquis Jet for $112,939.70 and absorbed monthly lease payments of $2,207.38 and $2,4045.72 for Roup and McDonald's luxury automobiles, respectively. During this time, World Health had a negative net income of $33,094.00 and only $117,699 of cash available. (2) In 2004, it incurred $114,181.11 private flight costs, and during one of its acquisitions, World Health paid Sercu $500,000 bonus and 1,000,000 shares of its stock. These

32

expenditure were made while World Health had a net loss of $13,427,523 for fiscal year 2004, according to its 2004 Annual Report. Licastro contends that the waste of corporate assets count should be dismissed because the alleged instances were not for his personal benefits and he was not involved. He also asserts that there is nothing in the pleadings that proves the alleged incidents amount to expenses so one sided that no reasonable business person would consider them adequate. (Doc. # 99, p. 12.)

The call on this count is a close one. There is no allegation that Licastro personally benefitted from the alleged expenditures. Licastro's role was vice president of operations and general counsel. Because he was not a financial officer his knowledge of the alleged wasteful spending for personal benefit to other officers and directors would seem not to be readily discernable. However, given the fact that we must view the allegation in the light most favorable to the Trustee, I believe the motion should be denied with respect to this count.

While Licastro may not have been actively engaged in these alleged wasteful expenditures, the Complaint alleges that "Defendants actively engaged in and/or allowed routine waste of the Company's limited resources," and the "directors, officers and other senior management[s] knew or should have known about the above referenced mismanagement and waste and they exhibited a substantial and systematic failure to control and monitor the

accrual of unnecessary expenses." (Doc. # 113, ¶¶ 82, 91.) Because
the Complaint alleges that Defendants, including Licastro,
"allowed" and "knew or should have known" the corporate waste, it
follows that the Complaint is asserting that Defendants, including
Licastro, were aware of the alleged corporate waste and took no
action, as fiduciaries, to prevent such conduct. Also, it is
conceivable that no person acting in good faith in pursuit of World
Health's interest would approve chartering expensive flights,
leasing luxury automobile, and granting large bonuses to certain
directors and officers while World Health was experiencing negative
net income. Thus, the motion to dismiss will be denied as to the
corporate waste count.

**(c) Aiding and Abetting Claims (Counts II, IV, VII)**

The Trustee alleges that Licastro aided and abetted in
the corporate waste (Count IV) and in McDonald's breaching his
fiduciary duty (Count II) and fraud (Count VII). With respect to
aiding and abetting waste of corporate assets count, for the
reasons set forth above, I believe that the Complaint alleges that
Licastro had knowledge of the wasting of assets and took no action
to correct it or to establish guidelines for corporate
expenditures. In his role as general counsel, it seems highly
likely that he would have been consulted as to guidelines for out
of the ordinary expenditures. To the extent other officers
directly caused those expenditures to be made, one can infer, and

the Complaint so alleges, that Licastro was aware of them.

With respect to the aiding and abetting of the breach of
fiduciary duty claim, the Trustee must allege:(1) a fiduciary duty;
(2) a breach of this duty; (3) knowledge of the breach by the
alleged aider and abetter; (4) the aider and abettor's substantial
assistance or encouragement of the wrongdoing. In re Caribbean K
Line, Ltd., 288 B.R. 908, 919 (Bankr. S.D. Fla 2002). For aiding
and abetting a fraud, the Trustee must plead: (1) the existence of
the underlying fraud; (2) that the defendant had knowledge of the
fraud; and (3) that the defendant provided substantial assistance
to advance the commission of the fraud. ZP N. 54 Ltd. P'ship v.
Fid. and Deposit Co. of Md., 917 So.2d 368, 371 (Fla. App. 2005).

