## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Case No. 06-10166-PJW |
| | : | (Jointly Administered) |
| WORLD HEALTH | : | |
| ALTERNATIVES, INC., et al., | : | Chapter 7 |
| | : | |
| Debtors. | : | |
| GEORGE L. MILLER, | : | |
| Chapter 7 Trustee for WORLD HEALTH | : | |
| ALTERNATIVES, INC., et al., | : | |
| | : | Adversary No. 07-51350 (PJW) |
| Plaintiff, | : | |
| | : | |
| v. | : | Jury Trial Demanded |
| | : | |
| RICHARD E. MCDONALD, MARC ROUP, | : | |
| JOHN C. SERCU, BRUCE HAYDEN, | : | |
| FREDERICK R. JACKSON, SR., JOHN W. | : | |
| HIGBEE, BRIAN T. LICASTRO, MARK B. | : | |
| RINDER, and DEANA J. SERUGA | : | |
| | : | |
| Defendants | : | |

## DEFENDANT BRIAN T. LICASTRO'S
## REPLY BRIEF IN SUPPORT OF HIS MOTION TO
## WITHDRAW THE REFERENCE

Michael D. DeBaecke (No. 3186)
**BLANK ROME LLP**
1201 Market Street
Suite 800
Wilmington, DE   19801
(302) 425-6400

and

Norman E. Greenspan
One Logan Square
Philadelphia, PA   19103
(215) 569-5500

*Attorneys for Defendant*
*Brian T. Licastro*

125751.00601/40175531v.1

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

I.    SUFFICIENT CAUSE EXISTS IN SUPPORT OF PERMISSIVE
      WITHDRAWAL OF THE REFERENCE OF THE NON-CORE CLAIMS ...................... 1

II.   THE WITHDRAWAL MOTION IS TIMELY UNDER THE FACTS
      AND CIRCUMSTANCES OF THIS CASE ................................................................. 2

CONCLUSION .............................................................................................................. 7

125751.00601/40175531v.1

# TABLE OF AUTHORITIES

**Cases**

*Boyajian v. DeFusco (In re Giorgio)*, 50 B.R. 327, 328 (D. R.I. 1985) ...........................................6

*Connolly v. Biderman Industries U.S.A., Inc.*, 1996 WL 325575 (S.D.N.Y. 1996) .......................6

*In re Sevko, Inc.,* 143 B.R. 114, 116 (N.D. Ill. 1992) ....................................................................5

*In re Stavriotis*, 111 B.R. 154 (N.D. Ill. 1990) ..............................................................................6

*Shubert v. Julius Kraft Company, Inc. (In re Winstar Commun., Inc.)*,
   321 B.R. 761 (D. Del. 2005) ....................................................................................................5

*Troisio v. Poirier (In re U.S.A. Floral Products, Inc.)*, 2005 U.S. Dist.
   LEXIS 38912 at *4 (D. Del. 2005) ........................................................................................4, 6


**Statutes and Rules**

28 U.S.C. § 157 (d) .......................................................................................................................5

On July 1, 2008, Plaintiff George Miller, Chapter 7 Trustee for World Health Alternatives, Inc., et al. (the "Plaintiff" or "Trustee"), filed his Brief (the "Answering Brief") in Opposition to Defendant Brian T. Licastro's (I) Motion for Determination of Core and Non-Core Proceedings (the "Core/Non-Core Motion") and (II) Motion for Withdrawal of the Reference (the "Withdrawal Motion" and collectively with the Core/Non-Core Motion, the "Motions"). This is Licastro's reply to the Answering Brief as it relates to the Withdrawal Motion.[1]

## I.    SUFFICIENT CAUSE EXISTS IN SUPPORT OF PERMISSIVE WITHDRAWAL OF THE REFERENCE OF THE NON-CORE CLAIMS.

The Answering Brief contains no argument in opposition to the substantive points made in the Opening Brief.  By failing to raise any substantive opposition, the Trustee has conceded the following key points:

(i) Licastro has a right to a jury trial on all of the Non-Core Claims and has not waived that right.  (Opening Brief at 5-7)  The Trustee fails to address this point in his Answering Brief and apparently believes he can ignore Licastro's constitutional right to a jury trial on the Non-Core Claims.  Licastro timely asserted his right to a jury trial in his answer to the first amended complaint (the "Amended Complaint").  Licastro filed his answer only five weeks prior to filing of the Withdrawal Motion.

(ii) The Trustee is estopped from arguing that Licastro is entitled to a jury trial on the Non-Core Claims because the Trustee himself demanded a jury trial in the Original Complaint and the Amended Complaint.  The Trustee did not withdraw that demand until June 26, 2008, shortly before he was required to respond to the Withdrawal Motion.  (Opening Brief at 6; Answering Brief at 3)

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in Licastro's opening brief (the "Opening Brief") filed in support of the Withdrawal Motion.

(iii) The Non-Core Claims are non-core. The Trustee argues that Licastro was on notice from the filing of the Original Complaint of "issues potentially giving rise to a right to withdrawal of the reference." (Answering Brief at 5; 6 ("it was clear from the face of the Original Complaint, filed over a year ago, and the Amended Complaint, filed over seven months ago, that issues presented in these pleadings could give rise to a filing of a withdrawal of the reference")) The Trustee has made no attempt to argue that any of the Non-Core Claims are core. He therefore has conceded the Non-Core Claims are non-core. This weighs heavily in favor of withdrawal of the reference.

Based upon the above and the undisputed arguments and authorities set forth in the Opening Brief, sufficient cause exists in support of permissive withdrawal of the reference of the Non-Core Claims asserted against Licastro.

## II.    THE WITHDRAWAL MOTION IS TIMELY UNDER THE FACTS AND CIRCUMSTANCES OF THIS CASE.

As his sole argument in opposition to the Withdrawal Motion, the Trustee asserts that it is untimely. That argument should be rejected. The Withdrawal Motion is timely under the facts and circumstances of this case, as demonstrated by the undisputed facts set forth below.

The Original Complaint was filed by the Trustee on May 21, 2007. By the Original Complaint, the Trustee demanded a jury trial on all claims, which jury trial necessarily would occur in the District Court. (*See* Opening Brief at 7) A copy of the Original Complaint is attached hereto as Exhibit "A".

On July 25, 2007, Licastro moved to dismiss the Original Complaint. Rather than responding to Licastro's initial motion to dismiss, the Trustee filed the Amended Complaint on November 15, 2007. The Amended Complaint added and removed defendants, contained nearly double the number of paragraphs, eliminated certain counts, and added multiple new counts

- 2 -

against Licastro. (*Compare* Original Complaint to Amended Complaint, a copy of which was attached as Exhibit "A" to the Opening Brief) By the Amended Complaint, the Trustee reiterated his demand for a jury trial.

On December 11, 2007, Licastro moved to dismiss the Amended Complaint. Briefing on that motion to dismiss was completed on January 25, 2008. The Bankruptcy Court issued its April 9 Opinion and Order granting in part (dismissal of four claims against Licastro) and denying in part the Licastro motion to dismiss.

By the April 9 Opinion and Order, the Bankruptcy Court gave the Trustee thirty days leave to replead. The Trustee chose not to file a second amended complaint within the allotted time. Therefore, on May 9, 2008, Licastro timely filed his answer to the Amended Complaint. By his answer, Licastro made his own demand for a jury trial.

The Withdrawal Motion, along with its companion Core/Non-Core Motion, was filed on June 17, 2008. The Withdrawal Motion is based upon Licastro's right to a jury trial on the Non-Core Claims and the non-core status of the Non-Core Claims. The Trustee did not withdraw his own jury trial demand until June 26, 2008. (*See* Answering Brief at 3)

The Trustee argues that for Licastro to have filed a timely Withdrawal Motion, he should have filed it as soon as he received the Original Complaint or the Amended Complaint, notwithstanding Licastro's pending motion to dismiss the Original Complaint and then his motion to dismiss the Amended Complaint. (Answering Brief at 3-4, 5) Licastro disagrees. The course of action advocated by the Trustee would have made no sense for a number of reasons, including that it would have required a tremendous waste of judicial and private resources.