With respect to these two claims, I would first note that
McDonald served as president, chairman of the board, principal
financial officer, and principal accounting officer. (Doc. # 113,
¶ 9.) The Complaint sets forth numerous and specific acts of fraud
and breach of fiduciary duty by McDonald. These include numerous
instances of false statements in SEC filings. As I stated above,
since the SEC adopted the final rule pursuant to § 307 of the
Sarbanes-Oxley Act, general counsels have a duty to inspect the
truthfulness of the companies' SEC filings. The Complaint also
alleges that Defendants, including Licastro, failed to implement
financial controls and proper check and balances, including failure
to maintain checks and balances to ensure that the information

provided by McDonald to third parties was complete, fair, and accurate. Furthermore, the Complaint alleges that Licastro joined McDonald in his pattern of fraud by making misrepresentation, or confirming McDonald's misrepresentations, to creditors and investors. (Doc. # 113, ¶ 216.) And also, Licastro provided substantial assistance to McDonald by failing to properly report misrepresentations that were knowingly false. (Doc. # 113, ¶ 217.) The Complaint set for enough allegations to support the claim at this stage.

**(d) Negligent Misrepresentation Claim (Count V)**

The Trustee asserts one count of negligent misrepresentation (Count V). A claim of negligent misrepresentation contains four elements: (1) a misrepresentation of a material fact; (2) the representor either knew of the misrepresentation, made the misrepresentation without knowledge as to its truth or falsity, or must have made the representation under circumstances in which he ought to have known of its falsity; (3) the representor must have intended the representation to induce another to act on it; and (4) injury must result to the party acting in justifiable reliance on the misrepresentation. Gibbs v. Ernst, 647 A.2d 882, 890 (Pa. 1994)

Licastro contends that the count should be dismissed for the following reasons. First, the Trustee lacks standing to bring this claim because he is pursuing it on behalf of World Health's

36

creditors. The creditors were the only ones who relied upon and were harmed by the purported misrepresentations. (Doc. # 126, p. 12.) Second, the Complaint does not allege Licastro made any specific misrepresentation. (Doc. # 126, p. 12.) Third, the Trustee failed to allege Licastro had knowledge of the misrepresentations. (Doc. # 99, p. 15.)

Licastro is correct in that a bankruptcy trustee does not have standing to assert claims on behalf of an estate's creditors. See Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416, 434 (1972). Here, however, the Trustee is bringing the claim on behalf of the creditors and the debtor estate. (Doc. # 113, ¶ 202.) The Complaint alleges that a class action derivative suit was filed against World Health as a result of various misrepresentations and World Health had to pay $2.7 million to settle it. The law suit is just one of the cognizable injuries that the debtor suffered because of the misrepresentations.

As for the rest of the arguments, it seems to me that the same allegations that were made with respect to the aiding and abetting counts apply here. The misrepresentations were the press releases and SEC filings. (Doc. # 113, ¶ 198.) As the in-house general counsel, Licastro should have reviewed these matters and should have undertaken an examination of the Company's affairs to ascertain the trustfulness of these disclosures. In other words, the Complaint is saying that if Licastro properly performed his

[corrected page]

duty as in-house counsel, these misrepresentation**s** would not have been made and the resulting harm would have been avoided.    I believe the allegation is based on Licastro having "made the representation under the circumstance in which he ought to have known of its falsity." (Doc. # 104, p. 26)    That is, Licastro is alleged to have been negligent in the performance of his duties as general counsel.    This properly sets forth a cause of action.

**(e) Fraudulent Transfer Claims (Counts IX, X, XI)**

The Trustee also alleges three counts of fraudulent transfers (Counts IX, X, XI).    With respect to Licastro, these three counts rest on just two facts: (1) the Indemnification Agreement and (2) a total of 10 money transfers from World Health to Licastro.    (Doc. # 113, ¶¶ 230-31).    I believe these three counts woefully do not satisfy the requirement of Rule 9(b).    Rule 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."    Even though pleading a constructive fraudulent conveyance does not need to reach the same level of stringency as that for fraud, a mere recitation of the statute is not enough. See Global Link Liquidating Trust v. Avantel (In re Global Link Telecom Corp.), 327 B.R. 711, 717-18 (Bankr. D. Del. 2005) (citing Hassett v. Zimmerman (In re O.P.M. Leasing Servs., Inc.), 32 B.R. 199, 203 (Bankr. S.D.N.Y. 1983)).

38

With respect to the Indemnification Agreement, without any particulars, the Trustee claims that World Health received less than reasonably equivalent value in exchange for it. The Complaint, however, does not allege that Licastro received any indemnification benefits. Absent the receipt of any benefits under the Indemnification Agreement, the Complaint does not show that World Health transferred any of its property (money or other property) to Licastro. It appears that the Indemnification Agreement was entered into when it became apparent that there were going to be securities law actions filed against some or all of the directors and officers of World Health. However, as pointed out by Licastro, and not challenged by the Trustee, Licastro was not a defendant in the securities law actions.