Until the Bankruptcy Court issued the April 9 Opinion and Order, Licastro did not know what claims remained at issue and should be addressed in the Withdrawal Motion and its companion Core/Non-Core Motion.[2] Moreover, if the Bankruptcy Court granted the motion to dismiss in its entirety, there would have been no need for the Motions. The Trustee's position on purported untimeliness is not well-taken, as it would encourage needless, wasteful, and untimely motion practice in this Court.

The Trustee completely ignores the fact that when Licastro timely filed his answer to the Amended Complaint on May 9, 2008, he demanded a jury trial. Licastro's timely demand for a jury trial is the primary ground supporting the Withdrawal Motion filed a mere five weeks after the timely answer and jury demand. *See e.g. Troisio v. Poirier (In re U.S.A. Floral Products, Inc.)*, 2005 U.S. Dist. LEXIS 38912 at *4 (D. Del. 2005) (holding that withdrawal of reference motion was timely when filed almost a month after answer asserting jury demand; defendants' answer was filed three weeks after bankruptcy court's opinion on defendants' motion to dismiss and more than a year after plaintiff's amended complaint).

Licastro had no reason to file the Withdrawal Motion prior to making a demand for a jury trial. The Trustee already had made his own demand for a jury trial and the Bankruptcy Court had not yet issued its April 9 Opinion and Order dismissing certain core claims. The Withdrawal Motion therefore was timely when filed. *See e.g. U.S.A. Floral* at *4 (it would have been "imprudent" for defendants to have filed withdrawal of reference motion prior to bankruptcy court decision on motion to dismiss), *citing In re Sevko, Inc.*, 143 B.R. 114, 116 (N.D. Ill. 1992) (granting motion for permissive withdrawal of reference filed three weeks after bankruptcy

---

[2] If Licastro had filed a motion for withdrawal of the reference after receipt of the Original Complaint, a second withdrawal of the reference motion would have been required after receipt of the vastly different Amended Complaint. Then, it is likely that after receipt of the April 9 Opinion and Order and the filing of Licastro's answer and jury demand, a third round of motion practice would have been required.

court's denial of motion to dismiss); *Shubert v. Julius Kraft Company, Inc. (In re Winstar Commun., Inc.)*, 321 B.R. 761 (D. Del. 2005) (motion for permissive withdrawal of reference granted when filed more than a year after complaint and almost nine months after answer containing undisputed jury trial demand).

The Trustee's argument for a denial of the Withdrawal Motion based on the fact that discovery has been conducted and is ongoing in the Bankruptcy Court is a classic red herring. As acknowledged in the Opening Brief, timing of a withdrawal of the reference is subject to this Court's exercise of its sound discretion. (Opening Brief at 7-8) This Court could issue an order stating that the reference will be withdrawn now or after pretrial matters have been completed in the Bankruptcy Court. The Trustee has not been harmed by the conduct of discovery in the Bankruptcy Court; in fact, this action remains in its early stages, as none of the parties have taken significant discovery to date, including the Trustee. To the best of Licastro's knowledge, no depositions have been taken yet by the Trustee or any other party. According to the scheduling order, a trial date will not even be set in the Bankruptcy Court until some time next year, at the earliest, perhaps when the parties next meet with the Bankruptcy Court in January 2009. Put simply, the fact that Licastro and the Trustee may be conducting discovery under an existing scheduling order issued by the Bankruptcy Court should not be construed against Licastro in addressing the Withdrawal Motion.

A court determines whether a motion to withdraw the reference is timely pursuant to 28 U.S.C. §157(d) after reviewing all of the relevant factual circumstances of a particular case. *U.S.A. Floral* at *3-4. As a result, the case law authorities relied upon by the Trustee to argue that the Withdrawal Motion is untimely are distinguishable and largely unhelpful, as those non-binding decisions necessarily turned on their own particular facts and circumstances.

- 5 -

For example, none of the cases cited by the Trustee involved a motion for withdrawal of the reference based upon a movant's timely demand for and undisputed right to a jury trial on non-core claims, particularly where the non-moving plaintiff also had demanded a jury trial and did not withdraw such demand until after the withdrawal of reference motion had been filed. Second, all but one of the cases cited by the Trustee involved requests for <u>mandatory</u> withdrawal of the reference (where consideration of non-bankruptcy federal laws affecting interstate commerce was required for a resolution of the proceeding) - in those cases, the district courts emphasized the fact that the movants knew from an early stage that such non-bankruptcy federal laws were implicated and only moved for withdrawal (i) when they failed to achieve their goals in the bankruptcy court or (ii) for purposes of delay. *See e.g. Connolly v. Bidermann Industries U.S.A., Inc.*, 1996 WL 325575 (S.D. N.Y. 1996) (mandatory withdrawal of reference motion filed to avoid impact of general bar date deemed untimely following delay of over 8 months); *In re Stavriotis*, 111 B.R. 154 (N.D. Ill. 1990) (mandatory withdrawal of reference motion filed in federal securities and RICO action deemed untimely following delay of over 6 months); *Boyajian v. DeFusco (In re Giorgio)*, 50 B.R. 327, 328 (D. R.I. 1985) (mandatory withdrawal of reference motion deemed untimely when filed less than a month before trial in bankruptcy court; movants delayed filing motion for more than a year after filing of complaint and 10 months after bankruptcy court initially raised possibility of transfer to district court for jury trial, 7 months after transfer issue raised a second time).

Here, Licastro has requested <u>permissive</u> withdrawal of the reference, so many of the cases cited by the Trustee and the reasoning utilized therein are inapposite. In addition, there are no substantive matters pending before the Bankruptcy Court and Licastro is not looking to delay the conduct of the remaining litigation. If deemed appropriate by this Court, he is fully prepared

to participate in pretrial matters in the Bankruptcy Court before a jury trial is held in this Court on the Non-Core Claims.

## CONCLUSION

Based upon the above and based upon the undisputed facts and arguments contained in the Opening Brief, the Withdrawal Motion is timely and the reference of the Non-Core Claims should be withdrawn.  Timing of the withdrawal is within the exercise of this Court's sound discretion.  Licastro respectfully requests entry of an order in substantially the form attached to the Withdrawal Motion.

Dated:  July 8, 2008

BLANK ROME LLP

*Michael DeBaecke*
Michael D. DeBaecke (No. 3186)
1201 Market Street
Suite 800
Wilmington, DE   19801
(302) 425-6400

and

Norman E. Greenspan
One Logan Square
Philadelphia, PA   19103
(215) 569-5500

Attorneys for Defendant
Brian T. Licastro

- 7 -

# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WORLD HEALTH ALTERNATIVES, INC., *et al.*[1] | CHAPTER 7 |
| | Case No. 06-10166 (PJW) |
| Debtors. | Jointly Administered |
| | |
| GEORGE L. MILLER, Chapter 7 Trustee for WORLD HEALTH ALTERNATIVES, INC., *et al.* | |
| | Adversary No. _____ |
| Plaintiff, | |
| v. | |
| RICHARD E. MCDONALD, MARC ROUP, JOHN C. SERCU, BRUCE HAYDEN, FREDERICK R. JACKSON, SR., JOHN W. HIGBEE, BRIAN T. LICASTRO, MARK B. RINDER and nominal defendant BERGER & MONTAGUE, P.C. in its capacity as escrow agent of a settlement fund, | |
| Defendants. | |