Furthermore, the Indemnification Agreement appears to have rather conventional terms, including:

> Excluded Action or Omissions. To indemnify the Indemnitee whose acts or omissions were found by judgment or adjudication to be material to the cause of action and constituted (i)a violation of criminal law, unless the person reasonably believed the conduct was lawful or had no reasonable cause to believe it was unlawful; (ii) a transaction in which the person derived an improper benefit or, in the case of a director, a circumstance under which the liability provisions of F.S. 607.0834 are applicable; or (iii) willful misconduct or conscious disregard for the best interests of the Company in a proceeding by or in the right of the Company to procure a judgment in its favor or in a proceeding by or in the right of a shareholder.

(Doc. # 99, Ex. A, pp. 5-6.) Such indemnification commitments, whether in by-laws or by separate agreements, are almost universal

for commercial corporate enterprises. And, of course, most states, if not all of them, have comprehensive statutory provisions authorizing such benefits for officers and directors. Florida is no exception. See Fla. Stat. § 607.0850 (2007).

The Trustee relies heavily on two reported decisions, namely, e2 Creditors' Trust v. Farris (In re e2 Communications, Inc.), 320 B.R. 849 (Bankr. N.D. Tex. 2004), and Boles v. Filipowski (In re Enivid, Inc.), 345 B.R. 426 (Bankr. D. Mass. 2006). These two cases are factually inapposite.

In re e2 Communications stands for the unremarkable proposition that a debtor's release of a cause of action against an officer is a transfer of property of the debtor. 320 B.R. at 855. The facts in In re e2 Communications, are distinctly different from the matter before me. In that case, the president was the largest shareholder of the corporate debtor. The debtor began experiencing cash flow difficulties and the president transferred to the debtor $620,000. Id. at 851. With respect to that transfer, the debtor executed five promissory notes together with a security agreement. Id. A separate corporation owned by the president provided consulting services to the debtor for $15,000 a month. Id. That corporation had a claim against the debtor arising out of the consulting agreement. That claim, in the amount of $200,000, was assigned to the president. Id. at 851-52. The debtor and the president entered into a contribution and release agreement that

40

provided: (1) the five notes and the assigned claim were
consolidated into a replacement note in the principal amount of
$821,804; (2) the president conveyed his stock back to the debtor
as a contribution to capital and (3) the parties exchanged mutual
limited releases. Id. Subject to certain specific exceptions (for
example, the president's duty of loyalty and good faith in dealing
with the debtor at the time he was the president and majority
shareholder), the debtor granted the president a broad release of
any claims, liabilities, damages, losses etc. which the debtor had
against the president. Id. In addressing the president's motion
for summary judgment with respect to the trustee's preference and
fraudulent conveyance counts, the court denied the summary judgment
motion in holding that, contrary to the president's arguments, the
release of causes of action was a transfer of the debtor's
property. Id. at 855. The court observed:

> Common sense suggests that a release of claims is a
> "transfer" of property – – i.e., a method of "disposing
> of or parting with" property, as the releasing party
> gives up the right to assert the claims in the future.

Id. at 856. Unlike In re e2 Communications, the Trustee here has
not alleged that World Health transferred any property to Licastro
in entering into the Indemnification Agreement.

The Trustee also cites In re Enivid, where he says the
court found that "plaintiff trustee's cause of action asserting
that certain payments made under a director's indemnification
agreement were fraudulent transfers or preferential transfers

pursuant to section 547 and 548 of the Bankruptcy Code survived a motion to dismiss." (Doc. # 104, p. 29) (emphasis added.) In the matter before me, the Trustee does not allege that any payments were made by World Health to Licastro pursuant to the Indemnification Agreement.