## COMPLAINT

Plaintiff, George L. Miller (the "Trustee"), the Chapter 7 Trustee for the jointly administered estates of World Health Alternatives, Inc. *et al.*, by and through his counsel, Fox Rothschild LLP, brings this adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure, to recover and avoid any transfer of an interest of World Health, to

---

[1] In addition to World Health Alternatives, Inc., a Florida corporation, the following entities are debtors in possession in these jointly administered bankruptcy cases: World Health Staffing, Inc., a California corporation, World Health Staffing, Inc., a Delaware corporation f/k/a MedTech Medical Staffing of Orlando, Inc., Better Solutions, Inc., JC Nationwide, Inc. f/k/a Medtech Staffing of Boca Raton, Inc. d/b/a JC Nationwide, MedTech

recover and avoid preferences and to recover and avoid fraudulent transfers pursuant to 11

U.S.C. §§ 544 (b)(1), 547, and 548 and alleges as follows:

## JURISDICTION AND VENUE

1.      This Court (the "Bankruptcy Court") has jurisdiction over this adversary

proceeding pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(a), which is a civil proceeding

arising under or arising in or related to a case under title 11 of the United States Code (the

"Bankruptcy Code").

2.      This is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(A), (F) and (O).

3.      Venue of this adversary proceeding is properly in the District of Delaware

pursuant to 28 U.S.C. § 1409(a).

4.      This adversary proceeding is commenced pursuant to Rule 7001 of the Federal

Rules of Bankruptcy Procedure.  By this adversary proceeding, the Trustee seeks to recover

money on behalf of the estate pursuant to Sections 544, 547 and 548 of the Bankruptcy Code.

## PARTIES

5.      The Bankruptcy Court appointed the Plaintiff as the Trustee for the World Health

bankruptcy estate on November 1, 2006.

6.      On December 6, 2006, the Bankruptcy Court authorized the employment and

retention of Fox Rothschild LLP to act as counsel to the Trustee.  Since that date, Fox Rothschild

LLP has been authorized to act as counsel for the Trustee.

7.      World Health (hereafter sometimes referred to as "the company"), was a provider

of healthcare staffing services to hospitals and other healthcare facilities.  The company is a

Florida corporation with its principal place of business at 777 Penn Center Boulevard, Suite 111,

Pittsburgh, Pennsylvania 15235.  The company provided primarily nurse staffing, which includes

Medical Staffing of New England, Inc. and MedTech Franchising, Inc.

2

registered nurses, licensed practical nurses, and certified nurses' aides, allied health staffing and

physician staffing. It also provided support services staffing and information technology staffing

for clients in the healthcare industry and other industries. World Health's clients included acute

care hospitals, including community hospitals, teaching institutions and trauma centers, private

physicians' practices, surgical and ambulatory care centers, nursing homes, pharmacies, medical

clinics, and insurance companies located in or near metropolitan areas.

8.    Defendant Richard E. McDonald ("McDonald") is a resident of the

Commonwealth of Pennsylvania. He served as President, Chairman of the Board of Directors,

Principal Financial Officer and Principal Accounting Officer of World Health from its inception

as a public company on February 20, 2003, until June 23, 2004, at which time he became Chief

Executive Officer. When World Health hired a Chief Financial Officer in mid-2005, McDonald

remained Chief Executive Officer and Chairman until his abrupt resignation on August 16, 2005.

9.    McDonald was World Health's second largest shareholder, claiming ownership of

6,194,000 shares, or 22.5% of all common stock, as of April 27, 2004.

10.    Defendant Marc D. Roup ("Roup") is a resident of the Commonwealth of

Pennsylvania. He was World Health's Chief Executive Officer until his resignation on June 23,

2004.

11.    Defendant John C. Sercu ("Sercu") is a resident of the Commonwealth of

Pennsylvania. Sercu served as World Health's Chief Operating Officer from May 2004 until

August 15, 2005, when he became acting Chief Executive Officer after McDonald's resignation.

On September 23, 2005, he resumed his duties as Chief Operating Officer. World Health issued

to Sercu 500,000 shares of World Health restricted common stock as part of his employment

3

agreement, with an additional 500,000 shares contingently issuable upon the achievement of certain performance goals.

12.     Defendant Bruce Hayden ("Hayden") is a resident of the Commonwealth of Virginia. He served as World Health's Chief Financial Officer from July 18, 2005 through August 24, 2005.

13.     Defendant Frederick R. Jackson, Sr. ("Jackson") is a resident of the Commonwealth of Pennsylvania. He served as a member of World Health's Board of Directors throughout the relevant period.

14.     Defendant John W. Higbee ("Higbee") is a resident of the Commonwealth of Pennsylvania. He served as a member of World Health's Board of Directors throughout the relevant period. Higbee served as chair of the Audit Committee.

15.     Defendant Brian T. Licastro ("Licastro"), upon information and belief, is a resident of the Commonwealth of Pennsylvania. He served as World Health's Vice President of Operations.

16.     Defendant Mark B. Rinder ("Rinder"), upon information and belief, is a resident of the State of Georgia. Rinder served as a financial consulting advisor to World Health.

17.     Defendants McDonald, Roup, Sercu, Jackson, Higbee, Licastro and Rinder are hereafter referred to as the "Individual Defendants."

18.     Nominal defendant Berger & Montague, P.C. is a law firm with its principal office in Philadelphia, Pennsylvania, which serves as the escrow agent for a settlement fund related to class actions filed against parties in the above-captioned litigation. The settlement fund is comprised of monies that should be property of the estate.

## PENDING CLASS ACTION

4

19.    Now pending in the United States District Court for the Western District of Pennsylvania is a class action styled:  In Re:  World Health Alternatives, Inc. Securities Litigation, Case No.:  02-05CV1194.  A settlement of that class action is pending.  The deadline for filing objections to the fairness of the settlement is May 21, 2007 and the hearing on the fairness of the settlement will be held on June 11, 2007 before The Honorable Terrence F. McVerry.  The settlement is based on a consolidated class action complaint filed in April 2006 and initial class action complaints filed in August 2005.

20.    Upon information and belief, Berger & Montague, lead counsel for the plaintiffs in the referenced class action, will oversee the distribution of the proceeds if that class action settlement is approved by the court.  The Trustee seeks to prevent the proceeds of that settlement from being spent at this time.

21.    The amount of the proposed settlement is approximately $2.7 million.

## BACKGROUND

22.    World Health was initially incorporated for the purpose of selling nutritional and similar products on the internet.  On February 20, 2003, World Health acquired 100% of the common stock of Better Solutions, Inc. ("Better Solutions"), a healthcare staffing company, from its founders and co-owners, McDonald and Roup.  In exchange, World Health provided McDonald and Roup with 33,000,000 shares of newly issued World Health common stock.  As a result, Better Solutions became a wholly owned subsidiary of World Health, and McDonald and Roup became the controlling shareholders of World Health, owning approximately 82% of its outstanding shares.  From the date of this transaction, the primary business of World Health was the Better Solutions healthcare staffing business.

5

23.     As of March 31, 2003 World Health had assets totaling $245,727 and negative shareholders equity of $91,762.  Sales for the three months ended March 31, 2003 and totaled $942,887, and World Health reported a net loss of $395,016, or $0.01 per share.

24.     On June 26, 2003 shares of World Health stock began to be traded on the OTC Bulletin Board, a national securities exchange system.