With respect to the 10 money transfers from World Health to Licastro, which occurred between March 11, 2005 and November 18, 2005, other than noting that these transfers did not involve "payroll and stock issuance" the Complaint does not state why the transfers were effected. (Doc. # 113, ¶ 247.) However, one cannot infer from this fact that these were gratuitous transfers with no consideration running from Licastro to World Health. Indeed, 7 of the 10 items are so small and in amounts down to cents that one may reasonably conclude that they represent reimbursement for business expenses incurred by Licastro. In any event, there is nothing in the Complaint alleging that these transfers to Licastro were made in the absence of any transfer of value from Licastro to World Health. Thus, these three counts of fraudulent transfers will be dismissed without prejudice.

**(f) Equitable Subordination Claim (Count XII)**

The next count is equitable subordination (Count XII). This count will be dismissed without prejudice because the Complaint does not allege that Licastro has filed a claim in this case. It asserts that "certain of the Defendants – including

Hayden and Jackson – have filed proofs of claim in these cases."
(Doc. # 113, ¶ 247.)  The next paragraph then goes on to allege
that "[o]ther Defendants are listed as having either priority
unsecured, or general unsecured claims on the Debtors' Schedules."
(Doc. # 113, ¶ 248.)  Note that it does not say that all the other
Defendants are listed in the schedules as having claims.  It would
not be difficult for the Trustee to examine the claims register and
the schedules to determine whether Licastro has a claim against the
estate.  The allegations under this count are too imprecise to
conclude that Licastro has a claim.  If he has, then the Trustee
can easily file a further amended complaint to address this issue.

**(g) Professional Negligence Claim (Count XIII)**

The final count the Trustee raises is professional
negligence (Count XIII).  Under Pennsylvania law, which parties
agree is the applicable law, the elements for a professional
negligence claim are: "(1) the employment of the attorney or other
basis for his duty to act as an attorney; (2) the failure of the
attorney to exercise ordinary skill and knowledge; and (3) that
such negligence was the proximate cause of damage to the
plaintiff."  Ibn-Sadiika v. Riester, 551 A.2d 1112, 1115 (Pa.
1988); Veneri v. Pappano, 622 A.2d 977, 978-79 (Pa. 1993).  In
addition, pursuant to Pennsylvania Rule of Civil Procedure
1042.3(a), a plaintiff asserting a professional negligence claim
must file a Certificate of Merit within 60 days of filing the

complaint.

Licastro argues that this count should be dismissed because he never was or acted as an attorney for World Health, and even if he had, _arguendo_, the Complaint does not allege any violation of his duty.  I disagree.  The Complaint states that "Licastro was employed by and served the Company as in-house General Counsel on a de facto and/or formal basis, and had a duty to provide legal services to the Company consistent with the applicable standard of care."  (Doc. # 113, ¶ 255.)  In light of the fact that I must take this assertion as true, Licastro owed a certain standard of care to World Health.

An attorney must "act[] with a proper degree of skill, and with reasonable care and to the best of his knowledge." _Savings Bank v. Ward_, 100 U.S. 195, 198 (1880).  The Complaint alleges "Licastro breached the applicable standard of care, for example, by not providing oversight and failing to provide advice that would have prevented the Company from submitting SEC filings that included material misrepresentation." (Doc. # 113, ¶ 255.) Moreover, "Members of the Company's management including . . . Licastro became aware or should have been aware of the malfeasance and misdealing and discrepancies in the Company's revenue; however, no actions were taken consistent with their fiduciary duties to remedy or ameliorate the discrepancies until after McDonald's resignation." (Doc. # 113, ¶ 151.) And, as a result of Licastro's

alleged professional negligence, World Health suffered damages. (Doc. # 113, ¶ 257.)  I believe the Trustee has alleged sufficient facts for a cause of action and the motion should be denied as to this count.

With regard to Pennsylvania Rule of Civil Procedure 1042.3(a)'s requirement for Certificate of Merits, the Complaint is silent.  In the Trustee's answering brief, he states that he would file it within the requisite time.  Given that this is a motion to dismiss, I will assume that the Trustee has met the requirement for the purpose of this motion.

## CONCLUSION

For the reasons discussed above Licastro's motion to dismiss (Doc. # 98) is denied with respect to Counts I, II, III, IV, V, VII, and XIII, and granted without prejudice with respect to Counts IX, X, XI, and XII, provided that the Trustee shall have 30 days to file an amended complaint if he can correct the deficiencies noted in this Memorandum Opinion as to Counts IX, X, XI, and XII.