25.     The fast growth of World Health was the result of the following acquisitions:

- Superior Staffing Solutions, Inc., of Pittsburgh, acquired on December 22, 2003 for $4 million cash, 305,343 shares of common stock, and an assumption of $392,000 debt;

- Pulse Healthcare Staffing, Inc., of Citrus Heights, California, acquired on April 30, 2004, for $13.3 million cash, and 100,000 shares of common stock;

- Care For Them Inc., of Massachusetts acquired on May 7, 2004 for $242,000 and additional contingent payments;

- Curley and Associates, LLC, acquired June 1, 2004 for $1.5 million cash, 662,025 shares of common stock, and additional contingent payments;

- Travel Nurse Solutions, Inc., of Alabama and Ohio, acquired October 14, 2004 for $6.3 million cash and 747,950 shares of common stock, with additional contingent payments to be made in stock;

- J&C Nationwide Inc., of Atlanta, assets acquired on November 15, 2004 for 875,000 shares of restricted stock and the assumption of $22 million in notes payable

6

- Parker Services, Inc., of Seattle for $4 million cash at closing, 182,481 shares of restricted common stock, and assumption of $260,000 debt and $4 million in the form of a promissory note payable over two years.

26.     World Health did not have a full-time Chief Financial Officer until the middle of 2005. McDonald served as both Chief Executive Officer and Principal Financial Officer until Hayden was hired effective on July 18, 2005.

27.     World Health also had a small Board of Directors containing only three members: McDonald, Higbee, and Jackson. It did not hold an annual meeting in 2003 or 2004, and thus, none of the Directors had been elected by public shareholders. McDonald had become a Director prior to World Health becoming public, and he appointed Higbee and Jackson in early 2004.

28.     As of April 27, 2004, McDonald was World Health's second largest shareholder, claiming ownership of 6,194,000 shares, or 22.5% of all common stock.

## INDIVIDUAL DEFENDANTS' WRONGFUL COURSE OF CONDUCT

29.     In several documents filed with the Securities Exchange Commission (the "SEC"), including the 2003 Annual Report, McDonald described his education background as follows:

> Mr. McDonald received the following degrees in Business
> Administration: (a) In April 1996, a Bachelor of Science Degree
> from the University of Pittsburgh; (b) in May 2000, a Master's
> Degree from Bridgewater University located in London, England;
> and (c) in May 2001, a Doctoral Degree from Bridgewater
> University.

30.     However, these representations were false. On July 15, 2004, McDonald signed and filed a Form 8-K with the SEC stating:

7

it was confirmed that Mr. McDonald did attend the University of Pittsburgh but the records available at the time could not confirm that he graduated with a B.S. degree.

31.    The Form 8-K stated that all educational credentials should be deemed removed from McDonald's biography.  McDonald had not graduated from the University of Pittsburgh, and Bridgewater University is an unaccredited school that offers degrees over the internet for very little work.

32.    From the third quarter of 2003 to June of 2004, McDonald signed and filed two certifications as Chief Executive Officer with each Form 10-QSB and 10-KSB filed with the SEC pursuant to Sections 302 and 906 of the Sarbanes Oxley Act of 2002.  Roup also signed and filed two certifications as Chief Financial Officer with each Form 10-QSB and 10-KSB filed with the SEC from the third quarter of 2003 until his resignation in June of 2004.  The certifications stated in pertinent part:

1.    I have reviewed this quarterly report on Form 10-QSB of World Health Alternatives, Inc;

2.    Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.    Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report.

4.    I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d -14) for World Health Alternatives, Inc. and have:

PHI 931629v9 05/18/07

    (i)      Designed such disclosure controls and procedures to ensure that material information relating to World Health Alternatives, Inc. is made known to me by others within the Company, particularly during the period in which the periodic reports are being prepared;

    (ii)     Evaluated the effectiveness of World Health Alternatives, Inc.'s disclosure controls and procedures as of a date within 90 days prior to the filing date of this report ("Evaluation Date"); and

    (iii)    Presented in the report their conclusions about the effectiveness of the disclosure controls and procedures based on their evaluation as of the Evaluation Date;

5.    I have disclosed, based upon their most recent evaluation, to World Health Alternatives, Inc.'s auditors and the audit committee of the Company's Board of Directors:

    (i)      All significant deficiencies in the design or operation of internal controls which could adversely affect World Health Alternatives, Inc.'s ability to record, process, summarize and report financial data and have identified for World Health Alternatives, Inc.'s auditors any material weaknesses in internal controls, and

    (ii)     Any fraud, whether or not material, that involves management or other employees who have a significant role in World Health Alternatives, Inc.'s internal controls, and

6.    I have indicated in this quarterly report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of their most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

and:

In connection with the Quarterly Report of World Health Alternatives, Inc. (the "Company") on Form 10-QSB for the period ending March 31, 2004 as filed with the

9

Securities and Exchange Commission on the date hereof (the "Report"), I certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

(1)     The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

33.     After Roup's resignation, McDonald signed all certifications as Chief Executive Officer and Principal Financial Officer. The consolidation of authority in one individual rendered meaningless the statutory requirement that both the Chief Executive Officer and the Principal Financial Officer provide certifications. 15 U.S.C. § 78j-1; 18 U.S.C. § 1350(a).

34.     Because World Health lacked adequate internal controls and was, therefore, unable to ascertain its true financial condition, these certifications were false and misleading.

35.     On August 16, 2004, World Health issued a press release announcing its results for the second quarter of 2004. In addition to reporting the financial results, the release stated, without explanation, that World Health's current liabilities included a $1.518 million "related party loan."

36.     The press release failed to state that the "related party loan" was purportedly made by McDonald.

37.     On August 23, 2004, World Health filed Form 10-QSB with the SEC reiterating the results stated in the August 16, 2004 press release and containing certifications pursuant to sections 302 and 906 of the Sarbanes Oxley Act of 2002 signed by McDonald. The Form 10-QSB lists a "related party loan" as a $1,518,571 liability, but does not list that loan as having been provided by McDonald.

10

38.     The Form 10-QSB for the third quarter of 2004 increased the amount of the purported "related party loan" to $3,644,307, again without explanation.

39.     On March 29, 2005, World Health issued a press release announcing the financial results for year-end 2004. The release included a listing for the related party loan in a lower amount of $3.01 million in World Health's current liabilities. The press release failed to identify McDonald as the purported lendor of the "related party loan."

40.     On April 15, 2005, World Health filed Form 10-KSB, the 2004 Annual Report. The filing included the same decreased "related party loan" in the amount of $3,010,420 as the press release.

41.     In World Health's Annual Report for 2004, the amount of the "related party loan" was reduced from $3,644,307 to $3,010,420. The apparent reduction from the third quarter was a result of World Health beginning to "repay" the purported loan. McDonald caused World Health to transfer corporate funds to himself. Note 11 of the financial statements reads:

> At December 31, 2004, there is a $3,010,420 loan from the Company's President and Chief Executive Officer, Richard McDonald. The loan is of a demand nature without any interest rate.

42.     In the first quarter of 2005, the financial statement listed a "related party loan" liability of only $1,089,949. McDonald again caused World Health to transfer corporate funds to himself when, as alleged *infra*, Defendants misstated the amount of the debenture and warrant agreement associated with the company's preferred stock, Defendants failed to disclose tax liabilities in excess of $4 million, and Defendants made intentional misstatements to the company's lenders which caused them to over-fund the company's lending arrangements by

11

approximately $6.5 million.  Under these circumstances, these transfers to McDonald represent

improper transfers of corporate money to McDonald.

43.    The transfers to McDonald were also made at a time when World Health was

accruing unpaid tax liabilities as evidenced by the fact that at the time of World Health's

bankruptcy in February of 2006, it declared a tax liability including penalties of $6,946,888.

44.    In addition, Defendants released false information regarding the financial viability

of World Health to the public in general and, therefore, to World Health creditors.

45.    On March 29, 2005, Defendants issued a press release announcing World Heath's

results for the fourth quarter and year-end 2004.  For the fourth quarter, World Health reported

sales of $22,553,603, an increase of 2244% over sales reported for fourth quarter of 2003.

World Health attributed the growth to acquisitions and organic growth.  Defendants reported that

World Health experienced gross profit for the fourth quarter of $3,928,592, an increase of 802%

compared to the fourth quarter of 2003.  For the year, World Health reported sales of

$40,339,739, compared to sales of $3,693,337 for 2003.  Gross profit for the year was

$10,242,997, compared to $1,599,794 in 2003.  Total assets as of December 31, 2004 were

reported as $100,697,761, compared to $5,301,358 in 2003.  Shareholders' equity increased to

$36,018,763 compared to $2,184,551 in 2003.  McDonald stated:

> The Company achieved critical mass in the fourth quarter,
> substantially through strategic acquisitions and strong organic
> growth. We now offer all of the product lines that are integral to
> staffing the healthcare industry, making us a 'one-stop' staffing
> solution for an entire healthcare system. We have established a
> national reach and expect the benefits to include additional client
> contracts, a deeper talent pool of consultants and stronger financial
> performance. We have also reduced our overall debt and improved
> our financial and operating position.
> . . .
> The first quarter of 2005 has also yielded excellent results so far
> and put us on schedule to meet our goals for the year. We expect

PH1 931629v9 05/18/07

our first quarter earnings to be $.08 to $.10 per share on revenues of $39 million to $42 million. Overall, we believe we are well-positioned to meet the increasing demand for healthcare staffing services that the Company has been experiencing and we reiterate our guidance for 2005 of $200 million in revenues and $.50 to $.55 in net earnings.

. . .

The Company expects to report a corresponding non-cash, beneficial increase in earnings in the first quarter of 2005 as a result of having incurred in the fourth quarter of 2004 certain non-cash expenses associated with preferred stock transactions recognized in the fourth quarter.

. . .

By incurring certain non-cash expenses in 2004, we have, in our estimation, positioned the Company for a profitable 2005. The financing we completed with CapitalSource Finance LLC in February 2005 to refinance existing indebtedness should provide us with the working capital and flexibility needed for us to grow our revenues to over half a billion dollars within the next two years through organic growth and acquisitions.

Defendant Sercu added:

> We are on track and continue to execute our plan to become the premier healthcare staffing company in the market. We have exceeded our organic growth expectations and continue to experience the benefits of our integration efforts. Our key performance metrics are increasing and all divisions are seeing the results of efforts to improve profitability.

46.     McDonald and Sercu's statements were false and misleading when made because World Health lacked adequate internal controls and was, therefore, unable to ascertain its true financial condition. World Health could not properly ascertain its debt or its tax liabilities.

47.     On April 15, 2005, World Health filed Form 10-KSB, the 2004 Annual Report, with the SEC that reiterated the results of the March 29, 2005 press release.

48.     The 2004 Annual Report contained certifications pursuant to sections 302 and 906 of the Sarbanes Oxley Act of 2002 signed by McDonald. These Certifications were identical to

the ones presented above and were false and misleading because World Health lacked adequate internal controls and was, therefore, unable to ascertain its true financial condition.

49. On May 12, 2005, World Health issued a press release announcing its financial results for the first quarter of 2005. World Health reported revenues of $40,477,810, compared to revenues of $1,680,745 reported for the first quarter of 2004. It reported gross profit of $11,498,570 versus gross profit of $665,452 for the first quarter of 2004. Earnings per share were reported to be $0.08 per fully diluted share, versus a loss of $0.01 per fully diluted share for the first quarter of 2004. World Health reported total assets as of March 31, 2005 of $112,836,140 compared to assets of $100,592,422 as of December 31, 2004 and $4,984,794 as of March 31, 2004. Shareholders' equity was reported as $50,381,614 compared to $37,402,921 as of December 31, 2004 and $3,595,343 as of March 31, 2004.

50. On the very next day, May 13, 2005, World Health issued a press release announcing it was changing the financial results released for the fourth quarter and 2004 fiscal year after determining that "large, non-cash expenses in connection with a preferred stock transaction that occurred in December 2004" were improperly recorded. The press release quotes McDonald as stating:

> We recorded the non-cash expenses in the fourth quarter of 2004 because we wanted to utilize a conservative reporting approach until we could consult with the Office of the Chief Accountant [of the SEC] and confirm that our position that the preferred stock conversion and redemption features did not create a need for any derivative accounting was correct. Additionally, the Company determined that the warrants associated with the transaction were a liability and therefore the $3,003,591 fair value of the warrants was recorded as a liability. The Company believed it was important to pursue this matter to increase the transparency of its financial reporting and better enable the market to evaluate the Company's financial results in 2004 and in the future. This positive restatement completes the Company's review of this matter as referenced in our 10-KSB for 2004.

14

The press release stated further that World Health was filing a Form 10-KSB/A later that day

setting forth revised financial statements that would exclude the large, non-cash expenses

relating to the preferred stock transaction. According to World Health's press release, "[a]s a

result, the Company's earnings for the quarter and fiscal year ended December 31, 2004

increased to 14 cents." A comparison of the Form 10-KSB/A filed on or about May 18, 2005,

with the March 29, 2005 press release announcing World Health's results for the fourth quarter

and year ended December 31, 2004 shows the opposite. The restatement merely reduced World

Health's reported loss by 14 cents per share, from $0.81 per share, as reported on March 29,

2005, to $0.67 per share, as reported on or about May 18, 2005.

  51.  On May 16, 2005, World Health filed Form 10-QSB with the SEC for the period

ended March 31, 2005. The report noted that:

> Effective December 15, 2004, the Company closed on a financing
> transaction with a group of private investors ("Investors") of up to
> $11,825,000. The financing consisted of two components: (a)
> 12,823 shares of Series A Convertible Preferred Stock with a
> principal amount of $12,823,000 at a dividend rate of 8% per
> annum and (b) Warrants registered in the name of each Investor to
> purchase up to a number of shares of common stock of the
> Company equal to 25% of such Investor's Subscription Amount
> divided by the subscription amount of $3.00 per share. The
> Investors have the right to purchase an aggregate of 1,068,583
> shires of the Company's restricted common stock. The Warrants
> have an exercise price equal to the closing price of the Company's
> common stock on the day prior to the closing ($3.86). The
> Warrant, which expires five years from the date of issuance, results
> in proceeds of $4,124,730 to the Company upon its exercise. The
> dividends are cumulative until December 31, 2006, and will be
> paid from an escrow established at closing if the Investors elect to
> be paid in cash. Under certain circumstances the Company may
> elect to pay the dividend in shares of the Company's common
> stock.
>
> The Preferred Stock is convertible into shares of Common Stock of
> the Company at a conversion price of $3.00 per share, which

15

would result in the issuance of 4,274,333 shares of the Company's common stock if all shares were converted.

52.     The preceding statements were false and misleading because Defendants were unable to correctly account for World Health's convertible debt and warrants associated with its preferred stock, and, was in breach of its existing financing documents.

53.     The Form 10-QSB for the period ended March 31, 2005 contained certifications pursuant to sections 302 and 906 of the Sarbanes Oxley Act of 2002 signed by defendant McDonald, which were identical to the ones presented above.  The certifications were false and misleading because Defendants had failed to implement adequate internal controls at World Health and were, therefore, unable to ascertain its true financial condition.

54.     On July 18, 2005, World Health announced the appointment of Hayden as the Chief Financial Officer.  Hayden was awarded 500,000 shares of stock and up to $100,000 in relocation expenses.  Hayden's compensation was $215,000 per year.

55.     On August 16, 2005, World Health revealed the first indications that it had discovered fraudulent, previously reported financial results.  On that date, World Health unexpectedly and abruptly announced that McDonald had resigned as President and Chief Executive Officer "for health and family reasons."  World Health appointed Sercu as acting Chief Executive Officer.  World Health also announced it had notified the SEC that the company would not file its 10-Q for the second quarter of 2005 on time.

56.     The statements referenced above were materially false and misleading because they failed to disclose the following material adverse facts that Defendants knew or should have known:

a.     Defendants engaged in improper accounting practices.  As detailed herein, Defendants admitted that World Health's prior financial reports were

16

materially false and misleading when it announced that it was going to restate the financial results for 2004 and 2005;

b.    there were discrepancies in the financial statement recognition of a convertible debenture and warrant agreement associated with World Health's preferred stock;

c.    there was underpayment of certain tax liabilities in excess of $4 million;

d.    irregular reports to World Health's lenders resulted in excess funding under World Health lending arrangements of approximately $6.5 million;

e.    World Health was in breach of existing financing documents;

f.    World Health lacked adequate internal controls and was therefore unable to ascertain its true financial condition; and

## The Disclosure

57.    The Company issued the following press release on August 19, 2005:

World Health Alternatives, Inc. Commences Investigation

World Health Alternatives, Inc. (OTC BB: World Health.OB) announced today that, following the recent departure of former Chief Executive Officer, Richard E. McDonald, the Company is investigating issues that include, but may not be limited to, apparent discrepancies in the amount of the debenture and warrant agreement associated with the Company's preferred stock, the underpayment of certain tax liabilities in excess of $4 million, and irregular reports to the Company's lenders that resulted in excess funding under the Company's lending arrangements of approximately $6.5 million, in addition to other issues which may constitute breaches of existing financing documents.

17

The Company has retained outside counsel, and the Board of
Directors has retained special counsel to conduct an investigation
into the discrepancies. The amounts at issue could change as the
investigation continues. Since the Company's stock is traded on
the OTC Bulletin Board, the Company does not have the authority
to suspend trading of its stock.

The Company has also terminated its engagement with Daszkal
Bolton LLP, its outside auditing firm, and will begin a search for a
new auditing firm. It is expected that the Company's prior
financial reports will be restated. The Company is actively working
with its investment banking and funding sources to raise capital to
meet its short-term cash obligations. John Sercu, the interim Chief
Executive Officer of the Company, stated, "It is very unfortunate
to have discovered that we have to deal with these issues, but
management and the Board are working diligently to resolve them.
The Company continues to make staffing placements of its medical
and other professionals on a daily basis with its clients, and we
look forward to continuing our business into the future."

58.     The financial statements issued and/or reviewed by Defendants on behalf of

World Health throughout the relevant period were materially false and misleading because,

among others, Defendants misstated the amount of the debenture and warrant agreement

associated with the company's preferred stock, Defendants failed to disclose tax liabilities in

excess of $4 million, and Defendants made intentional misstatements to the company's lenders

which caused them to over-fund the company's lending arrangements by approximately $6.5

million.

59.     World Health's statement that the company's reports to its lenders were

"irregular" is an admission that management intentionally falsified these reports.

60.     The circumstances of the "discovery" of the falsification of financial statements

and reports to its lenders following the abrupt "resignation" of McDonald strongly suggest

McDonald's complicity in falsifying financial statements.  McDonald's falsification of his

academic credentials in the Company's SEC filings, moreover, is further evidence of his intent to deceive the public and creditors of the estate.

61.    On August 24, 2005, the first of several class action lawsuits for violations of federal securities laws was filed in the Western District of Pennsylvania.

62.    In addition, a shareholder derivative action, filed on behalf of World Health, was also filed in the Western District of Pennsylvania asserting many of the same claims as in the class action lawsuits.

63.    The class action attorneys, the derivative action attorneys and the attorneys for many of the Individual Defendants entered into settlement negotiations.

64.    A consolidated class action complaint was filed in the Western District on April 21, 2006, which dropped the derivative claims that were brought on behalf of World Health.

65.    A settlement agreement has been entered into between the parties in the action pending in the Western District of Pennsylvania that purports to transfer insurance proceeds and other payments from Defendants to World Health shareholders, subject to approval by the U.S. District Court for the Western District of Pennsylvania - - and/or the Bankruptcy Court.

66.    The settlement is designed to avoid the fact that World Health is in bankruptcy and to transfer monies that should be part of the estate directly to World Health shareholders and their attorneys.

67.    On August 29, 2005, World Health filed a Form 8-K with the SEC announcing that the company had entered into an indemnification agreement (the "Indemnification Agreement") with each of the officers and directors of World Health, including Hayden and Sercu, named Defendants in the securities class actions.  The Indemnification Agreement also purported to have World Health indemnify Licastro, Higbee, Jackson and Rinder, against the

19

costs associated with shareholder fraud lawsuits, including attorney's fees and damages that they may otherwise have to pay.

68.    The announcement regarding the Indemnification Agreement came approximately 60 days before the revelation that World Health was undertaking an investigation of its accounting systems because of inadequate controls, examining past financial statements for possible restatement, and the need to withhold its financial statements for the third quarter of 2005 because of problems with the accounting systems.

69.    The Individual Defendants may attempt to rely on the Indemnification Agreement to state claims against the bankruptcy estate for costs and damages paid to settle the class action proceedings.

70.    Moreover, upon information and belief, no consideration was provided by the Individual Defendants in exchange for the Indemnification Agreement.

71.    The provision of the Indemnification Agreement to the Individual Defendants constitute a fraudulent conveyance to the Individual Defendants.

72.    Although the announcement was made on August 29, 2005, the Indemnification Agreement was dated August 21, 2005, one day prior to the filing of the first securities class action. The 8-K also announced that Hayden had resigned as Chief Financial Officer.

73.    On August 24, 2005, the Company filed a Form 8-K with the SEC announcing management discovered approximately $22 million in debt of which it was not previously aware. The 8-K stated:

> Current management of World Health Alternatives, Inc. (the "Company") recently became aware that the Company entered into a Securities Purchase Agreement dated as of May 17, 2005 (the "Purchase Agreement") with certain investors pursuant to which the Company issued (i) $22,037,828.93 principal amount of the Company's debentures, convertible into shares of common stock at

20

a $3.00 conversion price (subject to adjustment) per share, due on August 17, 2008 (the "May Debentures") and (ii) warrants (the "May Warrants") to purchase 4,205,693 shares of the Company's common stock with an exercise price of approximately $2.90 per share (subject to adjustment). Pursuant to the Purchase Agreement, the May Debentures were issued at a discount, and the aggregate principal amount issued represents 131.58% of the valuation of the consideration received. The consideration received by the Company for the issuance of the May Debentures and Warrants was $16,748,616, consisting of $1,969,866 paid in cash and $14,778,750 paid by the delivery and cancellation of Series A Convertible Preferred Stock held by the investors, which was valued at 125% of stated value pursuant to the Purchase Agreement. In connection with this transaction, the Company also entered into a Registration Rights Agreement dated May 17, 2005 with the investors under the Purchase Agreement. The Registration Rights Agreement, in part, provides certain registration rights to the investors, establishes payments to them based on a percentage of the subscription amount for the May Debentures and Warrants if certain registration obligations are unmet and contains customary cross-indemnification covenants between the Company and the investors. The Registration Rights Agreement provided that the Company was required to file a registration statement registering the resale of common stock issuable in respect of the May Debentures and Warrants within 45 days of May 17, 2005 and to use its best efforts to cause such registration statement to be declared effective within 90 days of May 17, 2005, subject to certain exceptions.

On August 18, 2005, the Company entered into a Bridge Loan Agreement pursuant to which Palisades Master Fund LP (the "Lender") has provided the Company with $4,000,000 in bridge financing, the proceeds of which have been used for working capital and to fund business operations (the "Bridge Loan"). In consideration for the Bridge Loan, the Company reduced the conversion price on the May Debentures issued to the Lender pursuant to the Purchase Agreement from $3.00 to $1.25 per share, subject to adjustment.

. . .

The Company is seeking to have the holders of the May Debentures and the Bridge Loan commit to exchange such securities in connection with a proposed new convertible preferred stock and warrant financing.  No assurance can be given that such exchange or new financing will be completed.

In addition, the Company is party to a number of agreements under which the Company is obligated to register the resale of privately

21

placed securities. Certain of these agreements provide for liquidated damages in the event that a registration statement is not declared effective by a specified date or does not remain effective, or if the associated prospectus is not kept current. The Company has not registered all of the securities covered by such agreements, and in view of the matters identified in Item 4.02 below, has issued notice to the selling stockholders under its Form SB-2 Registration Statement, File No. 333-119643 to suspend sales. As a result, the Company may be subject to liquidated damage claims. See Item 1.01 above. At this time the Company cannot estimate when sales under such Form SB-2 may resume or additional registration statements may be filed or what liquidated damage claims may be asserted.

As a result of the issues noted above and related uncertainties, the Board of Directors together with current executive officers of the Company determined on August 19, 2005 that the Company's previously issued financial statements for 2004 and 2005 should not be relied upon at this time. The Company intends to restate these financial statements based on the finding of its investigation and following review by a new independent accountant to be engaged by the Company. The Company is in the early stages of its internal investigation, and in the process of the investigation the Company may discover information that will raise other issues or cause the Company to conclude that financial statements for other prior periods may also need to be restated.

74.     On September 9, 2005, World Health announced that it had retained Alvarez & Marsal LLC, a global professional services firm specializing in turnaround management, to work with World Health's Board of Directors and management to evaluate the business plan and strategic capital structure of the company.

75.     On September 13, 2005, World Health filed a Form 8-K announcing it was aware of the SEC formal investigation involving the company.

76.     On September 23, 2005, World Health filed a Form 8-K announcing that Bristol Investment Fund, Ltd. notified World Health that it was in default of the terms of the Convertible Debentures and related warrants to purchase common stock issued in May of 2005 due to

22

breaches by World Health of the terms of the Debenture and Purchase Agreement. Bristol

notified World Health of a demand for payment of $6,288,373 plus interest and costs.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

77.    By reason of their positions as officers and/or directors of World Health, the

Individual Defendants owed the company and its shareholders the fiduciary obligations of good

faith, trust, loyalty, and due care.

78.    Each director and officer owed to the company and its shareholders the fiduciary

duty to exercise good faith and diligence in the administration of the affairs of the company.  In

addition, Defendants owed a duty to the company and its shareholders to implement adequate

internal controls and procedures and to assure that the financial condition and business prospects

of the company were reported truthfully and accurately.  Further, Defendants owed a duty to

ensure that the company complied with all applicable state and federal laws, and that the

company's financial statements were prepared and presented in accordance with GAAP.

79.    The Individual Defendants violated these duties and abdicated their oversight

responsibilities to World Health.  As a result, the company is a defendant in multiple securities

class action lawsuits and is bankrupt.  As a further result, the company is the subject of a SEC

investigation.

## COUNT I

### Against Individual Defendants
### Breach of Fiduciary Duty

80.    The Trustee incorporates by reference the allegations in paragraphs 1 through 79

of the complaint as though the same were set forth herein in full.

81.    The Individual Defendants owed World Health and its shareholders fiduciary

obligations to act in good faith,  with due care and in the best interests of the company.

23

82.    The Individual Defendants breached their fiduciary obligations in the following manners:

a.    They caused the company to misrepresent the financial condition and business prospects of the company and they failed to correct the company's publicly reported financial results and guidance.

b.    They failed to implement internal controls that would have prevented the wrongdoing alleged with particularity herein.

c.    They abused positions in the company for their own personal gain and to the detriment of the company.

d.    Directly, indirectly or through aiding and abetting, they failed to fulfill their fiduciary obligation to manage the company with the best interests of the company in mind.

e.    They committed corporate waste by paying excessive compensation to themselves and at the same time exposing the company to millions of dollars in liability and costs.

83.    As a direct and proximate result of the foregoing failure of Individual Defendants to perform their fiduciary obligations, World Health and its estate have sustained substantial damages for which the Individual Defendants are liable to World Health and/or its estate.

## COUNT II

### Against Individual Defendants
### Unjust Enrichment

84.     The Trustee incorporates by reference the allegations in paragraphs 1 through 83 of the complaint as though the same were set forth herein in full.

85.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of World Health.

86.     The Individual Defendants received, accepted and retained benefits from the company that it would be inequitable for them to retain without payment of value beyond that which they have paid.

87.     World Health seeks restitution from the Individual Defendants, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, from their wrongful conduct and breaches of fiduciary duties.

## COUNT III

### Against Individual Defendants
### Pursuant to 15 U.S.C. § 7243 (Sarbanes-Oxley Act)

88.     The Trustee incorporates by reference the allegations in paragraphs 1 through 87 of the complaint as though the same were set forth herein in full.

89.     Based upon the allegations made above, and pursuant to 15 U.S.C. § 7243, World Health is entitled to reimbursement of all bonuses and other incentive-based or equity-based compensation paid to the Individual Defendants, as well as any profits realized from the sale of World Health securities by them.

90.     At a time when World Health was experiencing a severe financial crisis and was insolvent, McDonald caused Debtors to pay to McDonald a payment of $250,000.00 and to "repay" an alleged "related party loan."

25

91.     The $250,000.00 payment was not made in accordance with any employment agreement between McDonald and World Health.

92.     Upon information and belief, while World Health was insolvent, the Individual Defendants caused payments to be made by World Health to the Individual Defendants that were not properly documented and for unknown reasons.

93.     At the time the payments described above were made to the Individual Defendants, the Individual Defendants were either officers, directors and/or members of the Compensation Committee of Debtors.

## COUNT IV

### Against McDonald
### Self Dealing/Breach Of Fiduciary Duty

94.     The Trustee incorporates by reference the allegations in paragraphs 1 through 93 of the complaint as though the same were set forth herein in full.

95.     At the time the payments described above were made to the individual defendants, the individual defendants were either officers, directors and/or members of the Compensation Committee.

96.     As an officer and director, McDonald owed a fiduciary duty to World Health to act with due care, good faith and in the best interests of the company with respect to the payment of salary and bonuses.

97.     McDonald breached his fiduciary duty by engaging in self-dealing in causing the Company to make excessive bonus payments, salary increases and "repayments" of an alleged "related party loan."

98.     As a result of the breach of fiduciary duty described above, Debtor incurred damages.

26

## COUNT V

### Against Individual Defendants
### Self Dealing/Breach Of Fiduciary Duty

99.    The Trustee incorporates by reference the allegations in paragraphs 1 through 98 of the complaint as though the same were set forth herein in full.

100.    As either officers and/or directors, the Individual Defendants owed fiduciary duties to the World Health to act with due care, loyalty and good faith in connection with the payment of salary and bonuses.

101.    The Individual Defendants breached their fiduciary duty by engaging in self-dealing in causing the Company to make excessive bonus payments, salary increases and "repayments" of an alleged "related party loan."

102.    As a result of the breach of fiduciary duties described above, World Health and/or its estate incurred damages.

## COUNT VI

### Against Individual Defendants
### Breach Of Fiduciary Duty By Directors Against Creditors

103.    The Trustee incorporates by reference the allegations in paragraphs 1 through 102 of the complaint as though the same were set forth herein in full.

104.    As either officers and/or directors, the Individual Defendants owed a fiduciary duty to the creditors of Debtor at a time when Debtor was either insolvent or "in the vicinity of insolvency."

105.    The Individual Defendants breached their fiduciary duty to the creditors by causing the Compensation Committee and/or Board to approve excessive bonus payments and salary increases at a time when World Health was either insolvent or "in the vicinity of insolvency."

27

106.   As a result of the breach of fiduciary duty described above, the creditors incurred

damages.

## COUNT VII

### Against Individual Defendants
### Fraudulent Transfer Under 11 U.S.C. §§ 548 and 550

107.   The Trustee incorporates by reference the allegations in paragraphs 1 through 106

of the complaint as though the same were set forth herein in full.

108.   Within one year of the Petition Date, World Health transferred to or for the

benefit of McDonald a total of at least $250,000.00 for unknown reasons.

109.   Further, within one year of the Petition Date, the remaining Individual Defendants

transferred to themselves items of value from World Health such as the Indemnification

Agreement, which named Licastro, Hayden, Sercu, Higbee, Jackson and Rinder as indemnitees.

110.   World Health received less than reasonably equivalent value in exchange for

World Health's transfers to McDonald as described above and for the Indemnification

Agreement.

111.   World Health was insolvent on the date the transfers were made to McDonald and

the other Individual Defendants or became insolvent as a result of the transfers.

112.   The Trustee is entitled to avoid the transfers made to McDonald pursuant to 11

U.S.C. § 548 and to recover the amount of the transfers to McDonald pursuant to 11 U.S.C. §

550.

## COUNT VIII

### Against Individual Defendants
### Fraudulent Transfer Under Pennsylvania Uniform Fraudulent Transfer Act, Section 5104

113.   The Trustee incorporates by reference the allegations in paragraphs 1 through 112

of the complaint as though the same were set forth herein in full.

114.    The transfers described above from World Health to the Individual Defendants were made with the actual intent to hinder, delay or defraud creditors of the debtor; or without World Health receiving a reasonably equivalent value in exchange for the transfer or obligation.

115.    World Health was engaged or was about to engage in a business or a transaction for which the remaining assets of the World Health were unreasonably small in relation to the business or transaction; or World Health intended to incur, or believed or reasonably should have believed that the World Health would incur, debts beyond the World Health's ability to pay as they became due.

116.    The Individual Defendants were insiders of World Health.

117.    World Health was insolvent or became insolvent shortly after the transfer was made.

118.    Section 544(b) of the Code provides that "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or is not allowable only under section 502(e) of this title."

119.    Pursuant to the Pennsylvania Uniform Fraudulent Transfer Act, the payments to McDonald and the provision of the Indemnification Agreement as set forth above are void.

## COUNT IX

### Against Individual Defendants
### Fraudulent Transfer Under Pennsylvania Uniform Fraudulent Transfer Act, Section 5105

120.    The Trustee incorporates by reference the allegations in paragraphs 1 through 119 of the complaint as though the same were set forth herein in full.

121.    The transfers described above from World Health to the Individual Defendants were fraudulent as to creditors because World Health made the transfer without receiving a

29

reasonable equivalent value in exchange for the transfer and World Health was insolvent at the time of the transfers or World Health became insolvent as a result of the transfer.

122.    Pursuant to the Pennsylvania Uniform Fraudulent Transfer Act, Section 5105, the payments to McDonald and the provision of the Indemnification Agreement as set forth above are void.

## COUNT X

**Against McDonald
Turnover of Property of Estate**

123.    The Trustee incorporates by reference the allegations in paragraphs 1 through 122 of the complaint as though the same were set forth herein in full.

124.    Section 541 of the Bankruptcy Code defines property of the estate as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Section 542 of the Bankruptcy Code gives a trustee the power to seek turnover of all property of the debtor's estate. 11 U.S.C. § 542. Section 542 states, in pertinent part, that:

> an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of the title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C. § 542(a).

125.    This section requires that any property of a debtor's estate held by any entity must be turned over to the trustee. In re Allegheny Label, Inc., 128 B.R. 947, 954 (Bankr. W.D. Pa. 1991); In re Express America, Inc., 130 B.R. 196, 198 (W.D. Pa. 1991), Staats v. Meade (In re Meade), 84 B.R. 106, 108 (Bankr. S.D. Ohio 1988) (characterizing funds held in bank account for benefit of another as property of the estate recoverable under section 542).

30

126.    To obtain turnover under section 542, the Trustee must establish the following elements: "(1) that the property which the [T]rustee seeks to recover is property of the estate; and (2) that the [T]rustee is entitled under Section 363 to use, sell, or lease the property." In re Allegheny Label, Inc., 128 B.R. at 954 (citing In re Weiss-Wolf, Inc., 60 B.R. 969, 975 (Bankr.S.D.N.Y. 1986)); In re Express America, Inc., 130 B.R. at 198.

127.    The Trustee has standing to assert a claim under section 542.

128.    The Trustee submits that at least $250,000.00 currently in McDonald's possession constitutes property of the estate within the meaning of Bankruptcy Code section 541.


## COUNT XI

### Against nominal defendant Berger & Montague, P.C.
### Turnover of Property of Estate

129.    The Trustee incorporates by reference the allegations in paragraphs 1 through 128 of the complaint as though the same were set forth herein in full.

130.    Berger & Montague is the designated escrow agent that is expected to receive and/or control certain funds ("Escrow Fund") paid by the Individual Defendants and two separate insurance companies to settle claims asserted by World Health's shareholders in a class action lawsuit filed in the United States District Court for the Western District of Pennsylvania.

131.    The Escrow Fund exhausts the insurance coverage available to cover the misdeeds of the defendants named in this complaint.

132.    If the Escrow Fund is disbursed to purported shareholders of World Health, such funds will not be available to the World Health estate for distribution as set forth in the Code.

31

133.    The estate will be irreparably harmed if the Escrow Fund is distributed by the Escrow Agent.

134.    The Trustee submits that the funds held by Berger & Montague as Escrow Agent constitute property of the estate within the meaning of Bankruptcy Code, section 541.

135.    Moreover, the Trustee is entitled to a permanent injunction barring Berger & Montague from disbursing the Escrow Fund without approval from this Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a.      Against the Individual Defendants and in favor of the estate of World Health for the amount of damages sustained by the company because of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, including attorney fees, accounting fees, investigation expenses and other costs and expenses incurred in connection with the company's restatement, the SEC investigation and the securities class action lawsuits;

b.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the Escrow Fund controlled by nominal defendant Berger & Montague, P.C. so as to ensure that the estate may properly distribute the assets of the estate pursuant to the Code;

PHI 931629v9 05/18/07

c.      Extraordinary equitable and/or injunctive relief as permitted by law, equity

and state statutory provisions sued hereunder, including attaching,

impounding, imposing a constructive trust on or otherwise restricting the

proceeds of the Individual Defendants' trading activities or their other

assets so as to ensure that Plaintiffs have an effective remedy;

d.      Awarding to World Health restitution from the Individual Defendants, and

ordering disgorgement of all profits, benefits and other compensation

obtained by these Individual Defendants;

e.      Awarding to World Health costs and disbursements of the action,

including reasonable attorneys' fees, accountants' and experts' fees, costs,

and expenses; and

f.      Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury.

Respectfully submitted,

FOX ROTHSCHILD LLP

By:   /s/ Francis G.X. Pileggi
        Francis G.X. Pileggi, Esquire (#2624)
        Daniel K. Astin, Esquire (#4068)
        Sheldon K. Rennie, Esquire (#3772)
        Seth Niederman, Esquire (#4588)
        919 N. Market Street, Suite 1300
        Wilmington, DE  19801
        (302) 655-3667

        and

33

Edward J. DiDonato, Esquire
Samuel H. Israel, Esquire
William H. Stassen, Esquire
FOX ROTHSCHILD LLP
2000 Market Street, Tenth Floor
Philadelphia, PA  19103
*Attorneys for Trustee*

Dated:  May 21, 2007

PH1 931629v9 05/18/07